UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Kevin Brown, et al.

     v.                     Civil No. 16-cv-242-JL
                                   Opinion No. 2017 DNH 246

Saint-Gobain Performance
Plastics Corp., et al.


**MEMORANDUM ORDER**


Resolution of the defendants' motions to dismiss this environmental trespass action turns on whether the plaintiffs have pleaded injuries recognized by New Hampshire law. Plaintiffs in this consolidated, putative class action allege that defendant Saint-Gobain Performance Plastics Corporation's Merrimack, New Hampshire plant released chemicals that contaminated the local groundwater.[1] They seek to recover against Saint-Gobain and the facility's general manager, Gwenael Busnel, for damages to plaintiffs' property, including

---

[1] The plaintiffs filed a series of actions against Saint-Gobain and the plant's general manager arising from the chemical contamination. Specifically, one set of plaintiffs filed two proposed class actions in Hillsborough Superior Court against Saint-Gobain and Gwenael Busnel, which defendants removed to this court. A second set of plaintiffs filed a proposed class action in this court against Saint-Gobain alone. A third set of plaintiffs filed an individual action against Saint-Gobain in this court. The court consolidated these cases for all purposes, see Order of Consolidation (doc. no. 48), and appointed interim lead class counsel, see Order of May 11, 2017 (doc. no. 76).

diminished property value, and accrual of costs associated with monitoring for potential injuries caused by ingesting the chemicals at issue.

The court has subject-matter jurisdiction over this action under the Class Action Fairness Act. 28 U.S.C. § 1332(d)(2)(A). The defendants move to dismiss the complaint in its entirety. They contend that the plaintiffs have not pleaded any present, physical injury to their property or their persons, and that the economic loss doctrine precludes their recovery in tort for purely economic damages. They further argue that plaintiffs have failed to plead intentional trespass and that New Hampshire law does not recognize their claims for negligent failure to warn and unjust enrichment.

The court denies the majority of the defendants' motion. At this stage of the litigation, the property-owning plaintiffs have pleaded facts, including present, physical damage to their property and contamination of groundwater, sufficient to maintain their claims for trespass, nuisance, and negligence. The defendants' motion to dismiss the medical-monitoring plaintiffs' claims is likewise denied at this juncture. Because New Hampshire has not recognized negative unjust enrichment -- that is, unjust enrichment through a defendant's failure to incur costs rather than through receipt of a benefit -- as a

cause of action, however, the court dismisses the plaintiffs'
unjust enrichment claim.

## I.  <u>Applicable legal standard</u>

A plaintiff's complaint must include "factual content that
allows the court to draw the reasonable inference that the
defendant is liable for the misconduct alleged." Martinez v.
Petrenko, 792 F.3d 173, 179 (1st Cir. 2015) (quoting Ashcroft v.
Iqbal, 556 U.S. 662, 678 (2009)).  This standard "demands that a
party do more than suggest in conclusory terms the existence of
questions of fact about the elements of a claim." A.G. ex rel.
Maddox v. Elsevier, Inc., 732 F.3d 77, 81 (1st Cir. 2013).  In
ruling on such a motion, the court accepts as true all well-
pleaded facts set forth in the complaint and draws all
reasonable inferences in the plaintiff's favor.  <u>See,</u> <u>e.g.,</u>
Martino v. Forward Air, Inc., 609 F.3d 1, 2 (1st Cir. 2010).
With the facts construed in this manner, "questions of law [are]
ripe for resolution at the pleadings stage." Simmons v. Galvin,
575 F.3d 24, 30 (1st Cir. 2009).

## II.  <u>Background</u>

This proposed class action arises out of the release of
toxic chemicals from Saint-Gobain's manufacturing plant in
Merrimack, New Hampshire.  Saint-Gobain has owned and operated a

plant in Merrimack since 2000.[2]  Defendant Busnel has served as

general manager of the plant since 2012.[3]  At that location,

Saint-Gobain used ammonium perflurooctonoate (AFPO), a

derivative of perfluorooctanoic acid (PFOA)[4] in, for example, a

process that coated woven fiberglass and other fabric with

material.[5]

In early 2016, Saint-Gobain reported the presence of

elevated levels of PFOA in the municipal water supplied by the

Merrimack Village District Water Works.[6]  Following this report,

the New Hampshire Department of Environmental Services

discovered the presence of PFOA in residential wells in the

vicinity of Saint-Gobain's plant and recommended that certain

residents of surrounding cities and towns not drink or cook with

---

[2] Plaintiffs allege that the plant was previously operated by
ChemFab Corporation, which Saint-Gobain acquired in 2000.
Compl. (doc. no. 80) ¶ 12.

[3] Id. ¶ 9.

[4] PFOA and AFPO are members of a family of per- and
polyfluoroalkyl substances (PFAS).  In their complaint, the
plaintiffs use the terms PFAS and PFOA interchangeably to refer
to both chemicals collectively.  See id. ¶ 13.  The court refers
to them collectively as PFOA, except where quoting the
plaintiffs' complaint.

[5] Id. ¶¶ 13-14.

