## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| KEVIN BROWN, individually and on behalf of all others similarly situated, *et al.*,<br><br>*Plaintiffs*,<br><br>v.<br><br>SAINT-GOBAIN PERFORMANCE PLASTICS CORPORATION, *et al.*,<br><br>*Defendants*. | Civil Action No. 1:16-cv-00242-JL |

## MEMORANDUM OF LAW IN SUPPORT OF SAINT-GOBAIN'S MOTION TO EXCLUDE THE TESTIMONY OF JEFFREY CARR

**PRELIMINARY STATEMENT**

Saint-Gobain moves to exclude the opinions of Plaintiffs' expert Jeffrey Carr, who opines on alleged groundwater damages.  Saint-Gobain and NHDES agreed to fund the transition of homes to municipal water as a remedy for PFOA, but Mr. Carr opines that residents as a group were harmed by this change.  Exhibit 1, Carr Rpt. at 1, 4.  He says that the classwide costs of municipal water service are greater than the classwide costs of operating and maintaining a private well, and that the difference between the two is damages.  His opinion is neither relevant nor reliable.

Mr. Carr's opinion is not relevant to this putative class action because, as he admits, he only purports to calculate aggregate damages for the whole class, not damages of any individual member.  His opinion on damages was based on purported average well costs for each property, and he agreed it would be "off point" to try "to relate [his opinion] to individual properties."  Exhibit 2, Carr Tr. at 62:22-63:21.  Such damages opinions "on behalf of 'the class'" are irrelevant, since "class actions are the aggregation of individual claims, and do not create a class entity."  *In re Asacol Antitrust Litig.*, 907 F.3d 42, 56 (1st Cir. 2018).  Rather, while "an average multiplied by the total number of individuals" may describe the total alleged damages of the putative class, it cannot sustain "the demonstrably wrong conclusion" that each putative class member experienced damages at the alleged average level.  *Id.* at 54.  Thus, the "shortcut" of using "'averages'" instead of "individual damages" signals "that class-wide proof of damages [i]s impermissible."  *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 343 (4th Cir. 1998).

Nor is Mr. Carr's opinion reliable.  He lacks either reliable facts or a reliable method for his strikingly low estimate of operating costs for a private well.  Mr. Carr opines that it is more expensive to have municipal water than to obtain water from a private well only because he ignored numerous costs of operating and maintaining a private well—the cost of a well pump, electricity,

water softeners, tests, and others. Instead, his cost estimate consisted solely of maintenance, which he calculated at $225/year based on two phone calls his associate had with well companies. In notes of those calls, those companies identified many other well operating costs, but Mr. Carr did not include them. Ignoring those costs skewed his analysis and rendered it unreliable.

Mr. Carr's opinion should be excluded.

## ARGUMENT

### I.    MR. CARR'S AGGREGATE DAMAGES OPINION IS IRRELEVANT

Mr. Carr's opinion is inadmissible because, by his admission, it does not "fit" the claims of the putative class members. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993). "Federal Rule of Evidence 702 'assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is ***relevant to the task at hand***.'" *Cipollone v. Yale Indus. Products, Inc.,* 202 F.3d 376, 380 (1st Cir. 2000) (emphasis added). "Along with the reliability requirement, the *Daubert* Court imposed a special relevancy requirement." *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co*., 161 F.3d 77, 81 (1st Cir. 1998) (citations omitted). This "intuitive idea of 'fit'—as courts have come to call the special kind of relevance that *Daubert* demands," *id*., "is context-dependent and must be assessed on a case-by-case basis." *United States v. Tetioukhine*, 725 F.3d 1, 7 (1st Cir. 2013).

The "fit" requirement has special significance in the context of putative class actions. Because "class actions are the aggregation of individual claims, and do not create a class entity," *Asacol*, 907 F.3d at 56, the evidence must show that there is a reliable method to "resolve an issue that is central to the validity of ***each one of the claims*** in one stroke." *Parent/Prof. Advoc. League v. City of Springfield, Massachusetts*, 2019 WL 3729033, at *10 (1st Cir. 2019) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)) (emphasis added); *Sher v. Raytheon Co*., 419 F.

2

App'x 887, 890-91 (11th Cir. 2011). Thus, competent expert evidence in a class case must be such that "the same evidence will suffice for each member to make a prima facie showing." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (internal citation omitted).

