UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| KEVIN BROWN, et al., | ) | Civil Action No. |
| | ) | 1:16-cv-00242-JL |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SAINT-GOBAIN PERFORMANCE PLASTICS CORPORATION, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO EXCLUDE DEFENDANTS' NON-MEDICAL MONITORING EXPERTS**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... III

EXHIBIT LIST ..... VII

INTRODUCTION ..... 1

I. DEFENDANTS' ATTEMPT TO HIDE THE INADMISSIBILITY OF THEIR EXPERTS' OPINION IN ITS ARGUMENTS ON CLASS CERTIFICATION FAILS TO SAVE THEIR UNSUPPORTED SPECULATIVE OPINIONS ..... 2

II. DEFENDANTS' FATE AND TRANSPORT EXPERTS PRESENT UNRELIABLE OPINIONS THAT DO NOT FIT THE CASE ..... 8

A. Defense Experts Offer No Evidence of Individualized Issues Relevant to Class Certification ..... 9

B. Defendants' Unsupported Speculative Other Source Expert Testimony Is Not Admissible ..... 12

C. Defendants' Hydrogeology Expert Michael Mobile is Not Qualified to Opine about Airborne Fate and Transport Issues ..... 14

D. Defendants' Experts Panday and Connor's Opinions are Unreliable and Do Not Fit the Case ..... 16

1. Their Testimony about PFOA/PFOS Ratios Lack a Reliable Basis ..... 16

2. Mr. Connor's Opinions on Municipal Water Quality Model Calibration are Unreliable ..... 17

E. Defendants' Expert Chinkin's Opinions are Inadmissible ..... 18

1. Mr. Chinkin is Not Qualified to Opine about PFOA Contributions from other Possible Sources ..... 18

1. Chinkin's Opinions about TCI Amherst Are Unreliable ..... 21

2. Chinkin's AERMOD Opinions Are Unreliable ..... 22

3. Mr. Chinkin's Opinions on Background PFOA Levels Are Unreliable ..... 24

III. DEFENDANTS' PROPERTY DAMAGE EXPERTS PRESENT UNRELIABLE TESTIMONY THAT DOES NOT FIT THIS CASE ..... 26

A. Hamilton is Unqualified and His Opinions are Unreliable and Do Not "Fit" This Case ..... 31

1. Defendants admit that Hamilton is not qualified to render most of the opinions he offers ..... 31

2. Hamilton's opinion that there is no diminution-in-value is unreliable and should be excluded ..... 32

a. Hamilton's diminution-in-value opinion violates USPAP standards and Defendants do not carry their burden of showing otherwise ..... 33

b. Hamilton's opinion that the Class Area properties experienced no diminution-in-value is unreliable .....35

i. Hamilton's comparison of "in-class" and "out-of-class" property sales says nothing about how Saint-Gobain's PFOA contamination has affected Class Area property values .....36

ii. Defendants' arguments to the contrary are contradicted by the record and their own experts .....38

iii. Bell's unimpaired regression analysis does not support Hamilton's diminution-in-value opinion, either .....41

3. Hamilton's opinions about market awareness and the methodology Bell should have used to determine damages and diminution-in-value are unreliable ..... 41

4. Hamilton's opinion that regressions only predict "averages," not individual property values, is unreliable and does not fit this case ..... 43

5. Hamilton's opinion that Bell's r-squared is "too low" because it is below 0.9 is unreliable, and Defendants do not disagree ..... 45

6. Hamilton's opinions that Bell's standard error is too low and that his regressions are not precise enough should also be excluded ..... 46

7. Hamilton's opinion that Bell did not include enough variables in his unimpaired regression analysis is unreliable ..... 47

B. Phillips is Unqualified and His Opinions are Unreliable and Do Not "Fit" This Case .....49

1. Phillips' paired sales analysis is unreliable and his opinion that 41 supposedly "in-class" properties did not lose value because of Saint-Gobain's PFOA contamination should be excluded ..... 49

2. Phillips' and Defendants' arguments to do not rehabilitate Phillips' unreliability..... 54

3. Phillips' diminution-in-value opinion must be limited to the 41 properties he evaluated ..... 57

4. Phillips' opinions about regression are unreliable ..... 58

5. Phillips' opinions about Bell's case study methodology, Bell's use of FRED, typicality, and whether PFOA has had a "physical impact" on Class Area properties are unreliable and must be excluded ..... 60

IV. DEFENSE EXPERT CHARLES MULLINS' OPINIONS ARE INADMISSIBLE.....62

A. Mullin Is Not Qualified to Testify About Real Estate Values .....62

B. Mullin's Calculations Purporting to "Illustrate" the Cost of Private Well Ownership Lack a Reliable Basis and are Inadmissible .....63

C. Mullin's "Strong Revealed Preference" Opinion Is Unreliable .....63

D. Mullin's Commonality Opinions are Irrelevant under First Circuit and New Hampshire Law .....64

CONCLUSION ..... 64

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Bais Yaakov of Spring Valley v. ACT, Inc*,
12 F.4th 81 (1st Cir. 2021) .......... 10

*Baker v. Saint-Gobain Performance Plastics Corp.*,
2021 WL 2548825 (N.D.N.Y May 7, 2021) .......... 1, 9, 22

*Baker v. Saint-Gobain Performance Plastics Corp.*,
2022 WL 1025185 (N.D.N.Y. Feb. 4, 2022) .......... 9

*Ball v. Union Carbide Corp.*,
385 F.3d 713 (6th Cir. 2004) .......... 9

*Bazemore v. Friday*,
478 U.S. 385 (1986) .......... 48

*Boughton v. Cotter Corp.*,
65 F.3d 823 (10th Cir. 1995) .......... 9

*Broadcort Cap. Corp. v. Summa Med. Corp.*,
972 F.2d 1183 (10th Cir. 1992) .......... 14

*Carignan v. N.H. Int'l Speedway*,
858 A.2d 536 (N.H. 2004) .......... 4, 14

*Case v. St Mary's Bank*,
63 A.3d 1209 (N.H. 2013) .......... 3

*Casas Off. Machines. v. Mita Copystar Am., Inc.*,
42 F.3d 668 (1st Cir. 1994) .......... 12

*City of Almaty, Kazakhstan v. Ablyazov*, No. 15-cv-5345,
2021 WL 5154110 (S.D.N.Y. Nov. 5, 2021) .......... 35

*City of Hobbs v. Hartford Fire Ins. Co.*,
162 F.3d 576 (10th Cir. 1998) .......... 14

*Cooper v. Meritor, Inc.*,
2019 WL 545187 (N.D. Miss. Feb. 19, 2019) .......... 13, 14, 63

*Cruz v. Bridgestone/Firestone N. Am. Tire, LLC*,
388 Fed. App'x 803 (10th Cir. 2010) .......... 14

*Currier v. United Technologies Corp.*,
393 F.3d 246 (1st Cir. 2004)........................................................................................ 24

*Curtis v. M&S Petroleum, Inc.*,
174 F.3d 661 (5th Cir. 1999) ........................................................................................ 12

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ........................................................................................ *passim*

*DeBenedetto v. CLD Consulting Engineers, Inc.*,
903 A.2d 969 (N.H. 2006) ........................................................................................ 5, 13

*Dunlop v. Daigle*,
444 A.2d 519 (N.H. 1982) ........................................................................................ 4

*Gates v. Rohm & Hass Co.*,
655 F.3d 255 (3d Cir. 2011)........................................................................................ 9

*Gaydar v. Sociedad Instituto Gineco-Quirurgico*m,
345 F.3d 15 (1st Cir. 2003)........................................................................................ 20

*Goudreault v Kleeman*,
965 A.2d 1040 (N.H. 2009) ........................................................................................ 4, 5, 14

*Grimes v. Hoffmann-Laroche, Inc.*,
907 F. Supp. 33 (D.N.H. 1995)........................................................................................ 44

*Hartle v. Firstenergy Generation Corp.*,
7 F. Supp. 3d 510 (W.D. Pa. 2014)........................................................................................ 22

*Innis Arden Golf Club v. Pitney Bowes Inc.*,
629 F. Supp. 2d 175 (D. Conn. 2009)........................................................................................ 14

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018)........................................................................................ 10, 11

*In re Mirena IUD Prod. Liab. Litig.*,
169 F. Supp. 3d 396 (S.D.N.Y. 2016) ........................................................................................ 19, 20

*In re Neurontin Mktg. & Sales Pracs. Litig.*,
712 F.3d 21 (1st Cir. 2013*)* ........................................................................................ 2, 10, 13

*In re Stucco Litig.*,
175 F.R.D. 210 (E.D.N.C. 1997) ........................................................................................ 11

*J.B. Hunt Trans., Inc. v. Gen. Motors Corp.*,
243 F.3d 441 (8th Cir. 2001) ........................................ 12

*Lee-Bolton v. Koppers, Inc.*,
319 F.R.D. 346 (N.D. Fla. 2017) ........................................ 13, 14

*Mejdrech v. Met-Coil Systems Corp.*,
319 F.3d 910 (7th Cir. 2003) ........................................ 9

*Milward v. Rust-Oleum Corp.*,
820 F.3d 469 (1st Cir. 2016) ........................................ 14, 33, 63

*Nash v. Wal-Mart Stores, Inc.*,
2017 WL 5188339 (D. Colo. Feb. 15, 2017) ........................................ 14

*Pages-Ramirez v. Ramirez-Gonzalez*,
605 F.3d 109 (1st Cir. 2010)........................................ 20

*Parko v. Shell Oil Co.*,
739 F.3d 1083 (7th Cir. 2014) ........................................ 9

*Prantil v. Arkema Inc.*,
986 F.3d 570 (5th Cir. 2021) ........................................ 9

*Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*,
49 F. Supp. 3d 385 (S.D.N.Y. 2014) ........................................ 48

*Rink v. Cheminova, Inc.*,
203 F.R.D. 648 (M.D. Fla. 2001) ........................................ 11

*Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*,
161 F.3d 77 (1st Cir. 1998) ........................................ 51

*Securities & Exch. Comm'n v. Yorkville Advisors, LLC*,
305 F. Supp. 3d 486 (S.D.N.Y. 2018) ........................................ 35

*Sullivan v. Saint-Gobain Perf. Plastics Corp.*,
2019 WL 12323322 (D. Vt. July 15, 2019) ........................................ 22

*Sullivan v. Saint-Gobain Performance Plastics Corp.*,
2019 WL 8272995 (D. Vt. Aug. 23, 2019)........................................ 9

*Tyson Foods, Inc. v. Bouaphakeo*,
136 S.Ct. 1036 (2016) ........................................ 10

*United States v. Zolot*,
968 F. Supp. 2d 411 (D. Mass. 2013)........................................................................ 44

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
208 F.3d 288 (1st Cir. 2000)........................................................................................ 5

*Wilder v. Eberhart*,
977 F.2d 673 (1st Cir. 1992) ............................................................................... 4, 5, 12

*Zeigler v. Gibralter Life Ins. Co. of Am.*,
43 F.R.D. 169 (D.S.D. 1967)...................................................................................... 5–6

*Zibolis-Sekella v. Ruehrwein*,
2013 WL 4042423 (D.N.H. Aug. 8, 2013)....................................................................12

**Statutes and Rules**

42 U.S.C. § 7409(a) .................................................................................................. 23

FED. R. CIV. P. 26 ........................................................................................................ 61

FED. R. EVID. 702 ............................................................................................... 2, 24, 44

N.H. Rev. Stat. Ann. § 477:4-d..................................................................................... 42

N.H. Rev. Stat. Ann. § 507:7-e ....................................................................................... 5

N.H. Code. Admin. R. Env.-Dw 706.06.........................................................................56

**Other**

N.H. Civil Jury Instructions 18.1 (2021) .........................................................................4

RESTATEMENT (SECOND) OF TORTS § 158........................................................................ 4

Revisions to the Guideline on Air Quality Models [],
82 Fed. Reg. 5182 (Jan. 17, 2017).................................................................................. 23

**EXHIBIT LIST**[1]

| SHORT CITE | FULL CITE | DK # | EXHIBIT # | STATUS |
|---|---|---|---|---|
| 2018 Barr Rpt. Figure C3 | Barr Engineering, Preliminary Air Soil and Water Modeling (2018) | 353-21 | Ex. 40 | Public |
| 3M Authors | Geary W. Olsen et al., Plasma Cholecystokinin and Hepatic Enzymes, Cholesterol and Lipoproteins in Ammonium Perfluorooctanoate Production Workers, Drug & Chem. Toxicol. (2000) | 355-21 | Ex. 92 | Public |
| A.R.E. 2013 excerpt 1 | THE APPRAISAL OF REAL ESTATE (Appraisal Institute, 14th ed. 2013) | 352-19 | Ex. 15 | Public |
| A.R.E. 2013 excerpt 2 | THE APPRAISAL OF REAL ESTATE (Appraisal Institute, 14th ed. 2013) | 353-6 | Ex. 25 | Public |
| Articles of Incorporation | DBMP LLC, Articles of Incorporation (Oct. 2019) | 356-10 | Ex. 107 | Public |
| Aschebrook-Kilfoy et al. 2012 | Aschebrook-Kilfoy et al., Modeled nitrate levels in well water supplies and prevalence of abnormal thyroid conditions among the Old Order Amish in Pennsylvania, Envtl. Health (2012) | 355-12 | Ex. 83 | Public |
| Baggett (2008) | Christopher C. Baggett, et al., *From Start to Finish: Calibrating Pinellas County's 2,000-Mile Hydraulic Water Distribution System Model*, (Dec. 2008) Fla. Water Res. J. 45. | 306-3 | | |
| Baggett Rpt. | Report of Christopher C. Baggett, Aug. 2, 2020 | 379-10 | Ex. 110 | Public |
| Baggett Tr. | Transcript of Deposition of Christopher C. Baggett, June 11, 2021 | 378-39 | Ex. 111 | Public |
| Barr 2018 Rpt. | Barr Preliminary Air, Soil, and Water Modeling | 379-31 | Ex. 112 | Public |

[1] This chart includes exhibits from all three briefs pertaining to Plaintiffs' motion to exclude Defendants' non-medical monitoring experts: Dkts. 351 (corrected motion), 370 (opposition), and this Reply.

| SHORT CITE | FULL CITE | DK # | EXHIBIT # | STATUS |
|---|---|---|---|---|
| | Technical Memorandum: Merrimack, New Hampshire June 2017 (Revised September 2018) | | | |
| Bartell 2018 Rpt. | Report of Scott M. Bartell, June 25, 2018 | 354-23 | Ex. 68 | Public |
| Bartell 2020 Rpt. | Report of Scott M. Bartell, June 1, 2020 as corrected on July 3, 2020 | 354-6 | Ex. 51 | Public |
| Bartell & Vierra 2021 | Bartell & Vieira, Critical review of PFOA, kidney cancer, and testicular cancer, J. Air & Waste Management Assoc. (2021) | 354-3 | Ex. 48 | Public |
| Bell (2016) | Randall Bell, Real Estate Damages (2016) (excerpts) | 370-1 | Def Ex. 1 | |
| Bell 2018 Rpt. | Expert Report of Randall Bell (June 25, 2018) | 352-20 | Ex. 16 | Public |
| Bell 2019 Tr. | Transcript of Deposition of Randall Bell, June 26, 2019 | 299-10 | | |
| Bell 2020 Rpt. | Expert Report of Randall Bell (Aug. 28, 2020) | 352-1 | Ex. 2 | Public |
| Bell 2021 Tr. | Transcript of Deposition of Randall Bell, May 20, 2021 | 299-18 | | |
| Bell & Jackson (2002) | R. Bell & T. Jackson, *The Analysis of Environmental Case Studies*, The Appraisal Journal (2002) (Bell 2021 Tr., Ex. 7) | 370-2 | Def Ex. 2 | |
| C8 Science Panel 2012 | C8 Science Panel, Probable Link Evaluation for Chronic Kidney Disease (2012) | 354-25 | Ex. 70 | Public |
| Carr Tr. | Transcript of Deposition of Jeffrey Carr, May 26, 2021 | 297-3 | | |
| Casson 2014 | Robert Casson et al., Understanding and checking the assumptions of linear regression: a primer for medical researchers, Clinical & Experimental Ophthalmology (2014) | 355-14 | Ex. 85 | Public |
| Chalmers (1994) | James A. Chalmers & Daniel Sorrells, Supporting Appropriate Adjustments in Large-Scale Condemnation Actions, The Appraisal Journal (1994) | 370-3 | Def Ex. 3 | |

| SHORT CITE | FULL CITE | DK # | EXHIBIT # | STATUS |
|---|---|---|---|---|
| Chang 2014 | Xiaohui Chang et al., Disease Risk Estimation by Combining Case-Control Data with Aggregated Information on the Population at Risk, Crit. Rev. Toxicol. (2014) | 354-1 | Ex. 46 | Public |
| Charbonnet (2021) | Joseph A. Charbonnet, et al., Environmental Source *Tracking of Per- and Polyfluoroalkyl Substances within a Forensic Context: Current and Future Techniques* (2021). Envtl. Sci. & Tech. Vol. 55, 7237-7245 | 370-4 | Def Ex. 4 | |
| Chinkin (2005) | L. Chinkin, et al., Overview of Health Effects, Air Quality, and Emissions, in INTERIM REPORT OF THE COMMITTEE ON CHANGES IN NEW SOURCE REVIEW PROGRAMS FOR STATIONARY SOURCES OF AIR POLLUTANTS (2005), *available at* www.nap.edu/read/11208/chapter/5 | 370-5 | Def Ex. 5 | |
| Chinkin (2006) | L. Chinkin, et al., Emissions, Air Quality, and Human Health, in NEW SOURCE REVIEW FOR STATIONARY SOURCES OF AIR POLLUTION (2006), *available at* *www.nap.edu/read/11701/chapter/9* | 370-6 | Def Ex. 6 | |
| Chinkin 2019 Tr. | Deposition of Lyle Chinkin (Dec. 20, 2019) | 356-2 | Ex. 99 | Public |
| Chinkin 7/16/2019 Rpt. | Report of Lyle R. Chinkin, July 16, 2019 | 370-7 | Def Ex. 7 | Public |
| Chinkin 2021 Rpt. | Expert Report of Lyle Chinkin (July 6, 2021) | 356-3 | Ex. 100 | |

| SHORT CITE | FULL CITE | DK # | EXHIBIT # | STATUS |
|---|---|---|---|---|
| Chinkin 2021 Tr. | Deposition of Lyle Chinkin (Sept. 14, 2021) | 356-1 | Ex. 98 | Public |
| Colwell (1983) | Colwell, R, Cannaday, R., & Wu, C., The Analytical Foundations of Adjustment Grid Methods (1983 | 370-8 | Def Ex. 8 | |
| Connor-Payday 2021 Rpt. | Expert Report of John A. Connor & Sorab Panday (July 1, 2021) | 356-4 | Ex. 101 | Public |
| Connor 2021 Tr. | Deposition of John A. Connor (Sept. 10, 2021) | 356-6 | Ex. 103<br>Def Ex. 9 | Partial |
| Connor 2021 Tr. Ex. 5 | EPA, Water Distribution System Analysis: Field Studies, Modeling and Management (Dec. 2005) | 356-7 | Ex. 104 | Public |
| Control and Test Property Graphic | Control and Test Property<br><br>Graphic | 353-4 | Ex. 23 | Public |
| Cuvelier (2021) | Cuvelier, N. & Bartell, S., *Shrinkage Estimation of Long-Term Water Ingestion Rates* (2021). J. Expo. Sci. & Environ. Epidemiol | 355-13 | Ex. 84 | Public |
| DBMP Mot. To Compel | In re DBMP, LLC, No. 20-30080 (JCW) (W.D.N.C. Bnkr.) | 356-8 | Ex. 105 | Public |
| Detwiler Rpt. | Expert Report of Russell Detwiler | | Ex. 129 | |
| Detwiler Tr. | Transcript of Deposition of Russell L. Detwiler, June 2, 2021 | 378-38 | | Public |
| Dougherty 2016 | Christopher Dougherty, Introduction to Econometrics, Oxford University Press (5th ed. 2016) | 352-17 | Ex. 13 | Public |
| Edwalds Feb. 2022 Tr. | Deposition of Eric Edwalds (Feb. 2, 2022) | 379-12 | Ex. 113 | Partial |
| Emmett (2006) | Emmett, E. A., et al., *Community Exposure to Perfluorooctanoate: Relationships between Serum Levels and Certain Health Parameters* (2006). J. Occup. Env. Med. 48(8): 771-779 | 355-9 | Ex. 80 | Public |