[6] Id. ¶ 37.

water from those wells, or consume vegetables from gardens where PFOA-contaminated water was used.[7]

The plaintiffs allege that Saint-Gobain released PFOA into the air, soil, and water in the vicinity of its Merrimack facility.[8]  Because PFOA is water-soluble, it "can migrate readily from soil to groundwater" and, because it is biologically and chemically stable, it can "remain present in the environment long after [it is] released."[9]  The United States Environmental Protection Agency associates exposure to PFOA with increased risk for certain types of cancer, as well as other illnesses and conditions.[10]

Plaintiffs further allege that Saint-Gobain was aware of the potential for PFOA contamination arising from its manufacturing processes in light of contamination of the public drinking water supply near its Hoosick, New York plant, which it reported to the United States Environmental Protection Agency in 2014.[11]  Plaintiffs also allege that Saint-Gobain removed its operations from a plant in North Bennington, Vermont, to the

---

[7] Id. ¶¶ 42-44.

[8] Id. ¶¶ 13-15.

[9] Id. ¶ 13.

[10] Id. ¶ 46-47.

[11] Id. ¶¶ 17-20.

Merrimack facility after Vermont imposed tighter environmental protection regulations to reduce emissions of PFOA.[12]  Despite this knowledge, plaintiffs allege, Saint-Gobain failed to install systems to limit PFOA emissions from its Merrimack facility.[13]

The plaintiffs allege that PFOA has contaminated the soil and water obtained through private wells within a certain geographic area,[14] as well as water in Merrimack and Bedford, New Hampshire, provided through the Merrimack Village District Water Works.[15]  For all of those who own residential property within these geographic areas, the plaintiffs seek damages for injury to their property, including (1) diminished market value,

---

[12] Id. ¶¶ 21-26.

[13] Id. ¶¶ 27-29.

[14] For purposes of defining the property-owner classes, the plaintiffs define this area as comprising:

> In Bedford and Merrimack, the geographic area west of the Merrimack River within three (3.0) miles of the property boundary of the Saint-Gobain Site; in Litchfield, the geographic area bounded by the Merrimack River on the west, Cummings Drive on the South, extended east to the Merrimack River and west to the Londonderry Town line, and the Londonderry Town Line on the East and the City of Manchester on the North and East, and the geographic area in Manchester bounded by Raymond Wieczorek Drive on the North.

Id. ¶ 60.

[15] Id. ¶¶ 37, 43.

(2) costs incurred to remediate and mitigate the contamination, and (3) loss of use and enjoyment of their property.[16]

For all of those who resided in these geographical areas and consumed water containing defined levels of PFOA for at least one year, or were born to mothers who consumed such water, the plaintiffs seek to recover the costs of monitoring for injuries related to exposure to PFOA in light of their "significant increased risk of illness, disease or disease process . . . ."[17]  The DeBlois plaintiffs, who have opted out of these classes, seek the same remedies, as well as recovery for "additional losses including, but not limited to, business losses, attorney fees for protecting their property rights in placing the water line, future water expenses and out-of-pocket expenses."[18]

## III. <u>Analysis</u>

Plaintiffs bring claims under four common-law torts: trespass, nuisance, negligence, and negligent failure to warn. They also seek to recover under the equitable doctrine of unjust enrichment.  The defendants move to dismiss plaintiffs' negligence, nuisance, and trespass claims, arguing that the

---

[16] Id. ¶ 54.

[17] Id. ¶ 55.

[18] Id. ¶ 56.

plaintiffs claiming property damage have not alleged any
tangible damage to their property, but seek only economic
damages foreclosed in tort by the economic loss doctrine or to
recover for groundwater contamination, for which they have no
private cause of action.  Defendants further argue that the
plaintiffs seeking medical monitoring have not alleged any
present physical injury.  Finally, they argue that the
plaintiffs have failed to plead all the elements of trespass,
and that plaintiffs, even on the facts construed in their favor,
cannot recover under their negligent failure to warn and unjust
enrichment theories.

### A.    Injury to property

Two sub-classes of plaintiffs claim injuries resulting from
chemical contamination of their real property:  those in the
appropriate geographical areas who own property served by
private wells and those in the relevant towns who own property
served by the Merrimack Village District Water Works.[19]  The
defendants move to dismiss the negligence, trespass, and
nuisance claims of these property-owning plaintiffs for failure
to allege present and actual damages to their property.

The allegations in the complaint are, as the defendants
observe, fairly general.  These property-owning plaintiffs

---

[19] Id. ¶¶ 58, 60-61.

allege that Saint-Gobain, through releasing toxic PFOA into nearby environs, contaminated the soil, dust, household water and household water systems, groundwater wells, air, and trees on the plaintiffs' property.[20]  They also allege that the PFOA contamination "further migrated through the soil and into the groundwater that Plaintiffs and Class Members have the right to use and have used for their domestic water supply."[21]

As a result of this contamination, they allege, the property-owning plaintiffs have "suffered the cost of mitigating the contamination through filters and alternative water supplies, and the cost of restoring and maintaining the water" and have had to pay to remediate their properties.[22]  They further claim that the value and marketability of their property has diminished as a result of the contamination.[23]  Finally, they claim loss of use and enjoyment of their properties, and that they "have also suffered annoyance, discomfort, and inconvenience" due to the "contamination of their properties and water supplies . . . ."[24]

---

[20] Id. ¶¶ 15, 39, 48.