Under these standards, damages opinions based on classwide averages do not fit the claims of the individual class members. The First Circuit holds that, in a putative class action such as this one, "the aggregate damage amount" is not the damages of a class entity (which does not exist), but rather "the sum of damages suffered by a number of individuals." *Asacol,* 907 F.3d at 55. As a result, damages for the members of the putative class cannot be determined by calculating the damages of an "average" class member. "[A]n average multiplied by the total number of individuals" may describe the total damages of the class, but it cannot support "the demonstrably wrong conclusion" that every class member was injured at an average level. *Id.* at 54.

This "shortcut" of "abstract" "'averages'" instead of "individual damages" is "a caution signal ... that class-wide proof of damages [i]s impermissible." *Broussard*, 155 F.3d at 343. "Attempts to meet the burden of proof using modeling and assumptions that do not reflect the individual characteristics of class members [are] met with skepticism." *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 266 (3d Cir. 2011) (citations omitted). As such, courts exclude proffered class-wide proof based on an average or a representative analysis because it uses a "methodology [that] does not fit the present case." *LifeWise Master Funding v. Telebank,* 374 F.3d 917, 929 (10th Cir. 2004); *see also In re Pharmacy Benefit Mgrs. Antitrust Litig.,* 2017 WL 275398, at *20 (E.D. Pa. 2017); *Opperman v. Path, Inc.,* 2016 WL 3844326, at *14 (N.D. Cal. 2016); *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.,* 2017 WL 1196990, at *58 (N.D. Ill. 2017).

Mr. Carr's damages opinion based on purported average well costs thus presents an "insurmountable *Daubert* fit problem." *In re Pharmacy Benefit*, 2017 WL 275398 at *20. Mr.

3

Carr has emphasized that his opinion offers only a "forensic estimate" of "total estimated added cost damages" for the entire proposed class. Carr Tr. at 33:3-34:16. He specifically disclaimed any opinion as to "*[h]ow that applies to individual class members*." *Id*. at 46:9-19 (emphasis added). Mr. Carr cabins his opinions to a "bottom up" analysis, "with the idea of getting to an **aggregate damages estimate**." *Id*. at 63:22-63:21. Nor did he attempt to apportion that aggregate number among class members. He opines on an aggregate damages figure only, explaining that "[h]ow that's allocated to the individual class members, individual addresses is not part of [his] analysis." *Id.*; *see also id*. at 46:9-19. In fact, it would be "off point" to "tak[e] an aggregate analysis and ... try[] to relate it to individual properties." *Id*. at 63:22-63:21.

Mr. Carr also dismissed the notion, advanced by other of Plaintiffs' experts, that his calculations based on purported average costs would be probative of the claim of any individual member of the proposed classes. As he explained, his estimate of total added-cost damages for all class members based on those averages "doesn't necessarily follow to each individual address because each individual address can have a different set of circumstances." *Id*. at 35:8-36:15. He acknowledged the critical distinction between the aggregate whole and the individual members: "you can't reach the same conclusion for each individual address," since damages would turn on "more precise and more complete information" on actual water consumption by each individual class member, which he "would advocate for." *Id.*; Exhibit 3, Mullin Rpt. at 7-20. This is because, he explained, it is "the nature of averages" that "[s]ome people deviate from the average on the high side," and "some people deviate from the average on the low side." Carr Tr. at 45:13-21, 47:19-25. Thus, if one uses only average values, one can "end up overcompensating some addresses and under-compensating others." *Id.*

4

Individuals might deviate from the average costs at different times based on a variety of factors, including the number of people in their household, *id.* at 48:18-49:7, their household financing rates, *id.* at 36:18-38:22, and well operation and maintenance costs.  *Id.* at 69:6-70:1.  And while it would "[c]learly" be more accurate to use individual information "than if you just used an average for each home," Mr. Carr did not obtain that information or attempt to determine added costs for individuals.  *Id.* at 45:5-8.  To be relevant in a class action, Mr. Carr's opinion needed to address the alleged damages for "each one of the claims."  *Dukes*, 564 U.S. at 350.  But instead of addressing the claims of all—or any—class members, he addresses "the class as a whole," which does not exist.  *See In re Asacol*, 907 F.3d at 55-56.  His opinion is inadmissible to prove the alleged damages of any or all the class members.