| SHORT CITE | FULL CITE | DK # | EXHIBIT # | STATUS |
|---|---|---|---|---|
| EPA (2005) | EPA, Guidelines for Carcinogen Risk Assessment (2005) | 354-21 | Ex. 66 | Public |
| EPA (2017) | U.S. EPA, 40 CFR App. W to Part 51 Guidelines on Air Quality Models | 370-10 | Def Ex. 10 | |
| EPA 2019 | EPA, Update for Chapter Three of the Exposure Factors Handbook (2019) | 355-11 | Ex. 82 | Public |
| EPA 2020 | EPA, Benchmark Dose Software (BMDS) | 354-22 | Ex. 67 | Public |
| Faustman (1997) | Elaine M. Faustman & Scott M. Bartell, *Review of Noncancer Risk Assessment: Applications of Benchmark Dose Methods*, Vol. 3 No.5, Human and Ecological Risk Assessment, 893 (1997) | 354-11 | Ex. 56 | Public |
| FRED Table of Literature | Federal Reserve Economic Data Table of Literature | 353-8 | Ex. 27 | Public |
| Frisbee et al. 2009 | Frisbee et al., *The C8 Health Project: Designs, Methods and Participants, Envtl. Health Perspectives* (2009) | 355-5 | Ex. 76 | Public |
| Gloudemans & Almy | Robert Gloudemans & Richard *Almy, Fundamentals of Mass Appraisal, International Association of Assessing Officers* (2011) | 352-10 | Ex. 8 | Public |
| Grandjean et al. 2012 | Grandjean et al., *Serum Vaccine Antibody Concentrations in Children Exposed to Perfluorinated Compounds*, Envtl. Health Perspectives (2012) | 355-6 | Ex. 77 | Public |
| GSI 2021 Rpt. | Report of John A. Connor and Sorab Panday, July 1, 2021 | 308-1 | | |
| Guide Note 6 | THE APPRAISAL INSTITUTE, GUIDE NOTE 6: CONSIDERATION OF HAZARDOUS SUBSTANCES | | Ex. 114 | |

| SHORT CITE | FULL CITE | DK # | EXHIBIT # | STATUS |
|---|---|---|---|---|
| | IN THE APPRAISAL PROCESS (2013) | | | |
| Guo et al. 2014 | Guo et al., Prenatal Exposure to Organo-Chlorine Pesticides and Infant Birthrate in China, Chemosphere (2014 | 354-17 | Ex. 62 | Public |
| Guzelian 2019 Tr. | Transcript of Deposition of Philip S. Guzelian, Sept. 13, 2019 | 353-25 | Ex. 44 | Public |
| Guzelian 2021 Rpt. | Report of Philip S. Guzelian, July 5, 2021 | 304-4 | Ex. 45 | Sealed |
| Guzelian 2021 Tr. | Transcript of Deposition of Philip S. Guzelian, Sept. 14, 2021 | 353-24 | Ex. 43 | Public |
| Hamilton (1997) | Doctoral Dissertation of Thomas Hamilton | 370-11 | Def Ex. 11 | |
| Hamilton Rpt. | Expert Report of Thomas Hamilton (July 6, 2021) | 352-3 | Ex. 4 | Public |
| Hamilton 2021 Tr. | Deposition of Thomas Hamilton (Sept. 3, 2021) | 352 | Ex. 1 | Public |
| Hamilton Data Sheet | Excerpt from Hamilton's Excel spreadsheet, HAMILTON_NH004670-HAMILTON_NH004670HAMILTON_NH004670-HAMILTON_NH004670; contains the data he used to create the graph on page 74 of his report; filtered for brevity to show the Bedford and Merrimack properties | 377-27 | Ex. 115 | Public |
| Hamilton Dissertation | Dissertation of Thomas Hamilton | 352-12 | Ex. 10 | Public |
| Hamilton Work File | Hamilton Work File excerpt, produced as back-up materials to Hamilton Rpt. | 370-13 | Def Ex. 12 | |

| SHORT CITE | FULL CITE | DK # | EXHIBIT # | STATUS |
|---|---|---|---|---|
| Hoffman (2011) | Hoffman, K. et al., *Private Drinking Water Wells as a Source of Exposure to PFOA in Communities Surrounding a Fluoropolymer Production Facility* (2011). Environ. Health Persp. 92-97 | 355-8 | Ex. 79 | Public |
| Holford 2019 Rpt. | Report of Theodore R. Holford, July 12, 2019 | 355-3 | Ex. 74 | Public |
| Holford 2019 Tr. | Transcript of Deposition of Theodore R. Holford, Sept. 24, 2019 | 355-1 | Ex. 72 | Public |
| Holford 2021 Rpt. | Report of Theodore R. Holford, July 2, 2021 | 354-18 | Ex. 63 | Public |
| Holford 2021 Tr. | Transcript of Deposition of Theodore R. Holford, Sept. 2, 2021 | 355-2 | Ex. 73 | Public |
| IAAO Standard | International Association of Assessing Officers ("IAAO") Standard | 352-9 | Ex. 7 | Public |
| Jackson 2003 | Thomas O. Jackson, Methods and Techniques for Contaminated Property Valuation, The Appraisal Journal (2003) | 353-10 | Ex. 29 | Public |
| Jackson 2005 | Thomas O. Jackson, Evaluating Environmental Stigma with Multiple Regression Analysis, The Appraisal Journal (Fall 2005) | 352-11 | Ex. 9 | Public |
| Jackson 2010 | Thomas O. Jackson, *Real Property Valuation Issues in Environmental Class Actions*, The Appraisal Journal (2010) | 352-24 | Ex. 19 | Public |
| Kane (2004) | M.STEVEN KANE, MARK LINNE & JEFFREY A. JOHNSON, PRACTICAL APPLICATIONS IN APPRAISAL VALUATION MODELING (2004) (selections) | 377-34 | Ex. 116 | |

| SHORT CITE | FULL CITE | DK # | EXHIBIT # | STATUS |
|---|---|---|---|---|
| Kleinbaum et al. 1982 | Kleinbaum et al., Logistic Regression Analysis of Epidemiologic Data, Communication in Statistics – Theory and Methods (1982) | 354-14 | Ex. 59 | Public |
| Lambert et al. 2016 | Lambert et al., A Case Control Study of Mesothelioma in Minnesota Iron Ore Miners, Occupational Envtl. Medicine (2016) | 354-15 | Ex. 60 | Public |
| Lentz (1998) | Lentz, G. & Wang, K., Residential Appraisal and the Lending Process: A Survey of Issues. Journal of Real Estate Research (1998) | 370-14 | Def Ex. 13 | |
| Linne (2000) | MARK LINNE, M. STEVEN KANE &GEORGE DELL, A GUIDE TO APPRAISAL VALUATION MODELING (2000) (selections) | 377-36 | Ex. 118 | |
| Linne et al. | Mark Linne et al., A Guide to Appraisal Valuation Modeling, The Appraisal Institute (2000) | 352-4 | Ex. 5 | Public |
| Mandel 2019 Rpt. | Report of Jeffrey H. Mandel, July 16, 2019 | 355-17 | Ex. 88 | Public |
| Mandel 2021 Rpt. | Report of Jeffrey H. Mandel, July 6, 2021 | 355-15 | Ex. 86 | Public |
| Mandel Tr. | Transcript of Deposition of Jeffrey H. Mandel, Sept. 9, 2021 | 355-16 | Ex. 87 | Public |
| Mandel Minnesota Tr. | Transcript of Jeffrey Mandel, M.D., State of Minnesota, et al. v. 3M Company (Aug. 24, 2017) | 355-20 | Ex. 91 | Public |
| Miles (1975) | W. Porcher Miles, Applied Multiple Regression Analysis, The Real Estate Appraiser (1975) | 370-15 | Def Ex. 14 | Public |
| Minnesota Exhibits | 3M Emails and Memos to Dr. Mandel | 355-23 | Ex. 94 | Public |

| SHORT CITE | FULL CITE | DK # | EXHIBIT # | STATUS |
|---|---|---|---|---|
| Minnesota Exhibit 2204 | Minnesota Exhibit 2204: Email communication from Dr. Giesy dated 03/26/2008 | 355-18 | Ex. 89 | Public |
| Minnesota Exhibit 2207 | Minnesota Exhibit 2207: Email communication from Dr. Giesy dated 03/25/2008 | 355-19 | Ex. 90 | Public |
| Minnesota Exhibit 2604 | Minnesota Exhibit 2604: Memo re: FC Meeting – November 11, 2003 | 355-24 | Ex. 95 | Public |
| Mobile 2019 Rpt. | Report of Michael A. Mobile, July 12, 2019 | 308-5 | Ex. 119 | ??? |
| Mobile 2021-09-08 Tr. | Transcript of Deposition of Michael A. Mobile, Sept. 8, 2021 | 370-16 | Def Ex. 15 | |
| Mobile 2021 Rpt. | Expert Report of Michael Mobile (July 2, 2021) | | Ex. 96 | Sealed |
| Mobile 2021 Tr. | Deposition of Michael Mobile (Sept. 29, 2021) | 356 | Ex. 97<br>Def Ex. 16 | Partial |
| Mulaku (2010) | G.C. Mulaku & J. Kamau, Computer-Assisted Analysis of the Impact of Location on Residential Property Value: A Case Study of Nairobi, Kenya, THE APPRAISAL J., Summer 2010 | 377-37 | Ex. 120 | |
| Mullin 2021 Rpt. | Expert Report of Charles Mullin (July 6, 2021) | 356-11 | Ex. 108 | Public |
| Mullin 2021 Tr. | Deposition of Charles Mullin (Aug. 30, 2021) | 356-9 | Ex. 106<br>Def Ex. 17 | Partial |
| National Research Council 1983 | National Research Council, Risk Assessment in the Federal Government: Managing the Process (1983) | 354-24 | Ex. 69 | Public |
| Newsome (1992) | Bobby A. Newsome & Joachim Zietz, Adjusting Comparable Sales Using Multiple Regression Analysis: The Need for Segmentation, THE | 377-39 | Ex. 121 | |

| SHORT CITE | FULL CITE | DK # | EXHIBIT # | STATUS |
|---|---|---|---|---|
| | APPRAISAL J., January 1992 at 129 | | | |
| NH Property Disclosure | Property Disclosure-Residential Only, NH Association of REALTORS-Form (Dec. 2014) | 353-7 | Ex. 26 | Public |
| NHDES Risk Memo | NHDES Memo from D. Larson to J. Regan re: Direct Contact Risk-Based Soil Concentration, Perfluorooctanoic Acid (June 17, 2016) | | Ex. 122 | |
| NHDES 11/3/2017 | Letter from Lea Anne S. Atwell of NHDES to Christopher S. Angier of Saint-Gobain Re: "October 30, 2017 Meeting," Nov. 3, 2017 | 308-11 | Ex. 123 | |
| NHDES 2018 Modeling Memo | Memo from C. Beahm of NHDES to C. Freise of NHDES Re: "Air Deposition Modeling Report, " Sept. 26, 2018 (excerpt), *available at* https://bit.ly/2Z4Ee6t | 309 | | Confidential |
| NHDES Londonderry | Town of Londonderry PFAS Informational Meeting, May 20, 2021 | 371-3 | Def Ex. 18 | |
| OEHHA PHG | Office of Environmental Health Hazard Assessment, Perfluorooctanoic Acid and Perfluorooctane Sulfonic Acid in Drinking Water, July 2021 | 354-2 | Ex. 47 | Public |
| Okoruwa | Ason Okoruwa, How to Interpret Regression Coefficients and Calculate Adjustments for Differences in Property Productivity Features, The Appraisal Journal (2018) | 352-23 | Ex. 18 | Public |
| Panday Tr. | Transcript of Deposition of Sorab Panday, Sept. 9, 2019 | 371-5 | Def Ex. 19 | Partial |
| Panday 2021 Tr. | Deposition of Sorab Panday (Sept. 9, 2021) | 356-5 | Ex. 102 | Partial |

| SHORT CITE | FULL CITE | DK # | EXHIBIT # | STATUS |
|---|---|---|---|---|
| Phillips 2019 Rpt. | Expert Report of Trevor Phillips (July 11, 2019) | 353<br>353-1<br>353-2 | Ex. 21 | Public |
| Phillips 2019 Tr. | Deposition of Trevor Phillips (Oct. 9, 2019) | 352-25 | Ex. 20 | Public |
| Phillips 2021 Rpt. | Expert Report of Trevor Phillips (July 6, 2021) | 353-3 | Ex. 22 | Public |
| Phillips 2021 Tr. | Deposition of Trevor Phillips (Sept. 1, 2021) | 353-5 | Ex. 24<br>Def Ex. 20 | Public |
| Phillips Paired Sales Adjustment Grids | Chart constructed by Phillips, produced in connection with Phillips 2021 Rpt. | 371-11 | Def Ex. 21 | |
| Phillips Work File | Phillips Work File excerpts, produced as back-up materials to Phillips 2021 Rpt. | 371-12 | Def Ex. 22 | |
| Pope (2008) | Jaren C. Pope, *Do Seller Disclosures Affect Property Values? Buyer Information and the Hedonic Model*, LAND ECONOMICS, November 2008 at 551 | | Ex. 130 | |
| Post et al. 2017 | Gloria Post et al., Key Scientific Issues in Developing Drinking Water Guidelines for Perfluoroalkyl Acids: Contaminants of Emerging Concern, PLOS Biology (2017) | 355-10 | Ex. 81 | Public |
| Quantitative Analysis | The Appraisal Institute, Quantitative Analysis (2012) | 353-9 | Ex. 28 | Public |
| R-Squares Literature | Table of R-Squares Values Literature | 352-5<br>352-6<br>352-7<br>352-8 | Ex. 6 | Public |
| Real Estate Damages | RANDALL BELL, REAL ESTATE DAMAGES (3rd ed. 2016) (selections) | 377-7 | Ex. 124 | |
| Regression Literature | List of professional appraisal literature published by the Appraisal Institute | 352-21<br>352-22 | Ex. 17 | |

| SHORT CITE | FULL CITE | DK # | EXHIBIT # | STATUS |
|---|---|---|---|---|
| Robinson (2007) | Rudy R. Robinson III& Scott R. Lucas, *Seller Disclosure and Buyer Knowledge: How They Affect Market Value*, THE APPRAISAL J., Spring 2007 at 134 | | Ex. 131 | |
| Roddewig (2010) | Appraisal Institute, Analyzing the Effects of Environmental Contamination on Real Property, 2010, Part 4, Instructor Notes | 371-13 | Def Ex. 23 | |
| Sanders 1996 | Michael Sanders, Post-Repair Diminution in Value from Geotechnical Problems, Appraisal Journal (Jan. 1996) | 353-11 | Ex. 30 | Public |
| Schmidt (2017) | Schmidt, C., Sprawling Over a Manicured Suburban Landscape, Scientific American (2017) | 371-14 | Def Ex. 24 | |
| Schwartz 2019 Rpt. | Report of Sorell L. Schwartz, July 30, 2019 | 354-9 | Ex. 54 | Public |
| Schwartz 2019 Tr. | Transcript of Deposition of Sorell L. Schwartz, Sept. 12, 2019 | 354-8 | Ex. 53 | Public |
| Schwartz 2021 Rpt. | Report of Sorell L. Schwartz, July 6, 2021 | 354-10 | Ex. 55 | Public |
| Schwartz 2021 Tr. | Transcript of Deposition of Sorell L. Schwartz, Sept. 27, 2021 | 305-8 | Ex. 52 | Sealed |
| Shearer et al. 2021 | Joseph Shearer et al., *Serum Concentration of Per- and PolyFluoroalkyl Substances and Risk of Renal Cell Carcinoma*, The Nat'l Cancer Institute (2021) | 354-5 | Ex. 50 | Public |
| Shin 11/2/2020 TCI Rpt. | Report of Hyeong-Moo Shin in *Hermens v. Textiles Coated Inc.*, No. 216-2017-cv-524 (N.H. Super. Ct.), Nov. 2, 2020 | 309-4 | | |
| Shin et al. 2011b | Hyeong-Moo Shin et al., *Retrospective Exposure Estimation and Predicted versus* | 355-4 | Ex. 75 | Public |

| SHORT CITE | FULL CITE | DK # | EXHIBIT # | STATUS |
|---|---|---|---|---|
| | *Observed Serum Perfluorooctanoic Acid Concentrations for Participants in the C8 Health Project, Envtl. Health Persp.* (2011) | | | |
| Shin Rpt. | Expert Report of Hyeong-Moo Shin | | Ex. 132 | |
| Shin Tr. | Transcript of Deposition of Hyeong-Moo Shin, June 8, 2021 | 309-7 | Ex. 125 | Public |
| Shlaes (1984) | J. Shlaes, *The Market in Market Value*, The Appraisal Journal (1984) | 300-17<br>300-18<br>300-19<br>300-20 | Ex. 129 | |
| Simons (1999) | Simons, R., et al., The Price and Liquidity Effects of UST Leaks from Gas Stations on Adjacent Contaminated Property, THEAPPRAISAL J., 186 (1999) | | Ex. 117 | |
| Simons (2001) | Robert A. Simons, PhD, Kimberly Winson-Geideman, and Brian A. Mikelbank, PhD, The Effects of an Oil Pipeline Rupture on Single-Family House Prices, The Appraisal Journal (2001) | 371-15 | Def Ex. 25 | |
| Slob 1999 | Wout Slob, Thresholds in Toxicology and Risk Assessment, Int'l Journal of Toxicology (1999) | 354-20 | Ex. 65 | Public |
| Steenland et al 2014 | Kyle Steenland et al., Class Action Lawsuits, Can They Advance Epidemiologic Research?, Epidemiology (2014) | 355 | Ex. 71 | Public |
| Steenland (2020) Link | Kyle Steenland et al., Review: Evolution of Evidence on PFOA and Health Following the Assessment of the C8 Science Panel, Elsevier (Sept. 8, 2020), https://www.sciencedirect.com/science/article/pii/S0160412020320808?via%3Dihub | 354-4 | Ex. 49 | Public |

| SHORT CITE | FULL CITE | DK # | EXHIBIT # | STATUS |
|---|---|---|---|---|
| Steenland et al. 2018 | Kyle Steenland et al., PFOA and Ulcerative Colitis, Envtl. Research (2018) | 355-7 | Ex. 78 | Public |
| Sullivan 2018 Rpt. | Expert Report of David Sullivan (June 22, 2018) | 353-18 | Ex. 37 | Public |
| Sullivan 2018 Rpt. Ref 30 | List of Companies for Which No Further Investigation is Deemed Necessary by NHDES as Part of Southern NH PFOA in Drinking Water Investigation, Jan. 27, 2017 | 309-10 | | |
| Sullivan 1/28/19 TCI Rpt. | Report of David A. Sullivan in Hermens v. Textiles Coated Inc., No. 216-2017-cv-524 (N.H. Super. Ct.), Jan. 28, 2019 | 310-1 | | |
| Sullivan 2019 | Supplemental Exhibit of David Sullivan (Aug. 28, 2019) | 353-20 | Ex. 39 | Public |
| Sullivan 2019 Tr. | Transcript of Deposition of David A. Sullivan, June 20, 2019 | 311 | | Public |
| Sullivan 11/2/2020 | Report of David A. Sullivan in *Hermens v. Textiles Coated Inc.*, No. 216-2017-cv-524 (N.H. Super. Ct.), Nov. 2, 2020 | 311-3 | | |
| Sullivan 2020 Rpt. | Expert Report of David Sullivan (June 1, 2020) | 353-19 | Ex. 38 | Public |
| Sullivan 2021 Tr. | Deposition of David Sullivan (June 4, 2021) | 353-23 | Ex. 42 | Public |
| Sullivan Oct. 2019 Tr. | Deposition of David Sullivan (Oct. 11, 2019) | 353-22 | Ex. 41 | Public |
| Swanson House Testimony and Supporting Exhibits | Testimony of Lori Swanson, Former Minnesota Attorney General, Before the United States House of Representatives (Sept.10, 2019) | 355-22 | Ex. 93 | Public |

| SHORT CITE | FULL CITE | DK # | EXHIBIT # | STATUS |
|---|---|---|---|---|
| Tachovsky 2021 | Michael Tachovsky, Environmental Dead Zones: The Evaluation of Contaminated Properties, Appraisal Journal (Spring 2021) | 353-12 | Ex. 31 | Public |
| TAJ 7/1/2020 Ltr. | Letter from N. Bannon (Managing Editor, *The Appraisal Journal*) to M. Tachovsky (*Landmark Research Group*), July 1, 2020 | 301-1 | | |
| ARE | Appraisal Institute*, The Appraisal of Real Estate* (15th ed. 2020) (excerpts) | 371-16 | Def Ex. 26 | |
| Tripepi at al 2011 | Tripepi et al., How to Deal with Continuous and Dichotomic Outcomes in Epidemiological Research, Nephron Clinical Practice (2011) | 354-13 | Ex. 58 | Public |
| USGS Guidelines | Thomas E. Reilly & Arlen W. Harbaugh, U.S. Geological Survey, Guidelines for Evaluating Ground Water Flow Models (2004) | 311-5 | | |
| USGS Website | Deposition of Charles Mullin, Ex. 4 – USGS Website | 356-12 | Ex. 109 | Public |
| USPAP (2020-21) | Uniform Standards of Professional Appraisal Practice (2020-2021) (excerpts) | 371-17 | Def Ex. 27 | |
| USPAP AO-9 | USPAP Advisory Opinion 9 | 352-2 | Ex. 3 | Public |
| USPAP AO-20 | USPAP Advisory Opinion 20 | | Ex. 126 | |
| USPAP Excerpts | The Appraisal Standards Board, The Appraisal Foundation, Uniform Standards of Professional Appraisal Practice, Standard 1-5 (Appraisal Institute, 2018-2019 ed.) | | Ex. 127 | |
| USPAP Std. 1 | The Appraisal Standards Board, The Appraisal Foundation, Uniform Standards of | 353-13 | Ex. 32 | Public |