[21] Id. ¶ 39, 48.

[22] Id. ¶ 54.

[23] Id.

[24] Id.

Through these allegations, the property-owning plaintiffs have pleaded, at the very least, a compensable injury sufficient to state claims for trespass and nuisance by pleading the presence of PFOAs in the groundwater serving both private and municipal water sources. "[C]ontamination of water with chemicals having a potential to cause harm is itself an injury regardless of whether the chemicals are certain to cause the ultimate harm of which they are capable." Energynorth Nat. Gas, Inc. v. Cont'l Ins. Co., 146 N.H. 156, 164 (2001).

Having established that contamination of water as alleged here may amount to an injury, the question then becomes whether it amounts to an injury to the plaintiffs. In New Hampshire, as Saint-Gobain observes, "instead of absolute ownership of the groundwater beneath one's land, 'the right of each is only to a reasonable use or management.'" In re Town of Nottingham, 153 N.H. 539, 548 (2006) (quoting Bassett v. Salisbury Mfg. Company, 43 N.H. 569, 577 (1862)). Absent such absolute ownership rights in groundwater, diminution of groundwater under a landholder's property by the State does not amount to a taking. Nottingham, 153 N.H. at 548. Similarly, "in this state lakes, large natural ponds, and navigable rivers are owned by the people, and held in trust by the state in its sovereign capacity for their use and benefit," giving rise to a public, not a private, right to use and benefit from them. St. Regis Paper Co. v. N.H. Water Res.

Bd., 92 N.H. 164, 170 (1942) (comparing such rights to traditional riparian rights, "which are property rights and which may not be invaded or taken from the owner without compensation."). The public nature of this right prevented the plaintiff in St. Regis from successfully challenging the State's delegation of authority over such waters to the State Water Resources Board. Id. at 170-71.

Relying on Nottingham and St. Regis, Saint-Gobain argues that the property-holding plaintiffs cannot recover for alleged contamination of the groundwater under their properties.[25] Those plaintiffs are not, however, seeking compensation for a governmental taking, nor do they challenge the State's regulation of navigable waterways. Instead, they have pleaded an interference with their use of the groundwater under their property in light of alleged chemical contamination. The New Hampshire Supreme Court has suggested that at least "claims for diminution in value of private property, lost business expenditures and other business and economic losses resulting from [chemical] contamination properly belong to private parties," rather than the State as trustee of those waters. State v. Hess Corp., 161 N.H. 426, 437 (2011), as modified on denial of reconsideration (Mar. 22, 2011). Thus, under Hess,

_____

[25] See Defendants' Mem. (doc. no. 82-1) at 9-10.

the property-owning plaintiffs have an interest sufficient to state claims at least for economic losses arising from the presence of contaminated groundwater by alleging diminished property values.[26]  Insofar as damages in trespass and nuisance actions "are measured primarily by the difference between the value of the real estate before and after the defendant's wrong was committed," Delay Mfg. Co. v. Carey, 91 N.H. 44, 44 (1940), the plaintiffs have alleged damage sufficient to state a claim under those theories.[27]  See also Soucy v. Royal, 116 N.H. 170,

---

[26] The Court further concluded that the State, acting as parens patriae, is "not necessarily preclude[d] . . . from pursuing damages for the costs of investigating, monitoring, treating, remediating, replacing, or otherwise restoring [privately-owned] wells" when "the injury alleged affects the general population of a State in a substantial way." Id.  It did not, however, affirmatively hold that the individual property owners may not recover such damages. Cf. id. at 440 (leaving open the possibility that "any monetary damages claimed by citizens individually may be excluded from the State's recovery" should private-well owners "actually object to state testing and treatment of their wells.").

[27] The defendants also argue that the groundwater contamination alleged here would amount to a public, rather than a private, nuisance or trespass, precluding property-owning plaintiffs from a claim under those theories. See Defendants' Mem. (doc. no. 82-1) at 12-14.  A private nuisance "may be defined as an activity which results in an unreasonable interference with the use and enjoyment of another's property.  A public nuisance, on the other hand, is an unreasonable interference with a right common to the general public." Robie v. Lillis, 112 N.H. 492, 495 (1972) (internal citations and quotations omitted).  Where "[c]onduct which unreasonably interferes with the rights of others may be both a public and a private nuisance," id., and the determining factor is the substantiality of the

172 (1976) (damages in trespass and nuisance "determined by the difference between the value of the property with and without the trespass and nuisance").

It is less clear that the property-owning plaintiffs have alleged physical damage to their real property sufficient to recover on a claim for negligence. "To recover for negligence, a plaintiff must show that the defendant owes a duty to the plaintiff and that the defendant's breach of that duty caused the plaintiff's injuries." Christen v. Fiesta Shows, Inc., No. 2016-0528, 2017 WL 4400281, at *2 (N.H. Oct. 4, 2017). Saint-Gobain contends that the plaintiffs' general allegations of damage do not suffice as allegations of present, physical injury to their property sufficient to state a claim for negligence,[28] and that the economic loss doctrine precludes them from recovering in negligence for the economic losses discussed supra.[29]

---

interference, the court is not inclined to dismiss these claims on this record.