## II.     MR. CARR UNRELIABLY OMITS WELL OPERATION AND MAINTENANCE COSTS

The proponent of expert testimony "bears the burden of showing that the testimony satisfies Rule 702."  *MMG Ins. Co. v. Samsung Elecs. Am., Inc.*, 293 F.R.D. 58, 63 (D.N.H. 2013) (Laplante, J.).  Expert testimony is admissible only if (1) it "is based on sufficient facts or data"; (2) it "is the product of reliable principles and methods"; and (3) "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702(b)-(d).  Here, Mr. Carr's method of calculating well operation and maintenance costs is neither reliable nor based on sufficient facts or data.  His failure as to that critical component of damages renders his opinion inadmissible.

At the outset, on a nationwide level, "[t]here exists a strong revealed preference for the municipal water supply over groundwater wells."  Mullin Rpt. at 23.  Yet Mr. Carr found that, in aggregate, putative class members were worse off on municipal water than on private wells.  He did so because he computed the putative class members' total cost to operate and maintain a well as ***less than*** the sum of their utility bills for municipal water.  Carr Rpt. at 2-4.  This slightly lower

purported average cost to operate and maintain a private well, multiplied by hundreds of class members and extended over a decade, amounted to over $2.6 million in total damages. *Id.* at 4. Because the differences between Mr. Carr's estimates of municipal water cost and private well cost are small, even a minor error in estimating private well costs can make the difference between net harm and net benefit. But Mr. Carr was able to reach this slightly lower purported average cost to operate and maintain a private well—which he estimated at *$225/year*—only because he ignored multiple aspects of that cost.

Though the estimate of private well costs was critical to his analysis, Mr. Carr was unable to explain what his estimate was actually intended to include. Carr Tr. at 105:12-106:10. Mr. Carr ultimately testified that this number was derived from a half page of notes about two phone calls his associate made to local contractors, as follows:

> How much does it cost or maintain a private well in New Hampshire?
>
> **Skillings & Sons**
> Telephone Call – (800) 441-6281
>
> It would all depends on the well—How old the system is; How deep and how far away the well is; or types of filters they have.
> Not really any annual maintenance. Might cost $120 for a tune up or $250 for two hours of work. The State has kits for homeowners to test their own well water.
>
> **Capital Well Cleaning Water Center**
> Telephone Call - (603) 774-6155
>
> Once installed the pumping system is good for years but should be periodically tested. Would costs between $200 and $250 for us to check it annually.

Exhibit 4, Carr Notes; *see also* Carr. Tr. at 98:13-99:19.

The first contractor, Skilling & Sons, said that the cost to maintain a well "all depends on the well—How old the system is; How deep and how far away the well is; or types of filters they have." Carr Notes. These are each individualized inquiries. While the contractor went on to note

6

that the cost could be "$120 for a tune up or $250 for two hours of work," *id*. Mr. Carr treated the amount of the annual tune up costs as encompassing ***all*** private well costs, such as maintenance, supplies, replacement parts, and electricity costs. *See* Mullin Rpt. at 21-22.

Mr. Carr similarly misapplied the information provided by the second contractor, Capital Well Cleaning, which advised only that: "Once installed the pumping system is good for years but should be periodically tested. Would costs between $200 and $250 *for us to check it annually*." Carr Notes (emphasis added). Here too, Mr. Carr used the amount quoted for an annual checkup as the entire cost of maintaining a well. He said he did not need to consider those other costs because "this wasn't an analysis about wells." *See* Carr Tr. at 67:20-68:3. But this case is necessarily an analysis about wells: the cost of operating a well is to the critical variable that determines whether a plaintiff received a benefit or harm from switching to municipal water.

Had Mr. Carr accounted for these other well operation costs, he would have come to a much larger and, much more importantly, a valid and reliable number of the costs to operate and maintain a private well. As Saint-Gobain's economist Charles Mullin, Ph.D., explains, even an assessment of "representative costs … for purely illustrative purposes" under Mr. Carr's methods, and using generally available consumer resources, results in a total annualized cost of approximately $954, ***more than four times the amount*** of Mr. Carr's $225 estimate:

Figure 6: Summary of annualized costs to maintain and operate a groundwater well[57]

| Category | Cost Components | Cost | Frequency (years) | Annualized cost |
|---|---|---|---|---|
| Cost included by Carr-Chase | Annual inspection | $225 | 1.00 | $225 |
| Annual operating costs | Water softener salt | $100 | 1.00 | $100 |
|  | Electricity | $21 | 1.00 | $21 |
| Periodic replacement | Water softener unit | $1,775 | 13.75 | $264 |
|  | Well pump | $1,485 | 11.00 | $245 |
|  | Pressure tank | $647 | 13.13 | $98 |
| **Total annualized cost** | | | | **$954** |

Mullin Rpt. at 22.