| SHORT CITE | FULL CITE | DK # | EXHIBIT # | STATUS |
|---|---|---|---|---|
| | Professional Appraisal Practice, Standard 1 (Appraisal Institute, 2018-2019 ed.) | | | |
| USPAP Std. 2 | The Appraisal Standards Board, The Appraisal Foundation, Uniform Standards of Professional Appraisal Practice, Standard 2 (Appraisal Institute, 2018-2019 ed.) | 353-14 | Ex. 33 | Public |
| USPAP Std. 3 | The Appraisal Standards Board, The Appraisal Foundation, Uniform Standards of Professional Appraisal Practice, Standard 3 (Appraisal Institute, 2018-2019 ed.) | 353-15 | Ex. 34 | Public |
| USPAP Std. 4 | The Appraisal Standards Board, The Appraisal Foundation, Uniform Standards of Professional Appraisal Practice, Standard 4 (Appraisal Institute, 2018-2019 ed.) | 353-16 | Ex. 35 | Public |
| USPAP Std. 5 | The Appraisal Standards Board, The Appraisal Foundation, Uniform Standards of Professional Appraisal Practice, Standard 5 (Appraisal Institute, 2018-2019 ed.) | 353-17 | Ex. 36 | Public |
| USPAP Std. 6 | The Appraisal Standards Board, The Appraisal Foundation, Uniform Standards of Professional Appraisal Practice, Standard 6 (Appraisal Institute, 2018-2019 ed.) | 352-18 | Ex. 14 | Public |
| Variable Differences Table | Table describing the differences between the published literature and Hamilton's positions | 352-14<br>352-15<br>352-16 | Ex. 12 | Public |
| White at al. 2009 | White et al., State-of-the-Science Workshop Report: Issues and Approaches in Low Dose Response, Extrapolation for Environmental Health Risk Assessment, Envtl. Health Perspectives (2009) | 354-19 | Ex. 64 | Public |

| SHORT CITE | FULL CITE | DK # | EXHIBIT # | STATUS |
|---|---|---|---|---|
| Wilson (2016) | A. Wilson, *Real Estate Damage Measurement: What Works, What Doesn't, and Why Not* (2016) (excerpt) | 371-18 | Def Ex. 28 | |
| Woolridge 2016 | Jeffrey M. Woolridge, Introductory Econometrics: A Modern Approach, Centgage Learning (2016) | 352-13 | Ex. 11 | Public |
| Wuolo Tr. | Deposition of Ray Wuolo (Jan. 14, 2022) | 379-22 | Ex. 128 | Partial |
| Yan et al. 2016 | Yan et al., Revealing Facts and Avoiding Biases, Frontiers in Public Health (Oct. 2016) | 354-12 | Ex. 57 | Public |
| Zhao et al. 2015 | Zhao et al., Ambient Air Pollutant PM10 and Risk of Pre-Term Birth in Landzhou China, Environ Int. (2015) | 354-16 | Ex. 61 | Public |
| Zhu (2019) | Zhu W., et al., *Final Report: PFAS Background in Vermont Shallow Soils (2019), available at https://anrweb.vt.gov/PubDocs/DEC/PFOA/Soil Background/PFAS-Background-Vermont-Shallow Soils-03-24-19.pdf* | 371-20 | Def Ex. 29 | |

## INTRODUCTION

Defendants proffer expert witnesses who offer unreliable opinions, frequently outside their claimed areas of expertise. Recognizing the inadequacies in their experts' opinions and qualifications, Defendants attempt to distance themselves from their experts' unsound speculation, recharacterize the opinions to align with claimed expertise, even when doing so runs counter to their own experts' testimony, misstate the record, and belatedly attempt to patch obvious holes in their experts' work.

Much of Defendants' response attempts to reargue their own *Daubert* motions and class certification opposition, which Plaintiffs fully address elsewhere. *See e.g.* Dkts. 377, 379. Whether in those pleadings or their opposition here, Defendants make wholly unsupported assertions. Here, they make the unsupported claim Plaintiffs have not provided "reliable criteria to establish relevant exposure." Dkt. 370 at 1. Plaintiffs' experts establish exposure for purposes of medical monitoring from actual measured well data, establishing historical exposures using the available measured data and widely accepted peer-reviewed methodologies.

Defendants try to blame Plaintiffs' experts for Defendants' own failure to address contributions from more than thirty *DeBenedetto* non-parties that they named in this case. Rather than provide a shred of evidence linking any of these "other sources" to any well contmaination at issue in this case, Defendants' experts offer *nothing* and proclaim there is another stage in this litigation to prove up their defenses. Dkt. 370 at 32. They do not "point to any evidence showing that a possible alternative source may be a significant contributing factor in contributing PFOA to the contaminated wells" in the Class area. *Baker v. Saint-Gobain Performance Plastics Corp.*, 2021 WL 2548825, *10 (N.D.N.Y May 7, 2021). Defendants' experts only claim that Plaintiffs' experts should have done more investigation without fitting those claims to Plaintiffs' burdens in this case. Plaintiffs need not rule out every other possible

source or prove a series of negatives. *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 45 (1st Cir. 2013).

Defendants argue that their property experts somehow "tested" Plaintiffs' expert's opinion that Saint-Gobain's contamination has caused diminution-in-value throughout the Class Area. Their experts' work contrary to generally accepted appraisal standards. Whether Class Area housing *prices* went up does not provided evidence about whether diminution-in-*value* occurred because of Saint-Gobain's class wide PFOA contamination. And even Defendants admit the very opinion they advance is not one that their expert is even qualified to render. Further, Defendants' new assertion that it does not matter whether their property damage experts considered the environmental conditions (including PFOA contamination) of any properties they evaluated is yet another fruitless attempt to save their expert's opinion by forfeiting their experts' credibility—the record, their own expert's testimony, and even common sense prove that their assertion is not accurate.

Defendants further suggest that a degree alone can establish expertise in any area, including areas in which the degree holder acknowledges a lack of expertise (or presumably substitute for reliable methodologies or data gaps). Dkt. 370 at 2. But an economist is not an expert in real estate when he admits he is not. Likewise, a hydrogeologist who admits he is unqualified to answer questions on airborne pollution should not be allowed to render opinions on the same. Both examples would turn Rule 702 on its head.

## I. DEFENDANTS' ATTEMPT TO HIDE THE INADMISSIBILITY OF THEIR EXPERTS' OPINION IN ITS ARGUMENTS ON CLASS CERTIFICATION FAILS TO SAVE THEIR UNSUPPORTED SPECULATIVE OPINIONS

In responding to Plaintiffs' Motion to Exclude, Defendants attempt to hide their experts' lack of reliability and that their opinions do not fit the issues in the case by arguing class certification. Even when arguing that their experts' opinions can be used for merits, Defendants

argue certification. Dkt. 370 at 34–35. Defendants argue proofs Plaintiffs are not required to make, most glaringly about non-parties. Defendants' experts' opinions about other sources are admissible only if they are reliable and fit the case; in other words, meet the proof required of Plaintiffs. They are reliable only if there is evidence in support. Defendants' and their experts' speculation is not admissible.

Plaintiffs do not have to prove that "all PFOA in all wells" at issue in the case is attributable to Saint-Gobain contrary to Defendants' claim, Dkt. 370 at 29–30, 35. Plaintiffs only have to prove that releases from Saint-Gobain, which Saint-Gobain and their experts do not dispute have occurred, entered on Plaintiffs' properties and caused an interference with those properties. Plaintiffs similarly are only required to prove that the PFOA released from Saint-Gobain was sufficient to cause interference and property losses, and was sufficient to cause contamination of household water at levels that require medical monitoring. Even if there are "background" (otherwise existing) levels of PFOA, which Defendants' experts do not prove, that would not change the proof that the PFOA Saint-Gobain has released caused property damage and exposure sufficient for medical monitoring. Whether some additional source may have added PFOA levels, that would not change the proof that the PFOA Saint-Gobain released caused property damage and exposure sufficient for medical monitoring. Thus Defendants' experts' opinions about a site-specific determination quantifying an unproven source's relative contribution, Dkt. 370 at 30, are not reliable where there is no actual evidence to support another source. And they do not fit this case because Plaintiffs are not required to show that quantification, and proof of alternate sources is Defendants' *DeBenedetto* burden.

Defendants and their experts argue that Plaintiffs must prove the amount of PFOA deposition from Saint-Gobain on each Class Area property. That is not true either for class

certification or trial. A trespass is an intentional entry on the premises of another. N.H. Civil Jury Instructions 18.1 (2021); *Case v. St. Mary's Bank*, 63 A.3d 1209, 1216 (N.H. 2013) (emphasis added); RESTATEMENT (SECOND) OF TORTS § 158 (1965). No quantification is required. A nuisance is an activity that substantially and unreasonably interferes with the use and enjoyment of property. *Id.* at 28.1. A private nuisance exists when an activity substantially and unreasonably interferes with the use and enjoyment of another's property. *Dunlop v. Daigle*, 444 A.2d 519, 520 (N.H. 1982). Again, no quantification is required. Plaintiffs' experts demonstrate what the law actually requires—proof that Defendants were a "substantial factor" in or "contributed" to Plaintiffs' harm. *Carignan v. N.H. Int'l Speedway*, 858 A.2d 536, 541–42 (N.H. 2004).

Defendants' experts' opinions that Plaintiffs experts' opinions are flawed because they or their methodologies do not quantify the amount of PFOA on a particular property are unreliable because it is contrary to Plaintiffs' legal burden of proof and so does not fit the case. *Cf. Goudreault v. Kleeman*, 965 A.2d 1040, 1049–50 (N.H. 2009) (plaintiff need only show with reasonable probability, not mathematical certainty, that but for the defendant's negligence, the harm would not have occurred). Thus, Plaintiffs do not have to show the *amount* of Saint-Gobain's emissions that fell within the Class Area, only that Saint-Gobain's emissions have been deposited on all properties throughout the Class Area. Plaintiffs do not have to show the *quantity* of deposition on any individual property, only that it has occurred in such a manner as to cause interference and property damage. That the deposition may be at different levels on different properties is irrelevant as long as it has occurred and is caused by Saint-Gobain.

Defendants claim that neither they nor their experts are required to show that specific alternative sources actually impacted specific individual public and private wells. Dkt. 370 at

34. That is not the law. *DeBenedetto*, decided fourteen years after *Wilder v. Eberhardt*, 977 F.2d 673 (1st Cir. 1992) upon which Defendants rely, requires identification of the specific parties that Defendants claim are responsible for the harm claimed by Plaintiffs, and those parties' fault. *DeBenedetto v. CLD Consulting Eng'rs, Inc.*, 903 A.2d 969, 981 (N.H. 2006). Moreover, a defendant may not easily shift fault under RSA 507:7-e; allegations of a non-litigant tortfeasor's fault must be supported by adequate evidence before a jury or court may consider the non-litigant for fault apportionment. *DeBenedetto,* 903 A.2d at 981 (emphasis added). Defendants' reliance on *Wilder* is misplaced. *Goudreault*, 965 A.2d at 1058. *Goudreault,* which Defendants fail to cite, noted *Wilder* was out of date in New Hampshire law. *Id.* Moreover, the New Hampshire Supreme Court distinguished *Wilder* from instances like this case, where the defendant is seeking to prove another cause and so must go beyond the mere rebuttal of the plaintiff's expert evidence. *Id.* Here, Defendants named more than thirty *DeBenedetto* defendants (Dkt. 272-8, *DeBenedetto* Disclosures) and are seeking to prove alternative causes through their experts. Defendants carry the burdens of production and proof as to each one. *Id.* at 1057. Defendants' "no evidence" argument that they can claim there is something out there that is a cause other than their conduct is simply not the law.

Defendants argue that the standard for evidence is different for class certification. Dkt. 370 at 29–30. However, the Court should not allow testimony where the record before it does not in any way support the assertions Defendants make. *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000) ("We are unwilling to fault a district court for not permitting arguments woven entirely out of gossamer strands of speculation and surmise to tip the decisional scales in a class certification ruling"), citing *Zeigler v. Gibralter Life Ins. Co. of Am.*, 43 F.R.D. 169, 172 (D.S.D. 1967) ("Defendant contends that there may be variations in the

representations made or differences in the kinds or degrees of reliance by the minority stockholders. Such allegations, however, are matters of complete speculation.").

PFOA sampling results in private and municipal wells document that PFOA is in household water consumed by class members. Defendants' experts do not dispute the accuracy of the actual sample results. The work of Plaintiffs' experts' and Saint-Gobain's consultant Barr Engineering shows that these measurements and Saint-Gobain emissions data can be used to predict past levels in municipal wells caused by Saint-Gobain's emissions alone. Even if there were other sources of PFOA that increase those levels, that does not eliminate Saint-Gobain's responsibility as a substantial factor in harms caused by its PFOA contamination. The levels shown in Barr's model and documented by Plaintiffs' experts are based on PFOA emission rates and mass caused by Saint-Gobain alone and replicate PFOA levels in water. Barr 2018 Rpt. at 1; *id.* at Appendix A. Thus, Defendants cannot show that those levels of PFOA came from an alternative source. Defendants complain that Barr only studied Saint-Gobain, but that matches Plaintiffs' burden of proof in this case: did Saint-Gobain's emissions cause harm to Plaintiffs?

Further, Defendants mischaracterize Plaintiffs' expert testimony on alternative causes. Defendants raise two separate categories of speculative alternate causes: 1) direct releases of PFOA to soil, causing groundwater contamination at a specific location, and 2) other airborne deposition of PFOA. With respect to groundwater sources, although Plaintiffs' expert Sullivan, an air modeler, identified the Merrimack Landfill as an example of a potential source of PFOA in the groundwater, both Plaintiffs' expert Shin and Saint-Gobain (through Barr Engineering) have shown that the landfill was not actually a source of PFOA contamination at any well. Sullivan does not "admit" to any particular direct release to soil or groundwater.

Dr. Shin evaluated the alternative causes that Barr Engineering listed and found no evidence that supports that any of them caused PFOA contamination of Class Area groundwater, contrary to Defendants' claim that he has not meaningfully accounted for them. Ex. 125, Shin Tr. 167:14–21; 167:14–21; 166:4–175:3. Defendants' citations do not say otherwise. Thus, Plaintiffs' experts do not admit that another source "impacted area groundwater," as Defendants' incorrectly claim. Dkt. 370 at 31. At most, Plaintiffs' experts indicate that if there were evidence, those potential sources would be localized additional sources. *Id*. And Barr's list of alternative causes was not "confirmed" as Defense counsel claims. *Id.* at 31. Barr only said that they were "known to be potential." Ex. 112, Barr 2018 Rpt. at 5. Dr. Shin's testimony on property-by property analysis addresses Saint-Gobain's claimed additional sources, not the class-wide contamination Saint-Gobain caused, as Defendants admit. Dkt. 370 at 31. Defendants' experts' claims that other sources could or did contribute to groundwater contamination, in addition to the PFOA contamination Saint-Gobain caused, and their claims that those other sources should be considered, must be excluded because they have no evidence that any of them actually did contribute to individual public and private wells, the issue that Defendants claim is in the case. Dkt. 370 at 30. It is like saying that NASA scientists are unreliable because they do not consider that the moon's surface is made of green cheese, when there is simply no evidence to support that proposition. That Plaintiffs' experts could not testify that there was never any other release of PFOA attests to their credibility and is irrelevant to the determination of whether Saint-Gobain's release caused the damages that Plaintiffs claimed.

As to the second category of speculative alternative causes, airborne sources, Defendants identify one. Both Plaintiffs' experts Sullivan and Shin acknowledge that some PFOA from TCI was likely deposited within the Class Area in addition to the PFOA contamination Saint-Gobain

caused, and so clearly evaluated that source. Ex. 42, Sullivan 2021 Tr. at 222:3–7; Ex. 125, Shin Tr. at 98:18–21; 26:1–12. Mr. Sullivan does not opine that any deposition from TCI impacted groundwater, contrary to what Defendants' lawyers allege. *Id*. Rather, Mr. Sullivan notes that because of the poor record keeping at both the TCI and Saint-Gobain facilities, comparative quantitative analysis (which is not required) cannot be completed. *Id*. at 222:8–16. Barr Engineering, Saint-Gobain's consultant, did not even list TCI as potential alternative source in its 2018 report, let alone an obvious one. Ex. 112, Barr 2018 Rpt. at 5, 6.

Defense counsel's argument on class certification does not save the unreliability of their experts' opinions and does not make those opinions fit the case. At issue for class certification is whether Saint-Gobain's contamination is individualized; it is not. That the inquiry into Defendants' experts' phantom "other sources" could be individualized, if they existed, does not mean that the inquiry into Saint-Gobain's contamination of class properties is individualized. Plaintiffs' experts and the work of Saint-Gobain's consultant Barr shows that it is not. And Defendants' experts never reliably show that an individualized inquiry of other sources is necessary where there is no evidence that they impacted any well at issue in the case.

## II. DEFENDANTS' FATE AND TRANSPORT EXPERTS PRESENT UNRELIABLE OPINIONS THAT DO NOT FIT THE CASE

This Court should reject Defendants' attempt to rehabilitate their fate and transport experts' unreliable speculation about other possible sources and on topics beyond their expertise. Their hydrogeology expert Michael Mobile forcefully disclaims expertise on air pollution fate and transport yet opines on the work of Plaintiffs' expert David Sullivan, a meteorologist and air modeler. Their air modeling expert Lyle Chinkin should not be allowed to offer opinions on PFOA at all given his demonstrable lack scientific knowledge about PFOA. Their environmental engineer Connor and hydrogeologist Panday cannot educate the jury on the significance of

PFOA/PFOS ratios since both lack a reliable basis to offer opinions about the data. Further, Mr. Connor lacks a reliable basis for asserting tap water samples are required to "properly calibrate" Mr. Baggett's municipal water quality model.

### A. Defense Experts Offer No Evidence of Individualized Issues Relevant to Class Certification

Defendants claim their fate and transport experts' hypotheses about contribution from other sources of PFOA contamination are relevant to class certification.[2] However, their experts do not offer any opinions that would create individualized issues at trial. They do not "point to any evidence showing that a possible alternative source may be a significant contributing factor in contributing PFOA to the contaminated wells" in the Class area. *Baker*, 2021 WL 2548825 at

[2] Defendants overstate circuit court holdings in environmental tort cases. Dkt. 370 at 30. *Prantil* held "only that the relative balance of concededly common claim elements to contested elements of causation and injury warrants closer attention [by the trial court]." *Prantil v. Arkema Inc.*, 986 F.3d 570, 580 (5th Cir. 2021). *Boughton* held that a district court did not *abuse its discretion* in denying class certification where the plaintiffs' injuries came from more than one source and where the plaintiffs' expert proof on medical monitoring was drastically different from Plaintiffs' experts present in this case. *Boughton v. Cotter Corp.*, 65 F.3d 823 (10th Cir. 1995). *Ball* held a district court did not *abuse its discretion* in denying class certification where multiple defendants made a single common course of action unlikely and proof of medical monitoring claims were different from here. *Ball v. Union Carbide Corp.*, 385 F.3d 713 (6th Cir. 2004). *Parko* held a district court needed to "revisit the issue of certification" because it "treated predominance as a pleading requirement." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086, 1087 (7th Cir. 2014) (also refusing to overturn a prior holding affirming an issue class of "homeowners who were complaining about contamination of groundwater" from an industrial solvent from a "single source of pollution" that contaminated the water supply. *Id.* at 1087 (citing *Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910 (7th Cir. 2003). *Gates* held the trial court did not *abuse its discretion* in denying class certification where the experts failed to demonstrate exposure to the defendants' pollution above a threshold requiring medical monitoring, again in contrast to Plaintiffs' case here. *Gates v. Rohm & Hass Co.*, 655 F.3d 255, 267 (3d Cir. 2011). In *Gates* the "parties *agree[d]*" that resolution of common questions left unanswered questions of "causation of contamination, extent of contamination, fact of damages, and amount of damages." *Id.* at 271 (emphasis added). Nor have Plaintiffs here "failed to present arguments or propose common proof for each element" of their claims. *Id.* Courts overseeing class actions involving PFOA contamination from Saint-Gobain facilities uniformly have held class certification appropriate. *Sullivan v. Saint-Gobain Performance Plastics Corp.*, No. 5:16-CV-125, 2019 WL 8272995 (D. Vt. Aug. 23, 2019); *Baker v. Saint-Gobain Performance Plastics Corp.*, No. 1:16-CV-00917, 2022 WL 1025185 (N.D.N.Y. Feb. 4, 2022) (confirming certification of settlement classes).