To the extent that the cases from other jurisdictions on which the defendants rely for the proposition that interference with groundwater cannot give rise to a private nuisance or trespass claim, they conflict with Hess, 161 N.H. at 437, and do not mandate dismissal.

[28] Defendants' Mem. (doc. no. 82-1) at 10-12.

[29] Id. at 7-8, 10.

"In New Hampshire, the general rule is that 'persons must refrain from causing personal injury and property damage to third parties, but no corresponding tort duty exists with respect to economic loss.'" Plourde Sand & Gravel Co. v. JGI E., Inc., 154 N.H. 791, 795 (2007) (quoting Ellis v. Robert C. Morris, Inc., 128 N.H. 358, 364 (1986)). Thus, "a plaintiff may not ordinarily recover in a negligence claim for purely 'economic loss'." Border Brook Terrace Condo. Ass'n v. Gladstone, 137 N.H. 11, 18 (1993).

As the plaintiffs observe, the economic loss doctrine most commonly precludes contracting parties from recovering in tort for purely economic losses associated with that contractual relationship. See Plourde, 154 N.H. at 794 ("[W]here a plaintiff may recover economic loss under a contract, generally a cause of action in tort for purely economic loss will not lie."). The parties dispute whether New Hampshire extends the economic loss doctrine to prohibit recovery in tort for any economic loss, even one suffered outside of a contractual relationship. The New Hampshire Supreme Court has suggested as much, see id. at 794-95, and the First Circuit Court of Appeals has concluded that New Hampshire adopted the economic loss doctrine in "its broadest form," under which "the doctrine reaches beyond the contractual context . . . ." Schaefer v. Indymac Mortg. Servs., 731 F.3d 98, 103-04 (1st Cir. 2013).

But, as the plaintiffs observe, the existence of a contractual relationship governed the outcome of both of those cases.  See Plourde, 154 N.H. at 798 (economic loss doctrine barred tort recovery where plaintiff's economic loss arose "solely from disappointed commercial expectations in that the plaintiff lost the anticipated profits of its contract with" a third party (quotations omitted)); Schaefer, 731 F.3d at 106 (plaintiff's negligence claims arising out of foreclosure proceedings barred by economic loss doctrine where alleged duties to provide information to plaintiff arise from mortgage agreement).  It is unclear, therefore, whether the economic loss doctrine in New Hampshire would bar recovery of economic losses in a situation such as this, where the alleged losses arise from negligence outside of the context of a contractual or otherwise purely economic relationship.

The court need not definitively resolve this question at this stage in the proceedings.  The property-owning plaintiffs have pleaded not only economic damages, but also that they have suffered damage to their property through the presence of PFOA in the soil and water, requiring them to mitigate the contamination and remediate their properties.  They further allege that the contamination has led to lost use and enjoyment of those properties.  Though the complaint is not a model of precision and clarity, and these allegations are less than

robust,[30] the court is disinclined, at this stage in the litigation, to dismiss the plaintiffs' negligence claim where they have sufficiently pleaded damages to their property to maintain claims for the common-law torts of trespass and nuisance on effectively the same factual bases.

### B.   Medical monitoring damages

Two additional sub-classes of plaintiffs seek damages in the form of costs to cover monitoring for potential medical conditions arising from their exposure to PFOA through its presence in the air and soil and through consumption of contaminated water.[31]  Exposure to PFOA in this manner, the plaintiffs allege, creates a "significant increased risk of illness, disease or disease process . . . requiring an award of the cost of a program for medical monitoring for detection of

---

[30] As an example, as the defendants observed during oral argument, the property-owning plaintiffs have not clearly alleged direct damage to any property.  Instead, they have alleged that their property is contaminated by PFOA as a result of the defendants' actions and that they have "suffered the need for and the cost of remediation of their properties."  Compl. (doc. no. 80) ¶ 54.  At oral argument, plaintiff's counsel confirmed that their allegations of a need for mitigation and remediation, rendered necessary by the contamination, constitute the plaintiffs' allegations of injury to their property beyond mere invasion by PFOA.  The court, drawing all reasonable inferences in the plaintiffs' favor, see Martino, 609 F.3d at 2, construes these as allegations that the plaintiffs' property has been damaged in some manner that gives rise to some necessarily remedial actions.

[31] Compl. (doc. no. 80) ¶¶ 55, 59, 62.

such illness, disease process or disease."[32]  Saint-Gobain moves

to dismiss the medical-monitoring plaintiffs' claims,[33] arguing

that the lack of any present physical injury to the plaintiffs -

- as compared to speculative, future injury -- precludes their

recovery in tort.

Some states allow recovery for the costs of such medical

monitoring.  The plaintiffs rely heavily, for example, on the

Supreme Court of Appeals of West Virginia's decision that, even

absent present, physical injury, "a cause of action exists under

West Virginia law for the recovery of medical monitoring costs,

where it can be proven that such expenses are necessary and

reasonably certain to be incurred as a proximate result of a

defendant's tortious conduct."  Bower v. Westinghouse Elec.

Corp., 522 S.E.2d 424, 431 (W.Va. 1999).  To sustain such a

claim,

> the plaintiff must prove that (1) he or she has,
> relative to the general population, been significantly

---

[32] Id. ¶ 55.