Mr. Carr claimed that these other costs were all somehow subsumed within the $225 figure he provided.  *See* Carr Tr. at 78:5-79:5, 104:22-105:11.  But he admitted that the notes of his associate's calls with the contractor did not address the cost of replacing the pump or the expansion tank, and he did not know whether they had addressed the cost of a water softener either.  *Id.* at 100:24-101:12.  He did not attempt to quantify this or to explain how they were subsumed when the contractor's estimates referred only to annual inspection and tune-up.  *See id.* at 104:22-105:11.

This is not a question of a reasonable dispute among experts.  Mr. Carr's sources identified many of these costs as components of a private well system.  But Mr. Carr made no attempt to quantify them.  Had he done so, it would have shown what the agreed remediation between Saint-Gobain and NHDES implicitly recognized: that Saint-Gobain's funding of municipal water connections has "reversed any alleged harm that may have occurred for the vast majority of proposed class members."  Mullin Rpt. at 5.

Mr. Carr's calculation of costs based on partial information in notes of two phone calls conducted by his associate, however, lacks a reliable method and is not "based on sufficient facts or data."  Fed. R. Evid. 702.  Mr. Carr said "you can call [these notes] subjective," but he would call them "experience-based assessment."  Carr Tr. at 81:19-82:9.  But in either case, these conclusory, hearsay notes of two phone calls provide little basis for Mr. Carr to infer that annual maintenance is the entirety of annual cost associated with a private well—especially where the notes acknowledge other costs that Mr. Carr does not account for.  Plaintiffs and Mr. Carr have "failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable."  *TK-7 Corp. v. Est. of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993).

8

And even if those statements were reliable, they also refer to other costs—the well system, its depth, and its filtration devices—that Mr. Carr made no attempt to quantify. The $225 figure for a "tune-up" was merely a floor, before considering the costs of a well pump, a pressure tank, testing, electricity, water softener, and others. Carr Tr. at 66:25-72:24. Having ignored those costs identified in his associate's notes, Mr. Carr's opinion is "speculative" and "does not 'rest[ ] on a reliable foundation.'" *Wai Feng Trading Co. Ltd v. Quick Fitting, Inc.*, 2018 WL 6726557, at *11 (D.R.I. Dec. 21, 2018) (quoting *Cruz-Vazquez v. Mennonite Gen. Hosp., Inc.*, 613 F.3d 54, 57 (1st Cir. 2010)). It is inadmissible.

## CONCLUSION

For these reasons, the Court should exclude the testimony of Plaintiffs' expert Jeffrey Carr.

Dated:  October 21, 2021                                                  Respectfully submitted,


/s/ *Bruce W. Felmly*
Bruce W. Felmly (NH Bar No. 787)
Jeremy T. Walker (NH Bar. No. 12170)
**MCLANE MIDDLETON, P.A.**
900 Elm Street, P.O. Box 326
Manchester, NH 03105-0326
Telephone:  (603) 625-6464
Fax:  (603) 625-5650
bruce.felmly@mclane.com
jeremy.walker@mclane.com

Sheila L. Birnbaum (Pro Hac Vice)
Mark S. Cheffo (Pro Hac Vice)
Bert L. Wolff (Pro Hac Vice)
Rachel Passaretti-Wu (Pro Hac Vice)
Lincoln Davis Wilson (Pro Hac Vice)
**DECHERT LLP**
1095 Avenue of the Americas
New York, NY  10036
Telephone:  (212) 698-3500
Fax:  (212) 698-3599

9

sheila.birnbaum@dechert.com
mark.cheffo@dechert.com
rachel.passaretti-wu@dechert.com
bert.wolff@dechert.com
lincoln.wilson@dechert.com

*Attorneys for Defendants Saint-Gobain Performance Plastics Corporation and Gwenael Busnel*