*10. They offer no data on a property-by-property basis and merely render (unreliable) opinions "common to the claims made by all class members." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1047 (2016); *see also* Dkt. 370 at 30.[3]

First Circuit case law holds that this Court should consider "how a trial would proceed in the event of certification." *Bais Yaakov of Spring Valley v. ACT, Inc.*, 12 F.4th 81, 98 (1st Cir. 2021). Trial will proceed with Plaintiffs' experts presenting common evidence linking Saint-Gobain's emissions to PFOA contamination throughout the Class Geographic Area. Defendants will attempt to undermine their testimony through cross examination. Assuming this Court finds Defendants' fate and transport opinions reliable (which they are not), their disclosed opinions indicate they will speculate that other sources could have also contributed to PFOA contamination to wells without testifying that any likely did, and without any data to support that they did. Thus, *at trial*, Defense experts will only raise a defense common to each class member.

Defendants are not precluded from raising property-specific defenses based on hypothesized additional PFOA contributions to individual properties from their *DeBenedetto* defendants. They simply chose not to. Six years into this case, they have yet to produce data that demonstrates any of their *DeBenedetto* non-parties in fact contaminated household water supplies for any class property. Even as to TCI, they provide no data that it did so. Defendants raise a "categorical challenge" without offering any individualized defense. *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 59 (1st Cir. 2018). However, the mere possibility a defendant *could have* raised individualized defenses is not enough to defeat class certification. *See id.* at 52

[3] Defendants' experts "other sources" opinions, which Defendants fail to rehabilitate, parallel arguments the First Circuit has rejected in the class context. Plaintiffs need not "prove a series of negatives" or "offer evidence which positively excludes every other possible cause." *Neurontin*, 712 F.3d at 45. Defendants also sidestep the preponderance standard that applies in civil cases.

(distinguishing *Nexium* because the defendant never asserted that they would challenge the plaintiffs' individual affidavits).

Defendants try to preserve their unsupported other sources by incorrectly asserting there is no burden "at this stage to prove up [their] defenses" and that there will be a "second round of litigation against third parties." Dtk. 370 at 32, 33. There are no additional stages or litigation for *DeBenedetto* defendants; the reports at issue in Plaintiffs' motion are also Defendants' merits reports. *See, e.g.*, Dkt. 368 (Joint Proposed Scheduling Order Mar. 22, 2022). Defendants cannot reopen discovery to "prove up" their defenses. Dkt. 370 at 32. Defendants had every opportunity to do the work to support individual affirmative defenses and challenges and failed to proffer expert opinions in support any non-parties. Dkt. 370 at 32 (quoting *Asacol*, 907 F.3d at 53). Their last-ditch effort to establish relevance of other sources to class certification without individualized expert opinions after six years of litigation do not withstand basic scrutiny.

Defendants' reliance on *Rink v. Cheminova, Inc.*, 203 F.R.D. 648 (M.D. Fla. 2001) and *In re Stucco Litig.*, 175 F.R.D. 210 (E.D.N.C. 1997) is also misplaced. The possibility of apportionment alone did not defeat the class certification in either case. *Rink* would have involved a series of minitrials because the plaintiffs chose not to seek class certification on key issues (injury and harm). *Rink*, 203 F.R.D. at 651–52. *Stucco* involved third party negligence claims both parties agreed were relevant and "there [was] evidence that third parties' negligence was a proximate cause of plaintiffs' damages." 175 F.R.D. at 214–15.[4] Prohibiting joinder of third-party defendants in *Stucco* would have required the defendants to institute a second round of house-by-house contribution claims. *Id.* Here, in contrast, Defendants raised their

[4] Named plaintiffs in the federal court action filed claims against third parties in state court (*e.g.*, contractors and builders of the plaintiffs' homes). *Id.* at 214.

comparative fault defense *in this litigation,* but failed to present any individualized evidence supporting it. Defendants have no individualized expert testimony to present.[5]

**B. Defendants' Unsupported Speculative Other Source Expert Testimony Is Not Admissible**

Expert testimony "must be more than unsupported speculation or subjective belief." *Zibolis-Sekella v. Ruehrwein*, 2013 WL 4042423, *3 (D.N.H Aug. 8, 2013) (citing *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999). "Expert testimony that is speculative is not competent proof and contributes nothing to a legally sufficient evidentiary basis." *Id.* (quoting *J.B. Hunt Trans., Inc. v. Gen. Motors Corp.*, 243 F.3d 441, 444 (8th Cir. 2001). A district court may exclude expert testimony where it finds that the testimony has no foundation or rests on obviously incorrect assumptions or speculative evidence. *Casas Off. Machines. v. Mita Copystar Am., Inc.*, 42 F.3d 668, 681 (1st Cir. 1994).

*Wilder* does not require admission of expert speculation about possible (as opposed to likely) contributions from other sources. The defense experts in *Wilder* were prepared to rebut competing expert testimony that "categorically ruled out *any possibility*" of other causes—a claim that Plaintiffs' experts do not make in this case. *Wilder*, 977 F.3d at 675. While the defense experts were not prepared to testify that any of the possible sources were "certainly or more probably than not" the cause, Dkt. 370 at 34 (quoting *Wilder*, 977 F.3d at 676), they *were* prepared to testify one was the "***most likely cause***" while the "***least likely of the possible causes***" was the one selected by the plaintiff's expert. *Wilder*, 977 F.3d at 675 n.1. Defendants offer no expert opinions that ***any*** other source (*i.e.*, *DeBenedetto* defendant) was more likely than Saint-Gobain to have contaminated ***any*** household groundwater in the Class Areas. They claim that

[5] Defendants' Seventh Amendment rights are therefore not at issue. *See* Dkt. 370 at 33. The same jury would have been able to hear Defendants' *DeBenedetto* claims if there were evidence.

Plaintiffs' experts must "prove a series of negatives" or "offer evidence which positively excludes every other possible cause," which is not required. *Neurontin*, 712 F.3d at 45.

Defendants also overstate the holding in *Cooper v. Meritor, Inc.*, 2019 WL 545187 (N.D. Miss. Feb. 11, 2019) with out-of-context quotes to claim their experts' speculation is relevant. The mere "*existence* of industrial and commercial activities" did not render the plaintiffs' expert testimony inadmissible in that case. Dkt. 370 at 34 (quoting *Cooper*, 2019 WL 545187, at *21–22) (emphasis added). Rather, there was "undisputed data" and an "established connection between the contamination [from the other sources] and the contamination [in the plaintiffs' properties]" that both parties recognized. *Cooper*, 20019 WL 545187, at *21. There is no "established connection" between contamination from ***any*** *DeBenedetto* defendant and ***any*** water source in this case, and Defendants' experts offer none.[6]

In *Lee-Bolton*, the expert's opinion on other possible sources was admissible because the expert did not merely submit the list and claim possible sources were in the area, but established some likelihood that other sources contributed to specific properties in the class area. *Lee-Bolton v. Koppers Inc.*, 319 F.R.D. 346, 378–79 (N.D. Fla. 2017). Defendants' experts here merely

[6] Connor and Panday opine that some percentage of PFOA mass from under Longa Landfill contributed to certain MVD wells, without any evidence. Ex. 101, Connor-Panday Rpt. at 30. Their opinion contradicts the analysis of Saint-Gobain's consultant Barr Engineering and conclusion that Longa was not a substantial contributor to PFOA contamination in those wells. Ex. 128, Wuolo Tr. at 43:20–44:18. Thus, there is no "established connection" comparable to the known groundwater plume at issue in *Cooper*. Moreover, the percentage Conner and Panday attribute to Longa Landfill is below 50 percent and therefore Defendants are still joint and severally liable under New Hampshire law. *See DeBenedetto v. CLD Consulting Engineers, Inc.*, 903 A.2d 969, 977 (N.H. 2006).

speculate other sources *may* have contributed PFOA contamination because they are in the Class Geographic Area without establishing any proof of ***any*** connection to ***any*** property or well.[7]

Finally, Defendants claim their burden on apportionment only "comes into play" after Plaintiffs prove fault. Dkt. 370 at 35. Again, there is no other stage of litigation devoted to *DeBenedetto* claims, and they ignore New Hampshire precedent requiring that "a defendant who raises a non-litigant apportionment defense . . . *must* seek to impose liability on a non-litigant just as plaintiff seeks to impose it on him." *Goudreault*, 965 A.2d at 1057 (emphasis added).[8] The opinions are not relevant.

### C. Defendants' Hydrogeology Expert Michael Mobile is Not Qualified to Opine about Airborne Fate and Transport Issues

Defense expert Mobile lacks the expertise to opine the work of Plaintiffs air modeler and meteorologist Sullivan. An expert with generalized knowledge "who lacks specific knowledge does not necessarily assist the jury to understand the evidence." *Nash v. Wal-Mart Stores, Inc.*, 2017 WL 5188339, *6 (D. Colo. Feb. 15, 2017) (citing *City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576, 587 (10th Cir. 1998)); *see also Broadcort Cap. Corp. v. Summa Med. Corp.*, 972

[7] Defendants' reference to Dr. Shin's testimony does not establish the need for a property-by-property analysis to demonstrate Defendants were a "substantial factor" and "cause[d] or contributed to the harm." *Carignan v. N.H. Int'l Speedway, Inc.*, 858 A.2d 536, 541–2 (N.H. 2004). That Dr. Shin was unwilling to testify with absolute certainty that 100 percent of the PFOA contamination is attributable to Saint-Gobain does not undermine Plaintiffs' expert opinions, not does it impeach Plaintiffs' claims of harm based on the contamination Saint-Gobain did cause.

[8] Defendants claim that various cases raise individualized causation issues all involved differential analysis methodology, which is akin to a process of elimination. *Cruz v. Bridgestone/Firestone N. Am. Tire, LLC*, 388 Fed. App'x 803, 807 (10th Cir. 2010) (explaining differential analysis); Dkt. 370 at 35 (citing *Milward v. Rust-Oleum Corp.*, 820 F.3d 469, 476 (1st Cir. 2016) (expert ruled out causes but failed to rule-in defendant as cause); *Cooper*, 2019 WL 545187, at *19, 22 (differential analysis); *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F. Supp. 2d 175, 189 (D. Conn. 2009) (same); *Lee-Bolton*, 319 F.R.D. at 373–74 (same)). Plaintiffs' experts in this case did not rely on differential analysis and so Defendants' apples-to-orange comparisons do not make their experts' opinions any less speculative or relevant.

F.2d 1183, 1195 (10th Cir. 1992). Mobile is not an air modeler and refused to answer basic questions touching on air modelling or air emissions because he is unqualified. *See e.g.*, Mobile Tr. at 60:2–22, 121:13–25, 139:2–11, 253:18–25.[9] While refusing to answer questions related to air emissions and modeling, Mobile nevertheless opines that Mr. Sullivan inappropriately relies on the Barr model. Dkt. 370 at 36 (citing Ex. 96, Mobile 2021 Rpt. at 69). Mr. Sullivan's relied on Barr's ***air*** model (AERMOD) and model inputs; both are outside Mobile's expertise. Defendants try to salvage Mobile's opinion by broadly characterizing the opinion as within "[e]nvironmental fate and transport." Dkt. 370 at 36. But there are different kinds of fate and transport models, which is why Defendants retained a separate air modeling expert. Dkt. 370 at 37.

Mobile similarly criticizes air expert Sullivan's consideration of other (speculative) groundwater sources of PFOA as somehow inadequate (*id.* at 36) while simultaneously denying expertise about air emissions. Ex. 106, Mobile 2021 Tr. at 139:2–11. Defendants again try to salvage the opinion as consistent with "industry guidance" for "fate and transport modeling generally." Dkt. 370 at 36. Mobile cannot opine about "sources potentially associated with deposition via emissions" while disclaiming expertise about the same. Ex. 96, Mobile 2021 Rpt. at 70.

Since Mobile disclaims even basic expertise on airborne emissions, *a fortiori* he also lacks the expertise to recognize and opine on resulting patterns of groundwater contamination indicative of airborne sources of PFOA. *See* Ex. 106, Mobile 2021 Tr. at 253:22–25 (the "actual extent of air deposition" is outside his expertise), 121:13–25 (Mobile will not opine about

[9] Mobile's first report includes a section on "Discussion of *Air Deposition* and Groundwater Modeling of PFOA Fate and Transport." Ex. 119, Mobile 2019 Rpt. at 9 (emphasis added).

mechanisms of airborne release from a facility). Rather than criticizing Mr. Sullivan's spatial analysis of PFOA contamination, he should have instead "deferred to someone with [the right] qualification." Dkt. 370 at 37 (quoting Ex. 106, Mobile 2021 Tr. at 121:17–25).

### D. Defendants' Experts Panday and Connor's Opinions are Unreliable and Do Not Fit the Case

#### 1. Their Testimony about PFOA/PFOS Ratios Lack a Reliable Basis

Even if ratio analysis can be diagnostic as Defense experts' Connor and Panday claim, that does not mean they applied the methodology reliably; they did not. Ex. 101, Connor-Pandy Rpt. at 29; *see also* Ex. 103, Connor 2021 Tr. at 105:3–9 (did not look at PFOA/PFOS ratios in the dispersions Saint-Gobain actually used; does not know ratio in other possible sources); Ex. 102, Panday 2021 Tr. at 126:13–22, 127:22–25 (does not know PFOA/PFOS ratio of other any other possible sources), 125:5–15 (does not know whether Saint-Gobain ever released or used PFOS), 127:15–21 (ratio could decrease from PFOS without addition of PFOA). Defendants claim incorrectly that there is no testimony confirming the fact that addition of PFOS can lower the ratio of PFOA/PFOS absent other sources of PFOA (Dkt. 370 at 39), but that is precisely what Dr. Panday testified. Ex. 102, Panday 2021 Tr. at 127:15–21. It is basic math. Connor and Panday cannot rely on PFOA/PFOS ratios to reach reliable opinions about other sources of PFOA without additional data on PFOS. Defendants' attempt to patch the hole in Connor and Panday's opinion with Mobile's deposition, which took place after Connor and Panday's, fails. Dkt. 370 at 39.[10] Mobile's deposition testimony cannot provide after-the-fact support for their other experts' unreliable opinions.

[10] Mobile offers no opinions about PFOS/PFOA ratios in his deposition or in reports. His reference to Charbonnet et al., which Defendants cite (Dkt. 370 at 39) was not included in either of Mobile's reports. Ex. 106, Mobile Tr. at 12:11–25.

**2. Mr. Connor's Opinions on Municipal Water Quality Model Calibration are Unreliable**

Defending Mr. Connor's unreliable opinions, Defendants use the same flawed legal arguments, raised in their fate and transport *Daubert* motions, that calibration is always required. It is not. *See* Dkt. 379 at 38–39. Defendants claim Mr. Connor never even offered the opinion that PFOA measurements at MVD-connected residential taps are required to "properly calibrate" Baggett's model. Dkt. 370 at 39. Ex. 101, Connor-Panday 2021 Rpt. at 59. Defendants then backtrack, quoting Connor's to suggest it is "important to have data at the residences" and that Mr. Baggett's model "cannot be validated or matched against PFOA concentrations in tap water . . . ." *Id.* at 41. Whatever position Defendants finally land on, Connor's opinions about the need for samples at MVD-served homes to "properly" calibrate Mr. Baggett's model lack reliable foundation or authority. Connor has no reliable basis to support his calibration theory, cites no authority to support the claim, and has never collected or directed anyone to collect tap water samples for calibrating a municipal water system model. Ex. 103, Connor 2021 Tr. at 243:19–248:12.

Connor provides no support for his claim that Mr. Baggett's calibration using multiple measured PFOA values from distant sample locations in the MVD system are insufficient to verify the model.[11] Connor also never identified any "available data" that Mr. Baggett failed to use; Baggett did not. *See* Ex. 101, Connor-Panday Rpt. at 7. And neither Connor or Panday provide any evidence that additional calibration would have changed the results. *See, e.g.*, Dkt. 379 at 4. The opinions are pure *ipse dixit*; Mr. Baggett calibrated his model and Connor's claim otherwise is unsupported. That Bartell and Detwiler plan to collect samples from participants in a

[11] Mr. Baggett's model predicts PFOA concentrations in "the pipelines where [residential] services would be connected" (Ex. 111, Baggett Tr. at 144:25–145:8) and "people drink water out of those service lines." *Id.* at 147:6–14. Thus, his model represents household PFOA levels.

CDC funded epidemiological study (which was not the purpose of the Baggett modelling) is irrelevant.

### E. Defendants' Expert Chinkin's Opinions are Inadmissible

#### 1. Mr. Chinkin is Not Qualified to Opine about PFOA Contributions from other Possible Sources

Mr. Chinkin is demonstrably unqualified to render opinions on other sources of possible PFOA contamination. Mr. Chinkin's background and experience regarding PFOA is limited to litigation, which Defendants do not dispute (Dkt. 370 at 44), and his deposition makes clear he has no expertise in distinguishing sources of PFOA. He purports to offer expert testimony on other possible airborne and direct PFOA sources to groundwater but was unable to definitively answer the most basic questions, *i.e.*, confirm there is "no naturally occurring PFOA in the air, correct?" Ex. 99, Chinkin 2019 Tr. at 69:2–5. Not knowing PFOA is a manmade chemical without any natural sources defeats Defendants' claim he "extensively researched the chemistry, fate and transport of PFOA." Dkt. 370 at 44. Defendants now try to claim the question was "vague" or "rhetorical," but they are wrong, which is why counsel did not object during the deposition. Dkt. 370 at 50; Ex. 99, Chinkin 2019 Tr. at 69:2–5.

When pressed to demonstrate his expertise by identifying airborne sources of PFOA from his list of possible sources, Mr. Chinkin speculated landfills are airborne sources of PFOA. Ex. 98, Chinkin 2021 Tr. at 177:5–186:13. He claimed PFOA in landfills could migrate to the surface and evaporate. Yet PFOA is not a volatile compound. Ex. 122, NHDES PFAS Risk Memo at 3 n.3. He admitted he lacked expertise on subsurface migration of PFOA, did not know whether PFOA is a volatile organic compound, and could not state whether PFOA evaporates at ambient temperatures. *Id.* Thus, he offered a speculation lacking in scientific support. This demonstrates Mr. Chinkin's the unreliability of his opinions.

Defendants attempt to lessen the impact of Chinkin's testimony by asserting that he merely testified "evaporation should be 'considered' as a possible environmental pathway" (Dkt. 370 at 43). Defendants now contend Mr. Chinkin "declined to speculate" that PFOA evaporation from a landfill actually occurred without a site-specific investigation (Dkt. 370 at 43), but the point is he had no reliable scientific basis to opine there was any need to investigate landfill PFOA air emissions in the first place. This is emblematic of Defendants' other sources defenses: Plaintiffs' expert opinions should be faulted based on Defendants' experts' unreliable speculative guesswork. "Industry best practices" do not require spending limited time and resources chasing down scientifically implausible and unreasoned hypotheses. In the context of this case, Mr. Chinkin lacks the expertise to critique Plaintiffs' experts on which sources should be evaluated, what is required to "adequately justify" excluding a source, or render any opinions about possible (let alone likely) contributions from other sources. *See* Dkt. 370 at 42

Regarding Chinkin's speculated non-airborne soil or groundwater sources, he is not an expert in hydrogeology or soil science. Ex. 98, Chinkin 2021 Tr. at 56:8–20, 161:8–21, 185:16–22. Mr. Chinkin explained that linking perceived hotspots to any particular well is "beyond my area of expertise." Ex. 98, Chinkin 2021 Tr. at 127:9–19. He therefore lacks expertise to know whether or if PFOA from any of such sources may possibly, let alone likely, contaminate any well in the class area, and has no basis for testifying about practices in those fields. *In re Mirena IUD Prod. Liab. Litig.*, 169 F. Supp. 3d 396 (S.D.N.Y. 2016) does not cure Mr. Chinkin's lack of expertise on PFOA-related fate and transport. There, the issue was whether a non-medical doctor Ph.D. could opine on general causation of an illness using case reports. *Id.* at 448. The court held the expert's particular profession alone could not exclude her from testifying or relying on certain types of information relied on by physicians. *Id.* However, the court excluded

the expert from testifying on topics she "admitted she is not qualified to offer opinions on." *Id.* Mr. Chinkin admits he is not an expert in hydrogeology, and his testimony reveals the lack of basic knowledge of PFOA (*i.e.*, whether it is naturally occurring, whether it evaporates at ambient temperatures) and therefore he lacks the expertise to criticize Plaintiffs' experts. His opinions are without foundation, unreliable, and not helpful to the jury.