[33] The plaintiffs pleading all claims on behalf of "Plaintiffs
and Class Members" generally, without distinguishing among or
between property-owning plaintiffs and plaintiffs seeking to
recover for medical monitoring costs.  At oral argument,
plaintiffs' counsel clarified that the plaintiffs assert all
claims on behalf of all plaintiffs.  It is unclear to the court
whether plaintiffs who are not property-owners may recover for
injuries to their persons under theories of trespass and
nuisance.  As the defendants have not moved on those grounds,
and as the parties have not briefed the issue, the court need
not resolve it here.

exposed; (2) to a proven hazardous substance;
(3) through the tortious conduct of the defendant;
(4) as a proximate result of the exposure, plaintiff
has suffered an increased risk of contracting a
serious latent disease; (5) the increased risk of
disease makes it reasonably necessary for the
plaintiff to undergo periodic diagnostic medical
examinations different from what would be prescribed
in the absence of the exposure; and (6) monitoring
procedures exist that make the early detection of a
disease possible.

Id. at 432-33.  Other states have likewise recognized a right to
similar recovery against exposure to toxic chemicals.  See,
e.g., Exxon Mobil Corp. v. Albright, 71 A.3d 30, 80, (Md. 2013)
("evidence of physical injury is not required to support costs
for medical surveillance"); Meyer ex rel. Coplin v. Fluor Corp.,
220 S.W.3d 712, 718 (Mo. 2007) ("recovering medical monitoring
damages does not require a threshold showing of present physical
injury"); Potter v. Firestone Tire & Rubber Co., 863 P.2d 795,
823 (Cal. 1993) ("a reasonably certain need for medical
monitoring is an item of damage for which compensation should be
allowed"); Ayers v. Jackson Twp., 525 A.2d 287, 312 (N.J. 1987)
(recognizing "the cost of medical surveillance [as] a
compensable item of damages" in toxic tort litigation).  See
also Baker v. Saint-Gobain Performance Plastics Corp., 232 F.
Supp. 3d 233, 252-53 (N.D.N.Y. 2017) (denying motion to dismiss
tort claims against Saint-Gobain seeking medical-monitoring
costs as damages); Benoit v. Saint-Gobain Performance Plastics
Corp., No. 116-CV-1057, 2017 WL 3316132, at *9-10 (N.D.N.Y. Aug.

2, 2017) (same). In doing so, several courts have relied, at least in part, on the conclusion of the Court of Appeals for the District of Columbia that a plaintiff "ought to be able to recover the cost for the various diagnostic examinations proximately caused by [the defendant's] negligent action." Friends for All Children, Inc. v. Lockheed Aircraft Corp., 746 F.2d 816, 825 (D.C. Cir. 1984) (addressing claims for compensation for medical evaluations of passengers following an airplane crash).

Still other states have rejected an expansion of negligence doctrine to encompass potential, not present, physical injury. See, e.g., Henry v. Dow Chem. Co., 701 N.W.2d 684, 691 (Mich. 2005) (economic losses incurred by paying for medical monitoring "are wholly derivative of a possible, future injury rather than an actual, present injury. A financial 'injury' is simply not a present physical injury, and thus not cognizable under our tort system." (emphasis original)); Lowe v. Philip Morris USA, Inc., 183 P.3d 181, 186 (Or. 2008) ("the present economic harm that defendants' actions allegedly have caused -- the cost of medical monitoring -- is not sufficient to give rise to a negligence claim"); see also Metro-N. Commuter R. Co. v. Buckley, 521 U.S. 424, 444 (1997) (declining to recognize a "separate tort claim for medical monitoring costs" for "asymptomatic plaintiffs" under the Federal Employers' Liability Act).

Neither New Hampshire's legislature nor its Supreme Court

has spoken on the question.  Generally, in New Hampshire,

> [t]he possibility that injury may result from an act
> or omission is sufficient to give the quality of
> negligence to the act or omission; but possibility is
> insufficient to impose any liability or give rise to a
> cause of action. . . . If, in a sense, there has been
> negligence, there is no cause of action unless and
> until there has been an injury.

White v. Schnoebelen, 91 N.H. 273, 274 (1941).  In the absence

of such a present, physical injury, the medical-monitoring

plaintiffs in this action seek to recover for an "economic

injury" -- that is, the cost of monitoring to determine whether

they have an injury.[34]  Such an allegation appears to conflate

"[a]n allegation of 'injury,'" which is "an instance of

actionable harm," with "a claim for 'damages,'" that is, "a sum

of money awarded to one who has suffered an injury."  Smith v.

Cote, 128 N.H. 231, 241-42 (1986).  The two are distinct.  Id.

In so doing, the plaintiffs effectively conceded that they do

not, at present have an injury.[35]  And, as discussed supra, it is

---

[34] Opp. (doc. no. 84-1) at 17.  Plaintiffs further characterize
their "injury" as "the present need for and cost of diagnostic
testing."  Id. at 18.  At oral argument, plaintiffs' counsel
further clarified that the injury giving rise to the medical-
monitoring plaintiffs' claims constitutes their exposure to PFOA
plus the cost of the monitoring.