Chinkin's opinions claiming that Plaintiffs' experts disregard any other emission pathway is not only outside his expertise but false. *See* Dkt. 379 at 24–33. His *ispe dixit* about the need for investigation is not helpful to the jury and unreliable given that Plaintiffs' experts did that investigation, as Defendants admit in their Opposition, and that neither Chinkin nor any Defense expert can identify a single source that affected the household water of a single class property other than Saint-Gobain. In contrast, one of the overarching opinions of Defendants experts Mobile is that Saint-Gobain is a source of PFOA in certain areas within the Class Geographic Area. Defs' Ex. 15, Mobile 2021-09-08 Tr. at 26:15–27:4.[12]

*Pages-Ramirez* is inapposite. There, the trial court erred by excluding testimony on standard of care based on an expert's lack of board certification in a particular specialty. *Pages-Ramirez v. Ramirez-Gonzalez,* 605 F.3d 109, 116 (1st Cir. 2010). However, the expert had knowledge, training, and experience specific to the issues presented in the case. *Id. Gaydar* affirmed the trial court's acceptance of a medical expert's testimony even though he was not a specialist in a particular field . *Gaydar v. Sociedad Instituto Gineco-Quirurgico,* 345 F.3d 15, 25

[12] Panday similarly admits Saint-Gobain is a likely source of PFOA contamination in the Class Geographic Area. Panday Tr. at 47:23–48:5. This includes at least some of the PFOA measured in MVD wells going back to 2000. *Id.* at 49:9–50:20.

(1st Cir. 2003). Plaintiffs' motion founded on Mr. Chinkin's lack of expertise on groundwater issues and demonstrable lack of expertise on PFOA in general, not his titles or certifications.

**1. Chinkin's Opinions about TCI Amherst Are Unreliable**

Mr. Chinkin's opinions on TCI are unreliable because he relies on the same model (AERMOD) that he claims is unreliable when Plaintiffs' experts use it. He states PFOA deposition from TCI "clearly overlaps" with the Class Geographic Area, based not on his own independent modeling, but on AERMOD results. Mr. Chinkin's opinions are incompatible.[13]

Defendants' mischaracterization of Mr. Chinkin's opinions fare no better. There is no evidence, opinion, or testimony that any TCI modeling shows that facility "significantly impacted" wells in the Class Geographic Area. Dkt. 370 at 46. This is the second time Defendants have exaggerated Chinkin's opinions on TCI impacts in their *Daubert* briefing. *See* Dkt. 379 at 26–27. He testified that, at best (relying on modeling he does not consider valid) there are possible impacts from TCI in the southwest corner of the Merrimack Class Geographic Area. Ex. 98, Chinkin 2021 Tr. at 256:20–257:12. Notably, after Plaintiffs filed their initial *Daubert* brief, Barr Engineering produced records from 2016 (clearly within Saint-Gobain's possession) that show minimal air deposition impacts from TCI Amherst. Dkt. 379-25, TCI Air Deposition Map. Defendants never produced this information to Plaintiffs **<u>or</u>** Mr. Chinkin, likely because the modeling supports Plaintiffs and undermine the opinions Defendants prefer Chinkin make.[14] His claim that Plaintiffs' experts fail to determine the "quantitative" effect of emissions does not fit the law; there is no requirement that either expert quantify deposition. Defendants'

[13] Defendants are wrong Plaintiffs' experts contradicted themselves. *See* Dkt. 379 at 21–27. Plaintiffs' experts fully explain why modeling TCI was not appropriate for their work in this case, and the class areas in each case to which they opine do not overlap. *See* Dkt. 379 at 24–26.

[14] The only wells at the MVDWW boundary Chinkin claimed could be impacted were modelled by Mr. Baggett as having no PFOA. *See* Dkt. 379 at 32. Chinkin's opinion is irrelevant.

claim that Chinkin did not have access to the TCI data is false; all he had to do is obtain publicly available NHDES files; he simply chose not to. Chinkin's claim about Plaintiffs experts "ignoring" their prior testimony, limiting their opinions to the non-overlapping TCI class is simply unsupported lawyer argument, not a matter of expertise. It too is simply wrong that Plaintiffs' experts concede that Chinkin's opinions are "substantial correct" as Defendants claim without citation. *See* Dkt. 370 at 45.[15] Chinkin also never opined that TCI emissions "significantly impacted" MVD wells. *See* Dkt. 379 at 26–27. He speculates TCI is "possibl[y] the predominant source" in the "southwest corner" of the Class Geographic Area. Chinkin Tr. at 256:20–257:12.

**2. Chinkin's AERMOD Opinions Are Unreliable**

Chinkin's opinions on AERMOD are unreliable because he has used AERMOD at least twice for the same purposes as Mr. Sullivan, because he is unwilling to identify *any* air model he believes would be appropriate in this case, and because AERMOD is widely accepted in the scientific community and by the courts for modeling the atmospheric dispersion and deposition of pollutants. Dkt. 351 at 57–59; *see also, e.g.*, *Baker*, 2021 WL 2548825 (N.D.N.Y May 7, 2021); *Sullivan v. Saint-Gobain Perf. Plastics Corp.*, 2019 WL 12323322 (D. Vt. July 15,2019); *Hartle v. FirstEnergy Generation Corporation*, 7 F. Supp. 3d 510, 515 (W.D. Pa. 2014). Defendants' consultant Barr likewise confirmed that "AERMOD has been demonstrated to be an effective tool for simulating air dispersion and deposition of PFOA and PFOS." Barr 2018 Rpt. at Appendix A. Indeed, the modeling did a good job of predicting the measured concentrations of PFOA in wells. Ex. 113, Edwalds Feb. 2022 Tr. at 359:9–16.

[15] As noted above, Plaintiffs experts did not "fail" to mention TCI in their initial reports; only Sullivan had an initial report, and that report addressed whether Saint-Gobain's contamination impacted properties class wide; he had no obligation for class certification to debunk Saint-Gobain's *DeBenedetto* defendants.

Defendants respond by focusing on purported modeling objectives which do not change the underlying scientific validity of the models themselves. They also attempt to distinguish Chinkin's own use of AERMOD in two other matters based on apparent modeling objectives. Dkt. 370 at 47–48. Chinkin's modeling objectives, however, are not distinguishable. Chinkin used AERMOD to determine whether an airborne source of lead emissions caused the pattern of lead contamination measured throughout a defined area. Ex. 98, Chinkin 2021 Tr. at 32:22–33:9. He also used AERMOD to determine whether nitrogen-enriched artificial snow would impact endangered plant species on top of a mountain. *Id.* at 27:23–28:18. Sullivan similarly used AERMOD to determine whether PFOA deposition from Saint-Gobain's facility occurred throughout the class each year it operated and used APFO. Sullivan 2020 Rpt. at 10. Both Chinkin and Sullivan used AERMOD to demonstrate a source contributed, or would likely contribute, pollutants to a defined area without the need for an "exact deposition rate or concentration." *See* Dkt. 370 at 48 (citing Ex. 98, Chinkin 2021 Tr. at 32:13–33:9).

Defendants try to find support for Chinkin's opinions in statements made by NHDES and Barr during enforcement negotiations over the extent of Saint-Gobain's responsibility for PFOA contamination. Dkt. 370 at 46–47. Whether EPA ever validated the AERMOD deposition function is a red herring. EPA has no regulatory standards for pollution deposition that would warrant EPA validation. Ex. 42, Sullivan 2021 Tr. at 197:8–18; *compare, e.g.*, Clean Air Act § 109(a); 42 U.S.C. § 7409(a) (requiring EPA to develop national ambient air quality standards for certain pollutants). In fact, EPA states "AERMOD can be used to treat dry and wet deposition for both gases and particles." Revisions to the Guideline on Air Quality Models [ ], 82 Fed. Reg. 5182, 5233 (Jan. 17, 2017) (final rule). Likewise, the scientific literature supports the use of

AERMOD's deposition component to model PFOA deposition. Ex. 112, Barr 2018 Rpt. at App. A (citing Barton et al. 2010, Shin et al. 2011, and Shin et al. 2012).

Defendants also mischaracterize the New Hampshire DES's November 3, 2017 letter. Dkt. 370 at 47. NHDES did not address AERMOD's use for "determining the existence or extent of surface deposition property," only its quantification which Plaintiffs are not required to do. Ex. 123, NHDES 11/3/2017 at 1. The letter reflects NHDES' concern that Barr's model underpredicts Saint-Gobain's impacts and would be inappropriate for limiting its liability. Chinkin ignores this context.

Defendants further claim that despite the widespread acceptance of AERMOD in courts, including two Saint-Gobain cases omitted from Defendants' *Daubert* motion (Dkt. 306-1), this Court should accept Mr. Chinkin's AERMOD testimony merely because the "presentation of contrary evidence" is appropriate for attacking "shaky but admissible evidence." Dkt. 370 at 48. First, nothing about Plaintiffs' use of AERMOD in this case is "shaky." *See* Dkt. 379 at 13–20. Second, the mere "presentation of contrary evidence" is not sufficient for admission of expert testimony. Dkt. 370 at 48 (citing *Currier v. United Technologies Corp.*, 393 F.3d 246, 252 (1st Cir. 2004)). Defendants have not met their burden under Rule 702 and *Daubert* that Mr. Chinkin is qualified to render his opinions and that his opinions have a reliable basis.

### 3. Mr. Chinkin's Opinions on Background PFOA Levels Are Unreliable

Mr. Chinkin offers specific opinions on New Hampshire background PFOA levels. He selected a background PFOA concentration for New Hampshire surface waters (10 parts per trillion) (surface waters are not at issue here) from which he derives numerous subsidiary opinions by comparing his chosen background level to numerical health advisory and drinking water standards, and PFAS concentrations in groundwater samples within the class area. Ex.

100, Chinkin 2021 Rpt. at 10, 13, 15, 21, 25.[16] Since his chosen background level lacks any reliable foundation, and he does not know whether PFOA occurs naturally, these subsidiary opinions based on comparing numerical values are also unreliable.[17]

Defendants tacitly admit Chinkin failed to cite any scientific study that supports his chosen background levels. *See* Dkt. 370 at 48–51. Their only option for rescuing his opinions was to reinvent his report and testimony claiming he selected a specific background level from "surrogate data." Dkt. 370 at 50. However, his reports never used the term "surrogate data," identified what "surrogate data" he relied on, or explained what methodology he applied to interpret the "surrogate data" to reach his chosen background level. Ex. 98, Chinkin 2021 Tr. at 228:10–235:13. His opinions therefore do not establish an actual or "approximate" background level. Dkt. 370 at 50. Nor does the unreliable "surrogate data" demonstrate background concentrations in New Hampshire are "non-negligible and must be considered." *Id.*

Plaintiffs, moreover, did not "distort" Mr. Chinkin's testimony regarding background levels. Dkt. 370 at 50. Plaintiffs questioned Mr. Chinkin at deposition to test his professed expertise. He failed the test by not knowing the answer to a fundamental question about background PFOA levels—whether PFOA is naturally occurring. Again, this was not a "vague" or "rhetorical" question. Dkt. 370 at 50. His inability to answer is disqualifying as are the rest of his unreliable opinions.

---

[16] For example, Mr. Chinkin's report states, "For context, when interpreting the data in Figure 2 [of his report], background levels of PFAS in New Hampshire . . . surface waters are approximately 10 ppt (Vedagiri et al., 2018)." Ex. 100, Chinkin 2021 Rpt. at 10. As shown at deposition, Vedagiri ***does not*** support Chinkin's claim. Ex. 98, Chinkin 2021 Tr. at 228:10–235:13.

[17] Plaintiffs do not argue that Mr. Chinkin's opinion should be excluded because PFOA is a manmade chemical as Defendants suggest. Dkt. 370 at 49. This is a strawman argument that distracts from the fact Mr. Chinkin did not know PFOA is a manmade chemical, which is relevant to his claimed expertise on PFOA.

## III. DEFENDANTS' PROPERTY DAMAGE EXPERTS PRESENT UNRELIABLE TESTIMONY THAT DOES NOT FIT THIS CASE

Plaintiffs' fate and transport experts explain that for decades, Saint-Gobain has significantly contaminated Class Area[18] properties with toxic PFOA. Dr. Randall Bell, Plaintiffs' real estate economist and property damages expert, evaluated whether, and, if so, to what extent Saint-Gobain's contamination has affected Class Area properties' value and use.

***Valuation of Contaminated Properties.*** Over the last 40 years, appraisal guidance and literature have established a methodology for determining the value of contaminated real estate. *See* Def. Ex. 26, ARE at 184–189. A property's "market value" is

> the **most probable price**, as of a specified date…for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with **the buyer and seller each acting prudently, knowledgably, and for self-interest**, and **assuming that neither is under undue distress.**

Ex. 2, Bell 2020 Rpt. at 220 (citing ARE) (emphasis added). A property's "unimpaired value" is its market value assuming no detrimental conditions, like contamination, are present. *See* Ex. 2, Bell 2020 Rpt. at 220 (citing Real Estate Damages (2016)); Ex. 3, AO-9. Its contaminated value, or "impaired value," "fully considers" the contamination and its effects. *Id.* The contaminated (impaired) value is determined by the following equation:

Impaired Value = Unimpaired Value – Property Devaluation

Ex. 114, Guide Note 6 at 7; *see also* Ex. 29, Jackson (2003); Ex. 3, AO-9 at 83; *see also* Dkt. 377 at 1–7. Appraisal guidelines sanction the use of mass appraisal techniques, including multiple regression analysis, to determine the market value of a universe of properties as of a given date.[19]

---

[18] "Class Area" in this section refers to the Class Geographic Areas, as defined in Plaintiffs motion for class certification (Dkts. 246, 246-1).

[19] The definitive standards governing the appraisal profession are the Uniform Standards of Professional Appraisal Practice ("USPAP"), and Standards 5 and 6 specifically pertain to mass appraisals. *See* Ex. 127, USPAP Excerpts.

Ex. 127, USPAP Excerpts at Stnds. 5, 6; Ex. 114, Guide Note 6; Defs' Ex. 26, ARE at 184–189; Ex. 29, Jackson (2003); Ex. 2, Bell 2020 Rpt. at 61-64, 225 (citing ARE). And courts regularly recognize mass appraisals, including regression analysis, as appropriate methods by which to calculate property damages on a class-wide basis in cases like this one. *See, e.g.*, Dkt. 377 at 10–12, 43–51.

***Bell's Analysis.*** Consistent with these principles, Plaintiffs' expert Randal Bell used mass appraisal techniques to reliably opine that the impact of Saint-Gobain's contamination caused an economic loss because of the impact on the use of the properties ("loss of use damages") and has reduced the value of Class Area properties ("diminution-in-value"). "Market value" and "impaired value" require a buyer who is acting knowledgably and is not under distress, with "full consideration of the effects of the environmental contamination and the presence of the environmental contamination" on or near the property. *See* Ex. 2, Bell 2020 Rpt. at 220 (citing Real Estate Damages (2016)); Ex. 3, AO-9. Thus, to determine whether sales in the Class Areas met the definition of market value, Dr. Bell had to determine whether the buyers purchasing Class Area properties during the relevant timeframe were well informed about the PFOA contamination and its risks and uncertainties. *See also* Ex. 3, AO-9 (defining and discussing "environmental risk"). Bell's analysis of the market data, including statutorily-required seller disclosures, MLS listings, and media reports, revealed that the great majority of buyers of properties in the market were *not* well informed about the PFOA contamination that in fact existed. In turn then, those sales did not reflect market value and thus almost all of the Class Area property transactions represented "unimpaired values," in other words, the sales price did not account for the impact of the contamination.

Dr. Bell used multiple regression, a well-accepted, specialized statistical technique, to determine the unimpaired values of the Class Area properties and to determine loss-of-use damages. The statistical outputs for these regressions indicate that, under generally accepted appraisal standards, they are valid, reliable, and robust. Defendants do not challenge Bell's loss-of-use regressions, even though their statistical outputs are very similar to those of his unimpaired regressions.

Next, Bell used five different generally accepted appraisal techniques (days on market analysis, paired sales analysis, case studies analysis, literature review, sale/resale analysis) to determine whether and to what degree Saint-Gobain's contamination has reduced Class Area property values, taking into account variations in contamination. After reconciling these techniques, he concluded that properties with PFOA household water contamination below the 12 ppt NHDES MCL have sustained a 5% diminution in value, while properties with PFOA household water contamination at or above the 12 ppt NHDES MCL have sustained a 15% diminution in value. Applying these percentages to the Class Area properties' unimpaired values, Bell calculated diminution-in-value damages.

***Defendants' Property Experts.*** Defendants' experts abandon these generally accepted principles, including authoritative USPAP appraisal standards, and Defendants' briefing repeatedly misstates what Bell did. Unable to find a single expert who, like Bell, is well-qualified to opine about mass appraisal, multiple regression, *and* valuation of contaminated properties, Defendants had to hire two separate consultants—Hamilton and Phillips—and cobble together their opinions in a failed attempt to rebut Bell. The majority of their experts' opinions are unreliable, do not fit this case, and should be excluded.

Hamilton's and Phillips' opinions are narrow. As Defendants' briefing explains, Hamilton and Phillips are only offering distinct, "complementary" critiques of specific aspects of Bell's opinions. Dkt. 370 at 7–9. Hamilton only opines about Bell's use of multiple regression to determine unimpaired values, and Phillips only opines about Bell's diminution-in-value opinion. *Id.* Notwithstanding this admission, Defendants have persisted in advancing and defending opinions, including throughout the parties' *Daubert* briefing, that far exceed the qualifications and scope of testimony of Hamilton and Phillips. Hamilton's and Phillips' reports are full of opinions that exceed those bounds, too. For example, Hamilton critiques Bell's diminution-in-value opinion even though he admits he is not an expert in valuing contaminated properties and did not apply the applicable industry standards, which he agrees are authoritative. Defendants perpetuate this unreliability by using Hamilton's unqualified diminution-in-value opinion to argue throughout their *Daubert* briefing that it "falsifies" Bell's opinion, when the analysis does not and could not show any such thing. And Phillips opines about the appropriate use and application of multiple regression analysis even though he admits he is not an expert in statistical analysis and has never performed a regression before. Opinions outside the scope of Hamilton's and Phillips' qualifications and retention *as Defendants have defined them* are unreliable and inadmissible.

The opinions Defendants claim Hamilton and Phillips *are* qualified to offer are unreliable and do not fit this case, either, and Defendants' opposition fails to meet Plaintiffs' arguments. Hamilton's litigation opinion that regressions cannot reliably predict individual values is contrary to the plethora of literature Plaintiffs cited in their motion (Dkt. 351) and other briefing (Dkt. 377, Pls. Opp to Defs. Mot. to Exclude Bell, incorporated by reference) and to Hamilton's own writings and testimony. His assertion that Bell's r-squared statistic (an indication of a

regression model's precision) is too low because it is below 0.90 is not supported by the literature, either; even Defendants now seek to disclaim it. And Hamilton's opinions about the standard error and precision of Bell's unimpaired regression or the variables he selected are similarly unfounded say-so opinions.

Phillips' diminution-in-value opinion, which is limited to 41 purportedly in-class properties, violates industry standards and USPAP guidelines too. Though Phillips claims to compare in-class, contaminated properties to out-of-class, uncontaminated properties, he mixed up the two; admits he did not evaluate (and never tried to evaluate) the environmental conditions of any of the properties he analyzed, including whether they were contaminated (even though he also admits that was the very point of his analysis); and uses a made up notion of buyer knowledge when deciding that all "in-class" sales represent impaired property values. Defendants' assertion that Phillips' conclusion should be extrapolated to *all* of the Class Area properties is directly contrary to Phillips' own testimony and the scope of his retention, as well as to the position they have taken up until now in this case—that diminution-in-value cannot be reliably evaluated on a class-wide basis. And Defendants' brazen insistence that whether the Class Area properties are impacted by Saint-Gobain's contamination is irrelevant to the diminution-in-value analysis is nonsensical, contrary to the record (which proves it is patently false), and contrary to the testimony of the only expert Defendants retained to opine about diminution-in-value.

Defendants' attempt to reframe Hamilton's and Phillips' opinions and this case so as to save their experts' reliability and fit is unavailing. Defendants have the burden of proving that Hamilton and Phillips are qualified and that their opinions are reliable and fit this case. They fail

to do so, choosing instead to focus on rehashing class certification and affirmative *Daubert* arguments. The opinions should be excluded.

### A. Hamilton is Unqualified and His Opinions are Unreliable and Do Not "Fit" This Case

#### 1. Defendants admit that Hamilton is not qualified to render most of the opinions he offers

Defendants explain that Hamilton was retained specifically to critique one piece of Bell's analysis: the statistical reliability of his regression for unimpaired values. *See* Dkt. 370 at 6–7. Defendants have the burden of proof but defend Hamilton's qualifications only as to quantitative and statistical analysis—*i.e.,* regression—something Plaintiffs did not even challenge. Dkt, 370 at 5–8. And Defendants admit that Hamilton is not qualified or designated to opine about diminution-in-value due to environmental contamination: that is Phillips' role. Dkt. 370 at 6–7. As a result, every opinion Hamilton offers aside from his critique of the statistical reliability of Bell's unimpaired regression must be excluded because, as Defendants agree, Hamilton is not qualified to opine to them and was not retained to offer them.