[35] The court is not persuaded that the rule allowing a plaintiff
to "maintain an action against an insurer for negligent failure
to settle a case without prior payment of or proof of ability to
pay the excess judgment," Dumas v. State Farm Mut. Auto. Ins.
Co., 111 N.H. 43, 46 (1971), translates into a viable claim for

unclear to the court whether New Hampshire law precludes a negligence claim seeking to recover purely economic damages in an action sounding purely in tort.  See supra Part III.A (discussing economic loss doctrine).

The court is therefore considering whether to certify this question to the New Hampshire Supreme Court, and at what procedural posture such a certification would be most advantageous.  See Old Republic Ins. Co. v. Stratford Ins. Co., 777 F.3d 74, 86 (1st Cir. 2015) (the court is "permitted to certify questions of law to the New Hampshire Supreme Court when questions of New Hampshire law are determinative of the case, and there is no controlling precedent from the New Hampshire Supreme Court."); N.H. Sup. Ct. R. 34.  The defendants' motion to dismiss this claim is, accordingly, denied without prejudice.

### C.  Trespass (Count 1)

The defendants further argue that the plaintiffs' claim for trespass must be dismissed because the plaintiffs have not alleged that Saint-Gobain intentionally invaded their property.[36] "[A] trespass [is] an intentional invasion of the property of another."  Case v. St. Mary's Bank, 164 N.H. 649, 658 (2013)

---

damages where the defendant's alleged breach of a duty may, but has not yet, resulted in actual injury to the plaintiff.  See Opp. (doc. no. 84-1) at 19.

[36] Defendant's Mem. (doc. no. 82-1) at 17-18.

(quoting Moulton v. Groveton Papers Co., 112 N.H. 50, 54 (1972))
(alterations in original).  "[I]t is well settled in this
jurisdiction that an involuntary or accidental entry upon the
land of another is not a trespass."  Paine v. Hampton Beach Imp.
Co., 98 N.H. 359, 363-64 (1953) (internal quotations and
citations omitted).  That said, "[t]he intent with which tort
liability is concerned is not necessarily a hostile intent, or a
desire to do any harm.  Rather it is an intent to bring about a
result which will invade the interests of another in a way that
the law forbids."  Thompson v. Forest, 136 N.H. 215, 219 (1992)
(quoting W.P. Keeton et al., Prosser and Keeton on the Law of
Torts § 8 (5th ed. 1984)).

> If an actor knows that an injury is substantially
> certain to result from his act and he nevertheless
> completes the act, he is treated by the law as if he
> in fact desired to produce the injury.  To constitute
> an intentional tort, the tortfeasor must have known
> that his conduct was substantially certain to result
> in injury.

Id. at 219-20 (citing Vittum v. N.H. Ins. Co., 117 N.H. 1, 4
(1977)).

The plaintiffs here have alleged that Saint-Gobain used
PFOA in its manufacturing processes at its Merrimack facility,
knowing that those processes, as well as the structure of its
plant, "were sources of odors, visible emissions, particular
emissions and releases of toxic pollutants, including PFAS, that
would travel when released and contaminate the properties and

water supplies of Plaintiffs and of Class Members," resulting in their exposure.[37]  The plaintiffs further allege that Saint-Gobain knew that its processes could result in such contamination because (1) it used similar manufacturing processes in, among other places, Hoosick Falls, New York, which resulted in PFOA contamination of drinking water in that community, and (2) its predecessor, ChemFab, relocated its processing plant to Merrimack from North Bennington, Vermont, because Vermont implemented controls to reduce PFOA emissions.[38] Despite this knowledge, plaintiffs allege, Saint-Gobain failed to sufficiently control or abate PFOA emissions from the Merrimack facility.[39]

The plaintiffs have thus alleged that Saint-Gobain knew that its manufacturing processes emitted PFOA and that PFOA could, as a result, infiltrate groundwater pulled by private wells and municipal water systems.  The court therefore declines to dismiss the plaintiffs' claim, as the defendants would have it do, on the grounds that the plaintiffs have also alleged that the defendants did so negligently.[40]

---

[37] Compl. (doc. no. 80) ¶ 14.

[38] Id. ¶¶ 18-20, 21-26.

[39] Id. ¶¶ 27-30, 33.

[40] Defendants' Mem. (doc. no. 82-1) at 17-18; Compl. (doc. no. 80) ¶ 40.

**D. Negligent failure to warn (Count 4)**

In addition to their claims for general negligence, the plaintiffs claim that the defendants negligently failed to warn them "of the release of toxic PFAS and the likelihood that groundwater and household water supplies were contaminated with PFAS emitted from the Saint-Gobain Site, and that they were being exposed to toxic PFAS."[41]  Saint-Gobain moves to dismiss this claim, arguing that New Hampshire law did not impose on it a duty to warn the plaintiffs under these circumstances.