Defendants' acknowledgment is made for good reason: Hamilton is *not* qualified to offer opinions about market value, damages, diminution-in-value, the appraisal of environmentally contaminated properties, or the methods appropriate for any of these tasks. He has not opined on the value of real property, has no experience with contaminated properties, has not applied USPAP Advisory Opinion 9 (which sets forth the standards for evaluating environmentally contaminated properties), has not calculated or estimated property damages, does not know if any of the class properties are contaminated, and says under oath that he is not opining about property values in this case (impaired or unimpaired). Ex. 1, Hamilton Tr. at 16:15–16; 116:5–13; 116:16–118:16; 186:24–187:5, 274:6–11, 235:13–239:16; 328:5–13; 335:6–17. No one has used Hamilton's regressions to determine property value. *Id.* at 20:21–21:5.

Notwithstanding Defendants' admission, Hamilton's report and testimony and Defendants' briefing reference and seek admission of numerous opinions well outside the scope of Hamilton's qualifications and retention. For example, Hamilton's report opines about:

- What is necessary to "reliably estimate any effect from the PFOA drinking water situation on prices and values." Ex. 4, Hamilton Rpt. at 1;
- How damages and changes in property value caused by environmental contamination can and should be assessed, *see, e.g.*, *id.* at 4, 15–29;
- Market awareness, *i.e.*, whether the Class Area's market is well-informed about PFOA and what that means, *see, e.g.*, *id.* at 18–23;
- Whether the market data shows that Class Area property prices changed after the contamination was announced and whether Class Area properties sustained a diminution in value, *see, e.g.*, *id.* at 73–77; Ex. 1, Hamilton Tr. at 221:21–222:8; *see also* Dkt. 370 at 11 (arguing class property values are increasing); and
- Whether there is a difference in property prices and/or values inside and outside of the Class Area and what that means, *see* Dkt. 370 at 12–13.

Each of these opinions, and any others like them, exceed Hamilton's qualifications and the scope of his retention *as defined by Defendants* and should be excluded.

**2. Hamilton's opinion that there is no diminution-in-value is unreliable and should be excluded**

Hamilton opines that property values in the Class Area have not changed because of the contamination (*i.e.,* there is no diminution-in-value) and Defendants' brief attempts to defend that opinion. Dkt. 370 at 10–13. Hamilton relies on two things to reach his conclusion. First, he prepared a simple regression model that he claims compares January 2012 to October 2019 Class Area property sales (not values) to out-of-Class property sales (not values). Dkt. 370 at 10–22,

Ex. 4, Hamilton Rpt. at 72–77. Hamilton says that because market pricing both "inside" and "outside" the class area increased from 2012 to 2019 and there was a purportedly "public announcement" of PFOA contamination in 2016, PFOA contamination has not affected property values. *Id.* at 77. Second, Hamilton claims that Bell's unimpaired regression data "show no diminution in value due to the announcement in March 2016." *Id.* at 17. Defendants use these opinions to argue that "property values in the class area during Dr. Bell's period of study increased," Dkt. 370 at 11, which they claim proves Bell's diminution-in-value opinion is wrong.

Defendants cannot have it both ways. They explicitly said that Philips, *not Hamilton,* is opining about diminution-in-value and, despite Plaintiffs' *Daubert* challenge, fail to demonstrate that Hamilton is qualified to offer a diminution-in-value opinion. *Milward*, 820 F.3d at 473 (the party seeking to introduce the evidence has the burden of establishing both its reliability and its relevance). This is enough to warrant exclusion. Yet even assuming Hamilton was qualified, his diminution-in-value methodology violates applicable professional standards and is fundamentally flawed, providing another independent basis for exclusion.

**a. Hamilton's diminution-in-value opinion violates USPAP standards and Defendants do not carry their burden of showing otherwise**

Defendants and Hamilton agree that USPAP standards govern Hamilton's opinions in this case. Dkt. 370 at 7–8; Ex. 4, Hamilton Rpt. at 7–9. Plaintiffs' brief explained that Hamilton's diminution-in-value methodology and opinion violate those standards, including USPAP Stnds. 1, 2, 3, 4, 5, 6, and AO-9. Dkt. 351 at 17–18. In response, Defendants merely claim that USPAP "appraisal review" standards, which they do not identify, explain, or include in the record, apply and that Hamilton "satisfies" them. Dkt. 370 at 7–8. They never explain how that is so and seem not to realize that Standards 3 and 4 *are* appraisal review standards. *Id.*; Ex. 127, USPAP Excerpts at Stnds. 3, 4. Defendants have the burden of proving Hamilton's

diminution-in-value opinion is reliable and consistent with generally accepted methodology; they fail to do so, meriting its exclusion.

Even if Hamilton was qualified, the opinion should be excluded because it violates USPAP standards. USPAP distinguishes between requirements for "appraisals" versus "appraisal reviews." *See* Ex. 127, USPAP Excerpts. Defendants insist that Hamilton's report is an "appraisal review" such that appraisal review standards apply, Dkt. 370 at 7–8, and Hamilton agrees. Ex. 4, Hamilton Rpt. at 6–9 (stating report is intended to comply with "those parts of USPAP that pertain to appraisal review reports"; claiming he is not opining as to loss of value); Ex. 1, Hamilton Tr. at 235:17–235:20 (conceding an opinion of value is an appraisal). But the scope of an appraisal review is limited to "the act or process of developing an opinion about the quality of another appraiser's work." Defs' Ex. 27, USPAP (2020-2021), at 3; *see also* Ex. 127, USPAP Excerpts, USPAP Stnds 3, 4 (governing appraisal reviews). USPAP Advisory Opinion 20 (AO-20) defines an "opinion of value" as an "appraisal" and explains that once an appraisal review offers an opinion of value, the scope of work has changed and USPAP *appraisal* standards apply.[20] *See* Ex. 126, AO-20 at 103, 105; *see also* Ex. 114, USPAP Excerpts, Stnd. 3, Rule 3-3 (emphasis added). Examples of language that constitutes a "value opinion" include whether the appraiser believes the valuation is too low or too high, agrees or disagrees with the valuation, or thinks the valuation is incorrect. *See* Ex. 126, AO-20 at 105, 107. Hamilton (and Defendants) use this valuation language when they claim that the Class Area properties did not experience a diminution-in-value. That is an opinion of value[21] that exceeds the scope of

---

[20] This is sometimes referred to as an "appraisal review with opinion."

[21] To the extent Hamilton claims he is not offering opinions of value, that is belied by his report, his testimony, and the fact that Defendants use his opinions to argue *valuation* and *diminution-in-value*. *See, e.g.*, Dkt. 370 at 10-13; Dkt. 299-1 at 1–2.

USPAP appraisal review standards, including Rule 3-3 and AO-9.[22]

Courts "have repeatedly excluded experts who certified that they complied with the USPAP but whose methods nevertheless departed from the USPAP." *City of Almaty, Kazakhstan v. Ablyazov*, No. 15-cv-5345, 2021 WL 5154110, at *7 (S.D.N.Y. Nov. 5, 2021). In *Almaty,* the defendant's economist, as here, was retained to perform an appraisal review but not to offer an opinion of value. The court observed that an appraisal review can provide an opinion of quality by identifying "errors or inconsistencies in the original work in a way that does not imply an appraisal by the reviewer." *Id.* at *8 (citing AO-20). But "the review has taken on the opinion of value characteristic once those errors are identified in relation to a value or value range, *such as indicating a direction in value* (i.e. more than, less than) or to an established benchmark." *Id.* (cleaned up) (underlining added). The court held that the expert's report "plainly includes opinions of value as defined in Advisory Opinion 20" by, for example, opining that the property's value was overstated. *Id.* Because the expert did not comply with USPAP standards for appraisal reviews, including AO-20, his opinions of value were unreliable and thus excluded. *Id.* at 8–9. *See also Securities & Exch. Comm'n v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 504–507 (S.D.N.Y. 2018) (holding similarly). Similar facts exist here, meriting the same outcome. Hamilton's diminution-in-value opinion and the accompanying discussion on pages 72–77 of his report should be excluded.

**b. Hamilton's opinion that the Class Area properties experienced no diminution-in-value is unreliable**

[22] If Hamilton wanted to offer an opinion of value then he at least needed to comply with USPAP, including Standards 1, 2, 5, 6, and AO-9. He did not do that, and both Defendants and Hamilton insist he did not, as it was not needed. Defendants fail to carry their burden of proof.

Even assuming that Hamilton was qualified to render a diminution-in-value opinion and that such an opinion was within the scope of his appraisal review and retention, his claim that Saint-Gobain's contamination has not reduced property values in the Class Area is so flawed as to be wholly unreliable, providing yet another ground for its exclusion.

**i. Hamilton's comparison of "in-class" and "out-of-class" property sales says nothing about how Saint-Gobain's PFOA contamination has affected Class Area property values**

Hamilton purports to compare housing prices within the Class Area to those outside of the Class Area from 2012–2019. Because he believes the pricing trends are identical throughout that time period even though there was purportedly a "public announcement" about PFOA contamination in 2016, he concludes that Class Area property prices were not affected by the PFOA contamination. Ex. 4, Hamilton Rpt. at 73–77. Hamilton's graph is fatally flawed and does not support his diminution-in-value opinion. Nor does it "test" or a "falsify" Bell's diminution-in-value opinion.

*First,* Bell opines that Saint-Gobain's PFOA contamination caused a reduction in Class Area property values. Thus to "test" or "disprove" Bell's conclusion, Hamilton had to compare the prices buyers paid for Class Area properties they knew were contaminated versus the prices they paid for out-of-Class properties they knew were not. *See, e.g.*, Ex. 114, Guide Note 6, Ex. 3, AO-9. But Hamilton had no information about the properties' contamination or what buyers did or did not know about it. *See* Ex. 1, Hamilton Tr. at 132:19–134:8; 116:16–118:16 (did not review any TDSs, confirm environmental status of any property, or apply any AO-9 factors to his analysis); Ex. 3, AO-9 at 82 (USPAP guidance describing property characteristics that must be considered). Further, he misidentified the properties and thus included Class Area and properties located in contaminated areas in the *out-of-class* grouping. Ex. 115, Hamilton Data

Sheet. Any comparison Hamilton tried to make between in- and out-of-Class and contaminated and uncontaminated properties on this basis was therefore meaningless.

*Second,* Hamilton's graph depicts market *prices*, not market *values.* Market value requires adequate buyer knowledge and no buyer or seller distress, while market prices are merely the prices the buyers paid; Hamilton concedes they are not the same thing. Ex. 1, Hamilton Tr. at 236:11–240:17; *see also* Defs' Ex. 10, Bell 2020b Rpt. at 220 (defining market value; citing ARE). This case is about market *values* and Bell is opining about diminution-in-*value. See* Dkt. 377, Pls.' Opp. to Def. Mot. To Exclude Bell, at 1–8 (outlining applicable industry standards, which all address market *value* and diminution-in-*value*). The distinction is particularly important because, as Bell explains, actual buyers of Class Area properties do not have adequate knowledge about the contamination to negotiate an appropriate discount for the risks and uncertainties associated with the PFOA contamination, and thus the property transactions represent the property's market value as if it *were not* contaminated (unimpaired value).[23] *See, e.g.*, Dkt. 377 at 1–7, 12–34.

*Third,* Hamilton's entire analysis is based on a fallacy that Defendants continue to perpetuate. **The question is not whether Class Area sales prices went up or down, but whether the properties are worth now what they would have been worth but for Saint-Gobain's PFOA contamination.**

[23] Thus even assuming Hamilton's graph is accurate, it simply proves Bell right—the market is not well-informed about the contamination, which is why post-March 2016 pricing trends are unremarkable—they represent unimpaired values. *See also* Dkt. 377 at 39–40 (discussing Hamilton's graph).

Bell's charge was to evaluate the effect, if any, that Saint-Gobain's PFOA contamination has on properties in the Class Area.[24] *See* Ex. 2, Bell 2020 Rpt. at 20. Hamilton's graphing of sales in which the contamination was not considered tells you nothing about the impact of that contamination on property values. Hamilton's simple regression does not support his diminution-in-value opinion and does not and cannot "test" or "falsify" Bell's diminution-in-value opinion. It is unreliable and does not fit this case.

**ii. Defendants' arguments to the contrary are contradicted by the record and their own experts**

Defendants concede that Hamilton did not consider PFOA contamination when opining about diminution-in-value. *See* Dkt. 370 at 12. But they claim it does not matter because neither Plaintiffs' class definitions nor Bell's diminution-in-value opinions rely upon "detectable PFOA" or "the presence of PFOA." *Id.* Defendants must know this is false.[25]

Plaintiffs' fate-and-transport experts opine that Saint-Gobain's air emissions caused PFOA to be deposited on the properties within the Class Area, impacting household water. *See, e.g.*, Ex. 38, Sullivan 2020 Rpt. at 10–11; Ex. 132, Shin Rpt. at 6; Ex. 129, Detwiler Rpt. at 1; Ex. 110, Baggett Rpt. at 5. Plaintiffs define the Class Area and the property damage classes based on the impacts of Saint-Gobain's PFOA emissions. *See, e.g.*, Dkt. 246-1, Pls. Memo. in Support of Mot. for Class Cert. at 7 (the property damage Class Areas have been "impacted by releases of toxic APFO by Saint-Gobain" such that "properties owned and occupied by class

---

[24] Defendants' repeated contention that Bell had a "hypothesis" which he employed "litigation-driven" standards to prove right, in part by "excluding" most of the market data, is wrong at each turn. Plaintiffs debunked these claims in Dkt. 377, Pls. Opp. to Def. Mot. to Exclude Bell.

[25] It is also misleading. Plaintiffs reference "PFOA contamination" and the "impact" of that contamination; that is what Bell opined about. *See, e.g.,* Ex. 2, Bell 2020 Rpt. at 2, 20, 33, 37. Defendants introduce ambiguous, undefined phrases like "detectable PFOA" and the "presence of PFOA" in an improper attempt to unilaterally narrow the inquiry.

members have been and are being invaded by toxic PFAS caused by Defendants' air emissions."); 11–17 (defining the Class Area based on the boundaries of Saint-Gobain's air emissions, confirmed by deposition of PFOA on those properties and household water contaminated with PFOA.). Plaintiffs bring claims for (among others) trespass and nuisance, alleging that Defendants' PFOA releases intruded upon Plaintiffs' and the class members' properties via the air, soil, dust, and household water, causing property damages that include loss of use and enjoyment and loss of value. *See* Dkt. 348, Third Master Amended Consol. Compl. at ¶¶ 38, 42–44, 47–48, 53, 78–79.

To that end, Bell analyzed whether and how Saint-Gobain's PFOA emissions affected property use and property values within the Class Area. Ex. 2, Bell 2020 Rpt. at 2, 20, 33. His diminution-in-value analysis, which included evaluation of substantial Class Area market data; a case study analysis of similar, contaminated properties; analysis of industry literature; a paired sales analysis; and reconciliation of those techniques, concluded that Class Area homes sustained a 5% or 15% diminution-in-value depending on whether the property's household water contamination is below or at/above the 12 ppt MCL.[26] Ex. 2, Bell 2020 Rpt. at 158–202. Because the market is not well-informed about the PFOA contamination and Dr. Bell is not a fate-and-transport expert with an independent opinion about the nature and extent of the contamination, USPAP standards required him to identify the impacts of PFOA contamination in the Class Area as a hypothetical condition[27] in his report. *See* Ex. 2, AO-9 at 80. He properly did

[26] Bell also considered these factors when concluding that class members experienced loss of use damages, but Defendants do not challenge this methodology or his associated regression models.
[27] Hypothetical conditions are commonly used in appraisals of contaminated property to represent "condition[s], directly related to a specific assignment, which are contrary to what is known by the appraiser to exist on the effective date of the assignment results but are used for the purpose of analysis." Ex. 3, AO-9 at 80.

so, and Defendants' criticism of that is meritless. *See also* Ex. 114, Guide Note 6 (explaining use of hypothetical conditions when appraising contaminated property).

Defendants' claim that PFOA emissions and contamination are not relevant to the Class Area, the property class definitions, and/or the property damages sustained by those classes is incorrect. Even Phillips—the *only* expert Defendants retained to opine about diminution-in-value—testified that at issue is whether *PFOA contamination* has affected Class Area property values. Ex. 24, Phillips 2021 Tr. at 309:5–11.

Defendants' other arguments also miss the mark. Plaintiffs do not have to prove that the "out-of-class" properties Hamilton evaluated are contaminated: the point is that Hamilton did not investigate that and does not know, contrary to industry standards, including USPAP, and the issues presented by this case. Nonetheless, State testing data shows that out-of-Class properties *are* contaminated with PFOA[28], and Saint-Gobain's recent agreement with the State of New Hampshire requires it to provide municipal water to PFOA-contaminated properties that are outside the Class Area.[29] Defendants' claim that Hamilton's simple regression is a "paired sales analysis" is also unavailing: not even Hamilton says that is so. A paired sales analysis necessarily compares "otherwise similar properties" to reach an opinion of value. *See* Ex. 29, Jackson (2003) at 315 (in a paired sales analysis, "sales of properties in the impacted area are paired with sales of *otherwise similar properties* located outside the impacted area in order to determine the effects, if any, of contamination on properties within the impacted area.").

---

[28] *See, e.g.,* https://www.arcgis.com/apps/View/index.html?appid=66770bef141c43a98a445c54a17720e2&extent=-73.5743,42.5413,-69.6852,45.4489 (last accessed April 24, 2022).

[29] *See* https://newhampshirebulletin.com/briefs/state-reaches-agreement-with-saint-gobain-on-providing-water-to-1000-impacted-properties/ (last accessed April 24, 2022); Settlement Term Sheet, https://www.des.nh.gov/sites/g/files/ehbemt341/files/documents/202204-sgpp-settlement-term-sheet.pdf (last accessed April 24, 2022).

Hamilton does not know if the properties he investigated are similar because he did not investigate that. And an opinion of value would again exceed the allowable scope of his appraisal review.

**iii. Bell's unimpaired regression analysis does not support Hamilton's diminution-in-value opinion, either**

Hamilton also opines that Bell's unimpaired regression analysis shows there is no diminution-in-value, claiming this is a "fact" of the model. Ex. 1, Hamilton Tr. at 221:21–222:8. This is incorrect and further demonstrates Hamilton's lack of qualification to analyze or value contaminated property. The unimpaired regression could not on its own show whether there is a diminution-in-value: it has to be considered alongside impaired values. *See* Defs' Ex. 26, ARE at 184–189; Ex. 3, AO-9; Ex. 114, Guide Note 6 at 7; Ex. 29, Jackson (2003); *see also* Dkt. 377 at 1–7. Though Hamilton assumes the unimpaired and impaired values for Class Area properties are the same, he never conducted the necessary analysis of "impaired value" to reliably reach that conclusion. Analysis of impaired value requires consideration of AO-9 and other industry standards that Hamilton ignored, and for which he lacks the necessary qualifications. *See, e.g., id.*; *see supra,* Sections III., III.A.1, 2.

**3. Hamilton's opinions about market awareness and the methodology Bell should have used to determine damages and diminution-in-value are unreliable**

Hamilton also opines about the techniques Bell should have used to analyze diminution-in-value in the Class Area, whether the market is well-informed or not, and how the Class Area properties' pricing and values compare to those outside of the Class Area. *See* Ex. 4, Hamilton Rpt. at 18–29. None of these opinions are reliable. Hamilton is not qualified to render them—he admits he has no experience with contaminated properties, did not consider the requirements of AO-9, and has never calculated or estimated property damages—and they are well outside the

scope of his retention. *See* Ex. 1, Hamilton Tr. at 115:8–118:16; 328:5– 335:22; Dkt. 370 at 7; *see also supra,* Section III.A.1.

Hamilton's lack of qualifications is further evidenced by his failure to employ the appropriate industry standards. The Appraisal of Real Estate (ARE), Appraisal Institute Guide Note 6, and USPAP AO-9 set forth "specialized terms" and concepts that pertain to the valuation of contaminated property and establish the framework an appraiser should use when determining if an environmental condition has affected a property's value. *See* Ex. 114, Guide Note 6; Ex. 3, AO-9; Defs' Ex. 26, ARE at 184–189; *see also* Dkt. 377 at 1–7; Ex. 29, Jackson (2003). They explain that a contaminated property's impaired (contaminated) value "fully considers" the contamination and its effects. AO-9 sets forth ten "relevant property characteristics" that an appraiser should consider when evaluating the impact of an environmental condition on value, including potential limitations on property use and regulatory compliance requirements. Ex. 3, AO-9 at 82. And New Hampshire's statutory language requires sellers to disclose, in writing, a household water contamination issue before sale. *See* N.H. Rev. Stat. Ann. § 477:4-d.

Hamilton admits he does not use this methodological framework. *See* Ex. 1, Hamilton Tr. at 117:14–118:16. As a result, even if he were qualified to offer them, Hamilton's opinions about market value, market knowledge, the methodologies Bell should have employed to determine diminution-in-value, and how Class Area property pricing and values compare to those outside the class, including pages 18–29 of his report, are unreliable and should be excluded.