"In general, anyone who does an affirmative act is under a duty to others to exercise the care of a reasonable [person] to protect them against an unreasonable risk of harm to them arising out of the act." Coan v. New Hampshire Dep't of Envtl. Servs., 161 N.H. 1, 8 (2010) (quoting Restatement (Second) of Torts § 302 comment a at 82 (1965)).  On the other hand, "[t]he duties of one who merely omits to act are more restricted, and in general are confined to situations where there is a special relation between the actor and the other which gives rise to the duty." Id.  The defendants, arguing that the plaintiffs allege an omission of an action (that is, failure to warn them of the potential for contamination), contend that no claim for negligent failure to warn can lie against them where the

---

[41] Compl. (doc. no. 80) ¶¶ 94-96.

plaintiffs have pleaded the existence of no special relationship giving rise to the duty to warn.[42]  The plaintiffs, arguing that the defendants have acted affirmatively (that is, by emitting PFOA), contend that defendants are subject to the duty of a reasonable person to protect the plaintiffs against the unreasonable risk of harm arising from that act by warning them about the presence of PFOA in their household water.[43]

The defendants are correct, therefore, that an allegation of omission, standing alone, likely would require a special relationship between the parties for a failure to warn claim to lie.  The plaintiffs have not alleged such a relationship.  But nor have they alleged an omission in a vacuum -- they plead it in the context of an affirmative action by Saint-Gobain.  The plaintiffs have alleged that the Saint-Gobain committed an affirmative act by releasing the PFOA, and only then that it omitted to act by failing to warn the plaintiffs about potential contamination resulting from those emissions.  The court is thus inclined to view plaintiffs' allegations as invoking the general "duty to others to exercise the care of a reasonable [person] to protect them against an unreasonable risk of harm to them arising out of the act." Coan, 161 N.H. 8.

---

[42] Defendants' Mem. (doc. no. 82-1) at 18-19.

[43] Opp. (doc. no. 84-1) at 21-23.

At the same time, that duty is the general duty that gives rise to a claim of negligence.  Id.  As such, it is unclear to the court that the plaintiffs may maintain a negligent failure to warn claim based on that duty separate from their general negligence claim.  At this stage of the litigation, however, where the latter may proceed for the reasons discussed supra Part III.A-B, the court declines to dismiss the former.

**E.    Unjust enrichment (Count 5)**

"Unjust enrichment is an equitable remedy that is available when an individual receives 'a benefit which would be unconscionable for him to retain.'"  Axenics, Inc. v. Turner Const. Co., 164 N.H. 659, 669 (2013) (quoting Clapp v. Goffstown Sch. Dist., 159 N.H. 206, 210 (2009)).  "The party seeking restitution must establish not only unjust enrichment, but that the person sought to be charged had wrongfully secured a benefit or passively received one which it would be unconscionable to retain, and unjust enrichment generally does not form an independent basis for a cause of action."  Gen. Insulation Co. v. Eckman Const., 159 N.H. 601, 611 (2010) (quoting 42 C.J.S. Implied Contracts § 10, at 17 (2007)).  "Unjust enrichment is not a boundless doctrine, but is, instead, narrower, more predictable, and more objectively determined than the

implications of the words 'unjust enrichment'." Clapp, 159 N.H. at 210 (quotation omitted).

> While it is said that a defendant is liable if 'equity and good conscience' requires, this does not mean that a moral duty meets the demands of equity. There must be some specific legal principle or situation which equity has established or recognized, to bring a case within the scope of the doctrine.

Cohen v. Frank Developers, Inc., 118 N.H. 512, 518 (1978) (quoting Am. Univ. v. Forbes, 88 N.H. 17, 19-20 (1936)).

The plaintiffs' unjust enrichment claim is premised on the savings that Saint-Gobain incurred -- that is, money not spent -- rather than on a benefit bestowed -- that is, money or some good received.[44] Such a savings "is also referred to as negative unjust enrichment or recoverable profit." Allan Kanner, Unjust Enrichment in Environmental Litigation, 20 J. Envtl. L. & Litig. 111, 146 (2005). Some jurisdictions have recognized negative unjust enrichment claims. See Branch v. Mobil Oil Corp., 778 F. Supp. 35, 36 (W.D. Okla. 1991) ("Oklahoma recognizes a claim for negative unjust enrichment."). Others have recognized a version of that claim, available only where "the plaintiff is unable to establish actual damages because such a determination may be too difficult" but "it would be unjust to allow Defendant to benefit from disposal of waste on a plaintiff's property without payment

---

[44] Opp. (doc. no. 84-1) at 23-24.

of any kind." Little Hocking Water Ass'n, Inc. v. E.I. du Pont Nemours & Co., 91 F. Supp. 3d 940, 986 (S.D. Ohio 2015).

Relying on these extra-jurisdictional cases, the plaintiffs claim that Saint-Gobain has unjustly enriched itself through its failures to "incur expenditures to limit or prevent the release of toxic PFAS into the environment and the contamination to Plaintiffs' and Class Members' properties and . . . neighborhoods and household water supplies" and to incur the costs to (1) "timely investigate the impacts" of that contamination; (2) "timely mitigate" those impacts, and (3) "remediate the contaminated soil, dust and groundwater."[45] By failing to incur these costs, the plaintiffs allege, Saint-Gobain "has received a benefit and it would be unconscionable and contrary to equity for [it] to retain that benefit."[46]

The plaintiffs have not cited, however, and the court has not found, any case suggesting that New Hampshire recognizes claims for negative unjust enrichment. To the contrary, the plaintiffs offer only one case recognizing an unjust enrichment claim, and that in the context of a benefit conveyed by the plaintiff to the defendant when the plaintiff repaired and improved the defendant's property. Petrie-Clemons v.