**4. Hamilton's opinion that regressions only predict "averages," not individual property values, is unreliable and does not fit this case**

Hamilton's opinion about how regression can and cannot be used in "contaminated property assignments" is unreliable for the reasons already discussed—it is outside the scope of his qualifications and retention. It is also contrary to the literature and does not fit this case.

Hamilton claims that regression "has only a limited role in contaminated property assignments": it is "useful" in measuring "the average differences between groups of properties (impacted and non-impacted neighborhoods)" but is not used for "estimating property values." Ex. 4, Hamilton Rpt. at 4; *see also id.* at 30 (opining that hedonic regression models cannot be used to determine "individual property *damages*.") (emphasis added). His later testimony undercuts this assertion: Hamilton agrees that as long as the proper adjustments are made, a regression *can* be used to reliably predict individual property values. Ex. 1, Hamilton Tr. at 51:9–54:8; 300:10–301:2 ("all regressions can predict an outcome for a subject property").

Indeed, the literature demonstrates that regressions, including Bell's, are intended to and do reliably predict individual property values. Ex. 121, Newsome (1992) at 129 (multiple regression is a popular tool for single-family residential properties); Ex. 117, Simons (1999) at 186 (hedonic regressions are used to predict individual property values); Ex. 116, Kane (2004) at Ch. 10, 118 (purpose is to predict market value of single residential properties; regressions can provide "uniform valuations for either a single property or group of properties" and predict with "exceptional accuracy"); Ex. 118, Linne (2000) at 40 (regressions can value properties one at a time). Its predictions of value are reliable, at least on par with traditional property appraisals. Ex. 120, Mulaku (2010) at 270. In fact, "mass appraisal is simply an individual appraisal adjusted many times. The principles employed at either level are the same." Ex. 118, Linne (2000) at Ch. 6; Ex. 116, Kane (2004) at Preface, 5 (describing convergence of mass appraisals

and single-property technique).[30] *See also* Dkt. 377 at 43–51, Pls. Opp. to Def. Mot. To Exclude Bell (incorporated by reference). Despite Defendants' contentions, Jackson 2010 does not state differently—Jackson explains that in order for a regression to allow for individual allocation of property values and damages, the appraiser should ensure relevant AO-9 characteristics are considered, and Bell did that here. *See* Ex. 19, Jackson (2010) at 148.

Hamilton's opinions are contrary to his previous writings and subsequent testimony and without any citation or support. *See* Ex. 10, Hamilton Dissertation at 49–50; Ex. 4, Hamilton Rpt. at 17, 30 (claiming robust literature support, but citing none). Such a "because I said so" opinion is legally insufficient. *Grimes v. Hoffmann-LaRoche, Inc.*, 907 F. Supp. 33, 38 (D.N.H. 1995) ("an expert cannot establish that a fact is generally accepted merely by saying so"); *United States v. Zolot*, 968 F. Supp. 2d 411, 430 (D. Mass. 2013) ("the opinion of an expert, no matter how qualified cannot simply be based on her say so … the gate-keeping function of the trial court requires more than merely "taking the expert's word for it") (citing Rule 702 advisory committee notes). Though Defendants point to authorities Hamilton cited on pages 32–34 of his report, that discussion does not meet Plaintiffs' point. It primarily addresses the ability of a regression to value the detrimental condition itself (here, contamination), which is not what Bell

[30] Defendants' attempt to distinguish Plaintiffs' Exhibit 17 is unavailing: none of these authorities say regression cannot reliably predict individual values. Miles (1975), Defs' Ex. 14, concluded that "a regression equation will do a reasonably good job of predicting the sale price of homes within a defined area"; his 47-year-old opinion that regression is less accurate than "a competent appraiser" (he never says *inaccurate*) is inconsistent with current literature. *See* Ex. 118, Linne (2000); Ex. 116, Kane (2004). Chalmers (1994), Defs' Ex. 3, recognized that "most mass appraisal methodology relies on regression analysis" and used regression, an "invaluable tool," to calculate the values of condemned properties, achieving r-squareds of approximately 0.66. And whether Defendants think the regression in Simons (2001), Defs' Ex. 25, was inadequate is immaterial: the article states that "the use of hedonic modeling in determining property values is well documented," and that its r-squared of 0.70 is "consistent with other housing valuation literature." *Id.* at 411, 414.

did: he used regression for the unimpaired value of the Class Area *properties* both individually and aggregately and used other methodologies to determine diminution-in-value.

Finally, to the extent Defendants and Hamilton take the position that a regression must predict a property's market value with certainty or precision in order to be reliable, that is inconsistent with Plaintiffs' legal burden, which merely requires Plaintiffs to reasonably approximate their individual *or aggregate* damages, Dkt. 377 at 43–51, and is contrary to the plethora of case law in which expert opinions based on multiple regression are deemed reliable for just that purpose. *See* Dkt. 377 at 10–12 (discussing cases). And neither Defendants nor Hamilton assert that regressions do not reliably predict *aggregate* values.

**5. Hamilton's opinion that Bell's r-squared is "too low" because it is below 0.9 is unreliable, and Defendants do not disagree**

A regression's r-squared statistic describes how much of the property's value the model explains. Here, Bell's unimpaired regression models had r-squareds of 0.818 and 0.847, which mean they explain 82% and 85% of the Class Area properties' values. *See* Ex. 2, Bell 2020 Rpt. at 97 (unimpaired single family regression), 106 (unimpaired condo regression). These figures are within generally accepted industry benchmarks for reliability. *See* Dkt. 377 at 13–15.

Hamilton opines that an r-squared value of 0.90 is required if the regression model will be used to predict individual property values and therefore that Bell's regression r-squareds are too low.[31] *See* Ex. 1, Hamilton Tr. at 243:16–249:8 ("[if] the first number after the decimal point isn't a 9, you are going to have a wide range of error"; "85 is not as good as it needs to be. When you are in your 90s, that's when it's good."); 243:16–246:11; *see also id.* at 249:9–250:4 (standard error more than 10 percent is "relatively poor"). This opinion is made up. Plaintiffs'

[31] Hamilton believes that Bell's r-squareds are low *only if* the model is used to predict individual property values; he agrees the r-squareds are appropriate if the model is used to predict a value across the data set, *i.e.,* an aggregate value. Ex. 1, Hamilton Tr. at 247:5–248:13.

motion explained why that opinion is unsupported say-so and identified multiple peer-reviewed articles in support. Dkt. 351 at 9–12 (discussing IAAO, among others); *see also* Dkt. 377 at 13–15 (explaining that Bell's model is tested and validated pursuant to accepted industry standards and providing literature citations). Defendants do not disagree. Instead, they claim that Hamilton never said what he said and that, in any event, Hamilton's opinion about r-squared is not important because Hamilton's *overarching* opinion is that Bell's unimpaired regression is too imprecise. In doing so, they also (again) erroneously describe Bell's model, which actually has an overall prediction rate of only -2.1%.[32] It is Defendants' burden to demonstrate the reliability of Hamilton's r-squared opinion and their failure to do so necessitates its exclusion.

#### 6. Hamilton's opinions that Bell's standard error is too low and that his regressions are not precise enough should also be excluded

For the same reasons that Hamilton's r-squared opinion should be excluded, so too should the Court exclude his opinions that Bell's standard error is too high and that Bell's regressions are not precise or accurate enough. *See* Ex. 4, Hamilton Rpt. at 66 ("high regression standard error"). Defendants claim that r-squared and standard error must be "analyzed together" to determine a regression's precision and accuracy. Dkt. 370 at 17. They say that Hamilton's opinion that Bell's regressions are not precise enough is rooted in his standard error and r-squared opinions. *Id.*

But Hamilton testified that there is an inverse relationship between an r-squared and a standard error: *i.e.,* an r-squared of 0.90 means there is a standard error of 10%.[33] Ex. 1, Hamilton Tr. at 173:23–174:2; 244:22–246:11, 250:12–253:2. The same appraisal literature

---

[32] Defendants' claim that +/- 26% is "the best possible outcome" is wrong. *See, e.g.,* Dkt. 377 at 13–15, 18–19. The "best possible outcome" is an error of 0; the overall prediction error is only -2.1%. *See id.*

[33] Defendants do not seem to realize this, and their brief erroneously conflates prediction error with standard error. *See* Dkt. 370 at 17.

addresses both statistical measurements, and it does not support Hamilton's opinion that Bell's standard error must be 10% or less, either. *See id.; see also* Dkt. 377 at 13–15, Dkt. 351 at 9–12. Because neither Hamilton's r-squared nor standard error opinions are reliable, his opinion about the precision of Bell's model is similarly unreliable and should be excluded.

**7. Hamilton's opinion that Bell did not include enough variables in his unimpaired regression analysis is unreliable**

Hamilton opines that Bell should have included more variables in his regressions. Hamilton's opinion is based on his modified regression analysis, which added 19 variables to Bell's unimpaired regression model. Hamilton claims that the inclusion of those variables means his model does a better job than Bell's of "explaining residential real estate pricing," relying in part on the fact that his r-squared is a mere 0.042 higher. Ex. 4, Hamilton Rpt. at 69–70.

Plaintiffs' brief explains why that opinion is unreliable. Bell's variable selection is well-supported by the literature, which Plaintiffs identified and appended as Exhibit 12. And the literature also explains that "more" variables is not necessarily better: not every variable drives value or is even relevant to the analysis, many variables are inter-dependent such that including too many of them will skew the results, and ultimately each regression is different. *Id.; see also* Ex. 2, Bell 2020 Rpt. at 69–70 (quoting Wolverton 2009). Indeed, Hamilton's modified model includes overlapping variables (*e.g.,* eight variations of date variables and five variations of lot size variables), creating a multi-collinearity problem and artificially inflating the model's statistical outputs or "credibility,"[34] including r-squared.

---

[34] Defendants seize on Plaintiffs' use of the word "credibility" to claim this is a weight issue. But Plaintiffs were not talking about *Hamilton's* credibility; they were explaining that Hamilton's model artificially inflates its own reliability by improperly using duplicative variables (multi-collinearity) to increase r-squared and so the opinion is not credible. This means that the increased r-squared value does not necessarily result in increased predictive precision.

Defendants' opposition does not rebut these points. Defendants claim that Hamilton "analyzed the statistical impact of each variable" but do not explain how that eliminates the multi-collinearity problem (it doesn't). Dkt. 370 at 19. They dismiss the literature Plaintiffs cite in support of Bell's variable selection and say, without any support or explanation, that it is distinguishable because those "analyses" do not "use regression to predict individual values for diminution-in-value claims." *Id.* And then Defendants try to divert focus back to Bell's opinions.[35] *Id.* Defendants' say-so arguments do not carry their burden. But even assuming Hamilton is correct,[36] the mere fact that his modified model explains Class Area property values a little bit "better" does not mean Bell's model is *unreliable*, and neither he nor Defendants ever explain otherwise: they just assume it, so that Hamilton's opinion does not fit the analysis. *See also Reed Const. Data Inc. v. McGraw-Hill Companies, Inc.*, 49 F. Supp. 3d 385 (S.D.N.Y. 2014) (a regression need only account for the "major variables" affecting the expert's analysis) (citing *Bazemore v. Friday*, 478 U.S. 385, 400 (1986)).

Nor can Defendants credibly employ Bell's testimony to bolster Hamilton's opinion. Defendants are wrong when they say that Bell's unimpaired regression does not include "many factors that Dr. Bell testified should be considered in a diminution in value analysis." Dkt. 370 at 18. Rather, when asked hypothetical questions, Bell merely agreed that as a general matter, other property characteristics could affect property values: he never said that those characteristics drive value here or that not including them rendered his analysis unreliable. *See also* Dkt. 377 at

[35] Bell's variables do not create a multi-collinearity problem so, even if it were true, Defendants' claim that Bell failed to consider "overlap" is irrelevant.
[36] Contrary to Defendants' representation, Plaintiffs did not "concede" (and do not agree) that Hamilton "correctly analyzed the omitted variables" or that adding them "improved the precision" of Bell's model. *Compare* Dkt. 370 at 19 to Dkt. 351 at 12–13.

50–51 (debunking this same claim). Defendants' assertion also again misstates the issues: Bell used the regression to predict *unimpaired property values*, not diminution-in-value.

**B. Phillips is Unqualified and His Opinions are Unreliable and Do Not "Fit" This Case**

**1. Phillips' paired sales analysis is unreliable and his opinion that 41 supposedly "in-class" properties did not lose value because of Saint-Gobain's PFOA contamination should be excluded**

Bell used five different appraisal techniques to determine whether the Class Area properties have sustained a diminution-in-value because of Saint-Gobain's PFOA contamination and then reconciled all of them. Ex. 2, Bell 2020 Rpt. at 158-200. To evaluate the same issue, Phillips purports to have employed just one of these techniques—a paired sales analysis. Ex.22, Phillips 2021 Rpt. at 17-18, 23-24; *see also id.* at 46; Ex. 124, Real Estate Damages (2016) at 33. A paired sales analysis compares properties with the detrimental condition the appraiser is investigating (here, the impact of contamination) to comparable properties without that condition. *Id.*; *see, e.g.,* Defs' Ex. 26, ARE at 186; Ex. 29, Jackson (2003) at 315. If people are willing to pay the same for the property with the detrimental environmental condition as they are a property without it, then the analysis concludes that the detrimental condition likely has not affected property values. *See* Ex. 124, Real Estate Damages (2016) at 33.

Phillips purports to have compared 41 in-class, contaminated properties (test properties) to what he represents are out-of-class, uncontaminated properties (control properties). Ex. 22, Phillips 2021 Rpt. at 17–18, 23–24. He ultimately concludes that the "in-class" properties sold for prices within the range of the comparable "out-of-class" properties. *Id.* at 44. But Phillips could not reliably reach this conclusion based on the analysis he performed. He mixed up in-class and out-of-class properties, failed to evaluate the environmental conditions of the comparable properties, including whether they are impacted by PFOA contamination (the very

condition for which he was conducting the analysis), and ignored industry standards when deciding whether buyers were well-informed about the contamination at the time of purchase.[37] As a result, Phillips' paired sales analysis does not actually evaluate the effect of Saint-Gobain's contamination on value. His analysis is unreliable and inadmissible.

***In-Class vs. Out-of-Class Properties.*** Phillips did not actually compare in-class to out-of-class properties. The map below, Ex. 23, shows the properties Phillips used: the blue properties are his "control" ("out-of-class," "uncontaminated") properties, the red properties are his "test" ("in-class", "contaminated") properties, and the pink shaded area is the Class Geographic Area. Some of the test properties are located outside of the Class Area; as a result, Phillips ended up comparing out-of-class properties to out-of-class properties, rendering any conclusion meaningless. Defendants never address this point.

[37] Phillips did not adjust his analysis for time. Dkt. 351 at 20–21. Defendants assert without any support that further adjustment was not necessary and would not have changed Phillips' results. Dkt. 370 at 27. This say-so representation by counsel does not rebut Plaintiffs' argument. Nor did Plaintiffs say that a paired sales analysis using sales price rather than price per square foot is "legitimate": that portion of their brief was merely quoting Phillips. Dkt. 351 at 23.




***Environmental Conditions, Including PFOA Contamination.*** Although Phillips admitted that what he was "concerned about in [his] analysis [was] the presence of PFAS on a particular property," Ex. 24, Phillips 2021 Tr. at 309:5–11, he did not evaluate the presence of PFOA on the properties he compared, did not know or investigate whether any of them were affected by Saint-Gobain's PFOA contamination, and does not know if any properties used in his analysis has or is impacted by household water contaminated with PFOA. *Id.* at 57:12–25, 58:20–59:14, 63:11–25, 88:3–8; 94:7–95:4. But industry standards, including USPAP AO-9, ARE, and Guide Note 6, all of which he concedes are authoritative, required him to know these facts. *See* Ex. 3, AO-9 (identifying property characteristics an appraiser must consider when evaluating whether a property's value is affected by environmental contamination); Defs' Ex. 26, ARE at 184–189 (describing how an appraiser should evaluate environmental conditions and discussing AO-9); Ex. 114, Guide Note 6 (identifying different ways appraisers can obtain information about properties' environmental conditions; appraisers must evaluate the uncertainties concerning the contamination, its remediation, and other factors); Ex. 29, Jackson

(2003) (paired sales analysis "involves the study of a group of sales with a detrimental condition, which are then compared with a group of otherwise similar market data without the detrimental condition.") (citing Real Estate Damages (1999)). *See also Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 81 (1st Cir. 1998) (expert's testimony must rest on "good grounds, *based on what is known*") (emphasis added). As a result, Phillips violated USPAP and does not know if he actually compared properties impacted by the contamination to those that are in fact not.[38] Some of the properties Phillips included in the "control" group are actually within contaminated areas, as publicly-available State testing data and Saint-Gobain's new agreement with the State reveal.[39]

***Adequate Buyer Knowledge.*** For the comparison to be meaningful, Phillips also had to ensure that buyers purchasing the test "contaminated" properties were well-informed (knowledgable) about the contamination and its risks and uncertainties such that the transaction price represented the property's impaired (contaminated) value. *See, e.g.,* Ex. 114, Guide Note 6 at 8; Ex. 31, Tachovsky (2021) at 110–111, 116. He could not do that because he admits he did not know whether they were contaminated at all. *See supra.* Even so, in deciding that the "in-

[38] Barr's modeling of Saint-Gobain's PFOA emissions confirms that there are no areas of zero deposition. Contrary to Defendants' argument, Dkt. 370 at 25 n.13, the fact of PFOA deposition throughout the class area is not an artifact of the Barr's AERMOD model, but of the data inputs to the model. Ex. 112, Barr 2018 Rpt. at Appendix A. Barr input PFOA emissions mass and rates supplied to it by Saint-Gobain, and wind speed, direction and frequency based on collected meteorological data. *Id*. The EPA-sanctioned model only shows deposition if the mass and rate of PFOA emission combined with the wind speed direction and frequency carries it to a location.

[39] *See, e.g.,* https://www.arcgis.com/apps/View/index.html?appid=66770bef141c43a98a445c54a17720e2&extent=-73.5743,42.5413,-69.6852,45.4489 ("ARCGIS Website," last accessed April 24, 2022); https://newhampshirebulletin.com/briefs/state-reaches-agreement-with-saint-gobain-on-providing-water-to-1000-impacted-properties/ (last accessed April 24, 2022); Settlement Term Sheet, https://www.des.nh.gov/sites/g/files/ehbemt341/files/documents/202204-sgpp-settlement-term-sheet.pdf (last accessed April 24, 2022).

class" property transactions represented impaired values, Phillips applied a definition of market knowledge that is contrary to USPAP and the literature. He decided that a buyer is well-informed as long as the seller simply discloses what they happen to know, without regard to whether that discloses the existence of contamination. Ex. 22, Phillips 2021 Tr. at 233:13–235:20. And he then assumed that the sellers in the "in-class" transactions he evaluated did that.[40]

But market value is about buyer knowledge, not seller knowledge. Market value requires knowledgeable parties who are not in distress. Ex. 2, Bell 2020 Rpt. at 220 (citing ARE); *see also* Dkt. 377 at 19-20 (citing literature); Ex. 129, Shlaes (1984) at 510, 516 ("The compelled transaction, like the transaction made by an incompetent or ill-informed buyer or seller, tells us little about market value, as the courts have repeatedly recognized."; "To be useful as market evidence the price must reflect an exchange between two reasonably capable and informed beings."). USPAP AO-9 explains that "impaired value" is the "***market value*** of the property being appraised with ***full consideration of the effects of its environmental condition and the presence of environmental contamination on, adjacent to, or proximate to the property.***" Ex. 3, AO-9 at 77 (emphasis added). It requires evaluation and knowledge of the specific property's environmental risk, including uncertainties around the nature and extent of contamination and

[40] Defendants' claim that Phillips "verified the principal terms and driving factors of the transactions he analyzed 'through discussions with parties to each sale,'" Dkt. 370 at 24, is not borne out by the record. Phillips vaguely represents that he "verified, to the best of [his] ability, the accuracy of the information regarding these sales, including the price, financing terms, and physical attributes through discussions with parties to each sale." Ex. 22, Phillips 2021 Rpt. at 51. He does not disclose the methodology, if any, he used to do that, what "information" he verified, what (if anything) he or his staff asked parties to the transactions about PFOA contamination, bottled water provision, or connections to municipal water, or presence of PFOA in that water or how short discussions between his staff and a seller or a seller's agent years after a transaction would yield reliable data about *buyer knowledge.*

the potential for changes in regulatory requirements. *Id.* Without this information, a buyer cannot be well-informed, and the transaction does not "fully consider" the contamination and its risks and uncertainties, and thus the transaction is not an impaired value. Phillips's ad hoc notion of market knowledge disregards ARE and USPAP AO-9. And his further assumption that the existence of old local media reports about the contamination means the market is knowledgeable is also contrary to the literature, which warns against that assumption. *See, e.g.*, Ex. 130, Pope (2008) at 570 ("simply placing environmental information into the public domain does not guarantee that the information will be noticed or used by economic agents"); Ex. 131, Robinson (2007) at 135 (media coverage of property condition does "not necessarily" create an informed market, and "never by itself"; "the appraiser should be careful not to assume that the mere existence of media attention indicates widespread public knowledge"); Ex. 31, Tachovsky (2021) at 111–12 ("local media coverage…does not necessarily create an informed market," and explaining why). These errors and methodological failures mean that Phillips did not and could not reliably characterize the "in-class" sales as impaired values and therefore his comparison does not tell us anything about the effect of Saint-Gobain's contamination on property values.