---

[45] Compl. (doc. no. 80) ¶ 98.

[46] Id. ¶ 99.

Butterfield, 122 N.H. 120, 124 (1982).  No other case cited by the plaintiffs addresses the possibility of such a claim.  See Axenics, 164 N.H. at 670 (no unjust enrichment where express contract governed scope of plaintiff's work on defendant's property); Clapp, 159 N.H. at 211 (no unjust enrichment where defendant retained funds it had otherwise voted to spend because express contract governed employee's recovery); Univ. Sys. of N.H. v. Nat'l Gypsum, No. 84-716, 1985 U.S. Dist. LEXIS 18277, at *22 (D.N.H. July 2, 1985) (no unjust enrichment where plaintiff voluntarily removed asbestos from its buildings); Cohen, 118 N.H. at 518 (no unjust enrichment to defendant when plaintiff forbore from exercising an option to purchase land to develop competing shopping center); cf. Camden Nat'l Bank v. Grestone Select Holdings, LLC, 2017 DNH 235, 10-12 (no unjust enrichment in contract context).

Another court in this district has rejected a similar argument, concluding, under Cohen, that restitution for unjust enrichment is available only in the context of a contract (express or implied) or a quasi-contract, and "that profits gained by defendants as a result of" the defendants' alleged statutory violations do not "constitute the unjust receipt and retention of a 'benefit' for which restitution is required." Pacamor Bearings, Inc. v. Minebea Co., 892 F. Supp. 347, 356-57 (D.N.H. 1995).

Because the plaintiffs' claim for unjust enrichment is not based in a "specific legal principle or situation which equity has established or recognized" in New Hampshire so as "to bring [this] case within the scope of the doctrine," Cohen, 118 N.H. at 518, the court grants the defendants' motion to dismiss Count 5 of the consolidated complaint.

### F.   **Respondeat superior** (Count 6)

Finally, the defendants move to dismiss the plaintiffs' residual claim against Saint-Gobain based in respondeat superior.[47]  Because the court dismisses the plaintiffs' claim for unjust enrichment against both defendants, no claim for respondeat superior liability may lie as against Saint-Gobain on that basis.  The court otherwise denies the defendants' motion to dismiss the plaintiffs' claims based in respondeat superior.

### G.   **Plaintiffs' motions**

As a final note, the plaintiffs' request on the last page of their opposition for leave to amend their pleadings[48] runs afoul of this court's Local Rule 7.1(a)(1) ("Objections to pending motions and affirmative motions for relief shall not be combined in one filing.").  Even if it did not, as the

---

[47] Defendants' Mem. (doc. no. 82-1) at 20.

[48] Opp. (doc. no. 84-1) at 24,

defendants rightly observe, the court afforded the plaintiffs in this consolidated action three separate opportunities to file a consolidated complaint.[49]  The court assumes that the allegations and claims asserted in their operative consolidated complaint are the result of considered factual and legal assessments by interim class counsel, and is thus disinclined to grant the plaintiffs a fourth opportunity to adduce facts in support of their consolidated claims.

The court is equally disinclined to elevate form over substance, however, and therefore grants the plaintiffs' motion for leave to substitute certain paragraph references in their consolidated complaint to correct what appear to the court to be mere typographical errors.  Plaintiffs shall file an amended complaint reflecting these revisions on or before **December 13, 2017.**

---

[49] See Consolidation Order (doc. no. 48) (ordering plaintiffs to file consolidated complaint); Brown Plaintiffs' Master Consolidated Complaint (doc. no. 60) (filed without consultation with Dowling plaintiffs' counsel); Order of March 6, 2017 (granting extension of time to file consolidated complaint); Dowling Plaintiffs' Master Consolidated Complaint (doc. no. 70) (filed without consultation with Brown plaintiffs' counsel); Order of March 30, 2017 (granting motion to stay filing of consolidated complaint until appointment of interim class counsel); Order of May 11, 2017 (appointing interim counsel and ordering consolidated complaint to be filed).

## IV.  Conclusion

For the reasons discussed above, the court GRANTS-IN-PART and DENIES-IN-PART the defendants' motion to dismiss the complaint.[50]  Specifically, it grants the defendants' motion to dismiss the plaintiffs' unjust enrichment claim (Count 5), and denies it as to the plaintiffs' remaining claims.

Finally, the court GRANTS the plaintiffs' motion for leave to substitute.[51]

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: December 6, 2017

cc:  Kevin Scott Hannon, Esq.
     Paul M. DeCarolis, Esq.
     Anthony Sculimbrene, Esq.
     Hunter J. Shkolnik, Esq.
     Kirk C. Simoneau, Esq.
     Lawrence A. Vogelman, Esq.
     Louise R. Caro, Esq.
     Paul J. Napoli, Esq.
     Finis E. Williams, III, Esq.
     Bruce W. Felmly, Esq.
     Douglas E. Fleming, III, Esq.
     Lincoln D. Wilson, Esq.
     Mark Cheffo, Esq.
     Patrick Curran, Esq.
     Paul A. LaFata, Esq.
     Sheila L. Birnbaum, Esq.
     Nicholas F. Casolaro, Esq.

---

[50] Document no. 82.

[51] Document no. 88.