**2. Phillips' and Defendants' arguments to do not rehabilitate Phillips' unreliability**

Phillips defends his "paired sales analysis" methodology by claiming that no appraiser can know what contamination exists on a property. Ex. 24, Phillips 2021 Tr. at 57:19–58:10, 144:10–145:20. This is a dodge that disregards the literature and demonstrates his incompetence. Appraisers are not expected to be environmental specialists, but they are expected to rely on them. *See* Ex. 114, Guide Note 6 at 2–4; Defs' Ex. 26, ARE at 184–89; Ex. 3, AO-9 at 81; *see also* Defs' Ex. 1, Real Estate Damages (2016) at 323–24. Such reliance or related factual assumptions (*e.g.,* that a property is contaminated) must be disclosed in the

appraisal report as a hypothetical condition—a condition contrary to what is known by the appraiser—or an extraordinary assumption—an assumption about uncertain information that, if false, could alter the appraiser's conclusions. Ex. 127, USPAP Excerpts at Standards 1, 2; Ex. 114, Guide Note 6 ("In appraisal assignments in which the appraised value is to take into account the effects on value of hazardous substances, most appraisers require the professional assistance of others."; "Extraordinary/Special Assumptions are used when relying on the work of others"); Ex. 3, AO-9. Phillips did not disclose any hypothetical conditions or extraordinary assumptions and Defendants say he did not to use any. Dkt. 370 at 9 n.3. If that is true, it merely confirms that Phillips did not consider these analytical gaps. If it is false, Phillips violated USPAP standards, which require disclosure of assumptions, making it impossible to figure out what he did and did not assume in his analysis.[41] Either way, the analysis is unreliable.

Defendants defend Phillips' "paired sales analysis" by reiterating their erroneous argument that "the presence of PFOA was not needed for the analysis since it is not an element of the class definition." Dkt. 370 at 25. That is wrong because the class definition defines a geographic area impacted by Saint-Gobain's PFOA, and the buyer knowledge about the risks of the presence of PFOA is at issue in the real estate analysis. *See supra,* Section III.A.2.ii. It is also contrary to Phillips' own testimony, where he explained that what he was "concerned about in [his] analysis [was] the presence of PFAS on a particular property," Ex. 24, Phillips 2021 Tr.

---

[41] It is unlikely Phillips did not use any extraordinary assumptions and/or hypothetical conditions. For example, he quotes defense expert Connor's opinions about Saint-Gobain's contamination, Ex. 22, Phillips 2021 Rpt. at 36–38, but does not disclose those opinions as an extraordinary assumption or explain what role they played in his analysis or conclusion. And although Bell's extraordinary assumptions include that the public records, MLS listings, and State PFOA water testing results he reviewed are accurate, Ex. 2, Bell 2020 Rpt. at 35–36, Phillips made no such similar disclosure, though he must have assumed the same. *See, e.g.*, Ex. 24, Phillips 2021 Tr. at 249:10–24. USPAP Standards 1 and 2 prevent this type of uncertainty.

at 309:5–11. And it misstates the issue, which is not about "the presence of PFOA" but about the impact of the PFOA contamination on property values and Phillips' admitted failure to consider it.

Defendants further claim that "PFOA issues" that "did not occur until *after* the effective period of the [paired sales] analysis cannot affect the analysis." Dkt. 370 at 26. Though unclear, presumably their point is that if a "control" property does not have a "positive" PFOA water "test result" until after Phillips did his analysis, the fact that it is impacted by contamination does not matter.[42] But this is merely an attempt to backfill Phillips' report. Phillips testified that he did not know if any of the comparable properties he analyzed had PFOA in their household water, did not look to see if there *was* any testing data for the "control" properties, and thus did not try to find out what those results might have been. Ex. 24, Phillips 2021 Tr. at 63:17–64:20. Phillips treated the existence of a positive PFOA water test result as immaterial to his analysis. And that is Plaintiffs' point. Industry standards required Phillips to consider the properties' environmental conditions, and that includes considering contamination, test results, whether regulatory standards are changing, and the nature of the site's remediation status. Ex. 3, AO-9 at 81; *see also* Defs' Ex. 1, Real Estate Damages (2016) at 323–24. Properties with PFOA contamination below the regulatory level or which are located near to a contaminated site can still sustain a diminution-in-value because of the contamination. *See, e.g.,* Def. Ex. 26, ARE at 184-189. Here, regulatory standards are lowering and mitigation is still in the investigatory stage: the geographic area impacted by Saint-Gobain's contamination continues to expand outward, as evidenced by Saint-Gobain's most recent Consent Agreement. *See, e.g.,* N.H. Code.

[42] Of course, a property (including its use and value) is impacted by contamination by more than just a "positive test result," which itself is an ambiguous term Defendants fail to define.

Admin. R. Env.-Dw 705.06 (New Hampshire now has a 0 ppt MCLG); *see supra,* note 38. Phillips concedes he did not consider the available contamination facts at the time he did his analysis. The result is a paired sales analysis that never controlled for the very condition it was evaluating. Defendants' reference to 7 Sara Beth Lane, Londonderry, Dkt. 370 at 26, Def. Ex. 22, proves this point: that property is part of the 2019 consent agreement area and had 14.8 ppt of PFOA in its household water prior to the sale Philips analyzed. *See* ARCGIS Website. Yet Phillips testified that he didn't know if Londonderry had any "issues with regard to PFOA contamination," did not ask whether any of the comparables had been tested for PFOA in the water, and did not believe any of the comparable properties were in the consent agreement area. Ex. 22, Phillips 2021 Tr. at 63:11–65:18, 88:3–8. *He just doesn't know,* and therefore he could not reliably evaluate market value, including whether the buyers were informed whether the properties he selected were comparable, or whether their sales prices represented unimpaired or impaired values.

**3. Phillips' diminution-in-value opinion must be limited to the 41 properties he evaluated**

Even assuming that Phillips' purported paired sales analysis of 41 properties is reliable, Defendants should be precluded from using that analysis to argue that the entire Class Area did not suffer a diminution-in-value because of Saint-Gobain's contamination. Defendants claim such extrapolation is appropriate because "the purpose of [Phillips'] analysis is to assess evidence of diminution in value in the area as a whole." Dkt. 370 at 22 n.10. This is probably news to Phillips. He said that the Class Area is too heterogenous for a reliable class-wide appraisal, Ex. 24, Phillips 2021 Tr. at 17:5–11, 121:10–17, and that he was *not* opining that the Class Area lost value due to PFOA contamination—only that *none of the properties he analyzed* "show any evidence" of diminution-in-value. Ex. 24, Phillips Tr. at 13:20–14:9. When pressed

as to whether he had any diminution-in-value opinions about *any other Class property* he said: "I can't draw that conclusion now because I haven't done the investigation." *Id.* at 16:21–17:13. He refused to say what Defendants wish he did. Phillips presents no generally accepted methodology to extrapolate conclusions of 41 sales for which he did not know there environmental circumstances to the entire class area. Doing so without a methodology is unreliable.

Defendants' argument is an abrupt about-face that either concedes class-wide diminution-in-value is reliably calculable, or simply reveals Defendants' belief that different industry standards and rules apply to Defendants' experts than to Plaintiffs'. Either way, Phillips' opinion is unreliable and contrary to Phillips' own testimony: it is tantamount to permitting unqualified defense counsel to offer an expert appraisal opinion.

#### 4. Phillips' opinions about regression are unreliable[43]

Bell uses multiple regression analysis to predict Class Area unimpaired values and loss-of-use damages. Phillips critiques Bell's multiple regression models, including the variables and property characteristics he selected and the sources of his data, and opines that regression cannot reliably predict individual property values. Ex. 22, Phillips 2021 Rpt. at 75–91. Phillips is not qualified to offer any of these opinions and they should be excluded because they are unreliable.

***Phillips' opinions about regressions and individual property values.*** Phillips has never run a regression model or determined which variables go into it; has never applied a regression model; has never presented a regression analysis; has not applied USPAP Standards 5 and 6 (which pertain to mass appraisals, including multiple regression); has not published a professional article on the use of statistical methods in real estate; and does not hold himself out

[43] Defendants suggest that because Plaintiffs did not explicitly challenge certain of Phillips' opinions, they agree with them, Dkt. 370 at 20, but that is wrong.

as an expert in statistical models. Ex. 24, Phillips 2021 Tr. at 268:4–8; Ex. 20, Phillips 2019 Tr. at 14:24–15:4; 49:22–25; 50:1–3; 53:2–11; 68:9–18; 68:23–25; 96:10–15; 118:15–25. Defendants do not dispute these facts. Dkt. 370 at 7. They represent that Phillips is *not* offering opinions about "the procedures followed and application of the proper development of regression models," because that is "Dr. Hamilton's domain." Ex. 24, Phillips 2021 Tr. at 178:6–179:4; Dkt. 370 at 7. They then proceed to argue the contrary, claiming that Phillips can reliably opine about the use of regressions to predict individual values because he has the training and experience to do so. Dkt. 370 at 9. He cannot because he is unqualified to do so. Regression is a specialized technique. Phillips has to understand and be an expert in regression to offer a reliable opinion about how regression can and cannot be reliably used. Defendants admit Phillips does not meet those criteria. They fail to carry their burden of proof.

Phillips' lack of qualifications is evidenced by the unreliable opinion he offers: that "regression does not produce a reliable model for developing accurate and reliable opinions of market value for individual properties." Ex. 22, Phillips 2021 Rpt. at 76, 85. As explained *supra*, Section III.A.4., and in Dkt. 377 at 10–12, 43–51, this is contrary to the literature and case law and misunderstands Plaintiffs' burden of proof. Further, Phillips' opinion is so vague as to be meaningless: he does not define or explain "accurate" or "reliable," though these are terms intertwined with legal concepts and burdens of proof Defendants repeatedly misstate. *See* Dkt. 377 at 43–51. And though Defendants claim that Phillips "tested" his opinion by comparing Bell's predicted values to sales prices, Ex. 22, Phillips 2021 Rpt. at 82; Dkt. 370 at 21, Phillips' methodology is not adequately explained, his analysis is significantly flawed, and his opinion is unreliable. *See* Dkt. 377 at 17–18. Neither Phillips nor Defendants provide a reliable methodology for how differences between a sales price and a predicted price for *only 25*

*properties* out of more than 7500 yields a statistically significant result or renders Bell's analysis unreliable.[44] Phillips' opinion should be excluded.

***Phillips' opinions about Bell's regressions***. Plaintiffs' motion explained that because Phillips is not qualified in regression and statistical techniques, he is not qualified to opine about Bell's regression analyses. Dkt. 351 at 24–26. Defendants claim that Phillips is *not* opining about the procedures, development, and application of regression models. They do not otherwise address Plaintiffs' argument, conceding the point. Phillips' opinions about Bell's regressions must be excluded.

**5. Phillips' opinions about Bell's case study methodology, Bell's use of FRED, typicality, and whether PFOA has had a "physical impact" on Class Area properties are unreliable and must be excluded**

***Case Studies.*** Though Phillips has never done a case study, Ex. 24, Phillips 2021 Tr. at 283:10–15, and is not qualified to opine about the technique, he nonetheless claims that Bell's case study methodology is unreliable. *See* Ex. 22, Phillips 2021 Rpt. at 91–100. This opinion is contrary to the literature, which explains that the case studies should be *comparable,* not *identical,* and that it is unreliable to use regression to determine impaired values when, as here, the market is uninformed. Ex. 29, Jackson (2003) at 316; Def. Ex. 2, Bell & Jackson (2002) at 86, 89–95 (using "similar" and "comparable"; similarity across all characteristics does not always occur; the "best and most comparable case studies would be similar to the subject property in terms of the SNAP issues, being an accidental versus a permitted discharge, and remediation lifecycle stage"); Ex. 131, Robinson (2007) at 137–38 (it is unreliable to use regression for impaired values when the market is uninformed); *see also* Dkt. 377 at 37–39 (addressing this argument and citing literature). Consistent with that literature, the case studies

[44] "Market value" speaks in terms of "probability," not certainty. *See* Ex. 2, Bell 2020 Rpt. at 4 (citing ARE).

Bell used are appropriately comparable to this case—particularly with respect to their environmental condition, the most important issue. *See id; see also* Ex. 2, Bell 2020 Rpt. at 179–87. No authority that Phillips or Defendants site requires identicality of chemicals in case studies analysis; Bell's studies analyze impacts to household water, the issue here. And, because the case studies examined risk effects on a percentage basis, Bell's findings can be reliably applied across different geographies/markets and time without further adjustments. *See, e.g.*, *id.* Phillips' opinions that the case study methodology, which he has never used, is not appropriate here and that the studies Bell selected are not properly comparable are unreliable and should be excluded.

***FRED.*** Philips testified that Bell's reliance on the FRED index is not acceptable for analyzing market adjustments over time but did not identify any professional or academic literature to support his position. Ex. 24, Phillips 2021 Tr. at 255:23–258:22 (not reliable to use FRED data and apply it to a single submarket as if it "sheds light on rates of appreciation in that submarket."); Ex. 22, Phillips 2021 Rpt. at 96; Dkt. 351 at 24. Defendants' opposition does not rebut this point or identify any professional literature that supports Phillips' opinion. Dkt. 370 at 29 n.16. Defendants' failure to explain how Phillips' say-so opinion is reliable warrants its exclusion. *See, e.g.*, *Milward*, 820 F.3d at 473 (the party seeking to introduce the evidence has the burden of establishing both its reliability and its relevance).

***Typicality.*** Phillips opines that the class representatives' properties are not "typical" or "representative" of the properties in the class area. Ex. 22, Phillips 2021 Rpt. at 38–43. This is a legal conclusion which Phillips is not qualified to opine about and should be excluded. Dkt. 351 at 32. *See* FED. R. CIV. P. 23 (identifying class representatives' "typicality" as a criterion for class certification). Defendants offer no response and thus concede the point.

***Physical Impact.*** Phillips opines that "plaintiffs have not demonstrated a physical impact of PFAS from the facility on each class members' property." Ex. 22, Phillips 2021 Rpt. at 37–39. This is a legal and scientific opinion outside of Phillips' training and expertise, Dkt. 351 at 31–32, especially because he admits he does not know whether and what properties in the Class Area are contaminated. *See supra.* Defendants try to rewrite the opinion, claiming Phillips "simply notes his 'understanding' based on the reports of other Saint-Gobain experts." Dkt. 370 at 9 n.4. But Phillips' report represents that he reviewed the Barr engineering report, too, and he then opines that neither MVD nor private well properties have "demonstrated" a "physical impact of PFAS from the Facility." Ex. 22, Phillips 2021 Rpt. at 36–38. Defendants do not explain how Phillips is qualified to offer this opinion because he is not. It should be excluded.

## IV. DEFENSE EXPERT CHARLES MULLINS' OPINIONS ARE INADMISSIBLE

Defense expert Mullin's opinions suffer from several critical flaws. He offers opinions related to real estate values that are outside his claimed area of expertise. He purports to reach conclusions about the cost of private well ownership that lack a reliable basis (a point Defendants do not contest), and through pure expert say-so he claims there is a strong "revealed preference" for municipal water. This Court should rule each opinion is inadmissible under *Daubert*.

### A. Mullin Is Not Qualified to Testify About Real Estate Values

Mullin opines that real estate values of contaminated properties rebound post-remediation (Dkt. 351 at 62–63; Ex. 108, Mullin 2021 Rpt. at 24 ¶ 58). He not only lacks the expertise to render this opinion (Ex. 106, Mullin 2021 Tr. 234:23–236:3) it also lacks a reliable basis, which Defendants do not contest and now argue he never offered the opinion in the first place. Dkt. 370 at 52. Defendants assert that Mullin only opined that economic harm should be capitalized into home values. Dkt. 370 at 52. Whether that is his only opinion or not, Mullin—*by his own*

*admission*—is not an expert in real estate appraisal and is therefore not qualified to opine on how real estate is valued. Ex. 106, Mullin 2021 Tr. 234:23–236:3. It is a different discipline subject to different practices and standards, which is why Defendants retained two other individuals to opine on real estate valuation. This Court should therefore exclude his testimony on real estate values, including whether the added costs Mr. Carr identified are capitalized into a home's value.

**B. Mullin's Calculations Purporting to "Illustrate" the Cost of Private Well Ownership Lack a Reliable Basis and are Inadmissible**

Defendants do not contest that Mullin failed to cite reliable sources to prove costs of private well ownership. Dkt. 370 at 53. Rather than address this failure, including that Mullin's strayed from his customary methodology (Dkt. 351 at 65), Defendants assert Mullin's calculations were for "illustrative purposes only." *Id.* (citing Ex. 108, Mullin 2021 Rpt. at 21). Whatever name they stamp on it, Mullin uses these calculations to reach a substantive opinion, *i.e.*, that private well costs will "often" exceed that of municipal water. *Id.* Since his conclusion is based in part on unreliable data, that Defendants *do not claim is reliable,* Mullin's opinion is also unreliable and should be excluded.

**C. Mullin's "Strong Revealed Preference" Opinion Is Unreliable**

Mullin's "strong revealed presence" opinion is unreliable for the same reasons the opinions were inadmissible in *Cooper v. Meritor, Inc.*, 2019 WL 545187 (N.D. Miss. Feb. 11, 2019), the differential analysis case Defendants (incorrectly) rely on to support their alternative source argument. *See above* § I(A). Defendants argue Mullin's report "cites data" published by the U.S. Geological Survey and is therefore admissible. Dkt. 370 at 53. Plaintiffs never contested the fact that Mullin relied on this data; the data does not support Mullin's claim that growth in municipal water use is caused by consumer preference for municipal water. He reached this conclusion without running any models, ruling out the cause identified by the USGS

(population grown in urban centers), and other confounding factors he acknowledges but does not analyze. Ex. 106, Mullin 2021 Tr. at 246:16–247:15. More significantly, and unlike Plaintiffs' fate and transport experts, Mullin fails to "rule in" his hypothetical cause. *Milward*, 820 F.3d at 476. Defendants retort that "other things [Mullin has] looked at through time that align" with his theory while Mullin shields Plaintiffs from the material claiming it is subject to a protective order. Dkt. 370 at 53. Opinions based on expert say-so and "other things" hidden from Plaintiffs and the Court are plainly unreliable and warrant exclusion.

### D. Mullin's Commonality Opinions are Irrelevant under First Circuit and New Hampshire Law

Defendants gloss over binding legal precedent under which mathematical precision is not required to prove damages. *See* Dkt. 351 at 65; *see also* Dkt. 375 at 1–2. Mullin's demand that Plaintiffs obtain, among other things, the equivalent of each class members' credit score to calculate damages is unsupported and beyond what the law requires. *See* Dkt. 351 at 64. Mullin's commonality-aimed opinions also conflict with black letter law in this circuit holding aggregate damages calculations are permissible and routine in class actions. Dkt. 375 at 3–5. Thus, Mullin's opinions do not fit the case and must be excluded. *See* Dkt. 375 at 5–8.

Mullin's opinions are also not relevant to class certification because Mullin fails to offer any individualized evidence for presentation at trial. Thus, he only presents a common argument against Carr's common evidence. None of his commonality opinions weigh against class certification given binding precedent on damages, aggregate damages in class actions, and the lack of any individualized opinions for trial.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' Motion to Exclude Defendants' Non-Medical Monitoring Expert Opinions.

Respectfully submitted,

Dated: May 2, 2022

*/s/Kevin S. Hannon*

Kevin S. Hannon, Esq. (NH Bar #269896)
THE HANNON LAW FIRM, LLC
1641 North Downing Street
Denver, CO 80218
(303) 861-8800
khannon@hannonlaw.com

Paul M. DeCarolis, Esq. (NH Bar #596)
GOTTESMAN AND HOLLIS, PA
39 East Pearl Street
Nashua, NH 03060
(603) 889-5959
pdecarolis@nh-lawyers.com

John A. Yanchunis (Pro Hac Vice)
MORGAN & MORGAN COMPLEX
LITIGATION GROUP
201 N. Franklin Street, 7th Floor
Tampa, FL 33602
(813) 223-5505
jyanchunis@forthepeople.com

Kenneth J. Rumelt (Pro Hac Vice)
MORGAN & MORGAN COMPLEX
LITIGATION GROUP
1641 North Downing Street
Denver, CO 80218
(303) 264-1766
krumelt@forthepeople.com

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of Plaintiffs' Reply Memorandum In Support of Plaintiffs' Motion to Exclude Defendants' Non-Medical Monitoring Expert was filed through the ECF System and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/Kevin S. Hannon*
Kevin S. Hannon